VIRGIL HARRIS,
　　　Plaintiff,

v.

LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON,
　　　Defendant.

CIVIL ACTION NO.:
1:19-cv-4257-CC

## DEFENDANT'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Rule 56.1(B)(1), Defendant Lincoln Life Assurance

Company of Boston ("Lincoln")[1] submits this Statement of Undisputed Material

Facts in support of its Motion for Judgment on the Record.

**Introductory Statement**

As more fully explained in Lincoln's supporting memorandum, filed

herewith, this is an action for disability benefits under the Employee Retirement

Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001 *et seq*., and the Court

---

[1] The original Defendant was incorrectly named in the Complaint. By joint motion and this Court's order (*see* ECF Doc. #31), the correct defendant-in-interest has been joined and the incorrectly-named party dismissed.

will review Lincoln's determination below under ERISA's *de novo* standard and on the basis of the Administrative Record that was before Lincoln at the time of its final determination. *See*, *e.g.*, <u>Metropolitan Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 111 (2008); <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 109 (1989); <u>Blankenship v. Metropolitan Life Ins. Co.</u>, 644 F.3d 1350, 1355 (11th Cir. 2011); <u>Glazer v. Reliance Life Ins. Co.</u>, 524 F.3d 1241, 1246 (11th Cir. 2008). Thus, summary judgement is merely the procedural "vehicle for resolving conclusively— in the light of the record before the plan administrator—the question of the reasonableness of the administrative determinations in this case." <u>Blankenship</u>, 644 F.3d at 1354, n.4 (citing <u>Leahy v. Raytheon Co.</u>, 315 F.3d 11, 16–18 (1st Cir. 2002)). Said another way, the district court "sits more as an appellate tribunal than as a trial court" in that it "does not take evidence, but rather, evaluates the reasonableness of an administrative determination." <u>Leahy</u>, 315 F.3d at 18; *see also*, *e.g.*, <u>Curran v. Kemper Nat. Servs., Inc.</u>, 2005 WL 894840 (11th Cir. Mar. 16. 2005)(quoting <u>Leahy</u>).

Accordingly, the undisputed facts necessary to warrant summary judgment are limited to those that establish this Court's jurisdiction, bring the case within coverage of ERISA, and show the contents of the Administrative Record. As set

forth below, none of those facts are genuinely disputed, and this case is ripe for summary disposition.

By contrast, any disputes over the reasonableness or correctness of Lincoln's determination—including any disagreements as to the proper characterization, interpretation, or weight to be given to the various materials contained in the Administrative Record—are legal arguments to be resolved by the Court and not "factual disputes" in the ordinary summary judgment sense. *See*, *e.g*., Bauman *ex rel*. Summer v. Publix Super Markets, Inc. Employee Stock Ownership Plan, 2017 WL 5236148 at *5 (N.D. Ga. March 17, 2017)(explaining that there "may indeed be unresolved factual issues evidence in the administrative record, but unless the administrator's decision was wrong, or arbitrary and capricious, these issues will not preclude summary judgment as they normally would.")(quoting Pinto v. Aetna Life Ins. Co., 2011 WL 536443 at *8 (M.D. Fla. Feb. 15, 2011)); Graham v. Life Ins. Co. of N. America, 222 F. Supp. 3d 1129, 1136 (N.D. Ga. 2016)(same); Bates v. Metropolitan Life Ins. Co., 2009 WL 2355834 at *1 (M.D. Ga. July 27, 2009)("Thus, the role of the district court in ERISA matters is not to determine whether issues of fact exist for trial but to review the administrative record before it under the ERISA framework and make adjudications on both fact and law as would occur in a bench trial while handling the [matter] in an expedited fashion

resembling summary judgement.")(internal quotation omitted); <u>Wimmer v. Hewlett-Packard Co.</u>, 2009 WL 1066844 at *2 (N.D. Ga. July 14, 2009)(stating that "the typical summary judgment standard does not apply").

<strong>Undisputed Material Facts</strong>

1.    Plaintiff Virgil Harris ("Plaintiff") was a participant in an employee welfare benefit plan (the "Plan") sponsored and maintained by his former employer, Robert Half International, Inc.. <u>Decl. Tom</u> at ¶ 2.[2]

2.    Long-term disability ("LTD") benefits under the Plan were at all relevant times funded by a Group Disability Income Policy, Policy Number GF3-860-066675-01, which was issued by Lincoln's predecessor in interest (the "Group Policy"). <u>Decl. Tom</u> at ¶ 3.

3.    Lincoln at all relevant times served as the claim administrator for the Group Policy and for LTD benefits under the Plan. <u>Decl. Tom</u> at ¶ 4.

4.    Plaintiff applied for LTD benefits under the Group Policy alleging that he became disabled after leaving work on or about October 14, 2015. <u>Decl. Tom</u> at ¶ 5.

---

[2] The Declaration of Richard Tom is filed herewith.

5. On May 26, 2017, Lincoln approved LTD benefits under the Group Policy. Decl. Tom at ¶ 6.

6. Lincoln paid LTD benefits under the Group Policy from April 13, 2017, to April 23, 2019. Decl. Tom at ¶ 7.

7. On or about April 30, 2019, Lincoln notified Plaintiff of its determination that he failed to meet his continuing burden to prove eligibility for LTD benefits under the Group Policy. Decl. Tom at ¶ 8.

8. As allowed by the Group Policy, Plaintiff requested an administrative appeal of Lincoln's determination by letter dated May 15, 2019. Decl. Tom at ¶ 9.

9. In response to Plaintiff's appeal, Lincoln provided a full and fair review. Decl. Tom at ¶ 10. Upon completing its review, Lincoln upheld its prior determination. *Id*. Lincoln notified Plaintiff of its uphold determination by letter dated August 23, 2019. *Id*.

10. Thereafter, Plaintiff filed this lawsuit. Decl. Tom at ¶ 11.

11. Pursuant to ERISA, 29 U.S.C. § 1001, *et seq*., and applicable regulations, Lincoln compiled an Administrative Record with respect to Plaintiff's LTD claim and Lincoln's administration of that claim. Decl. Tom at ¶ 12.

12. A true and accurate copy of the Administrative Record compiled by Lincoln in this matter is attached hereto as Exhibit A, which consists of 1577 pages

of the Administrative Record (numbered LIB0001 through LIN1577).  <u>Decl. Tom</u> at ¶ 13.

**Evidence in the Administrative Record**

Although not required by Local Rule 56.1, for the convenience of the Court, Lincoln also provides the following summary of evidence contained in the Administrative Record, citing to the Administrative Record where appropriate.  As noted above, to the extent Plaintiff disputes any of the following statements, such disputes constitute merely legal argument over how the Court should construe and evaluate the Administrative Record in this case.  Such disputes cannot preclude summary disposition of this ERISA review proceeding or raise a factual question of the kind that the Court usually must resolve at trial.  *See*, *e.g*., <u>Bauman</u>, 2017 WL 5236148 at *5; <u>Graham</u>, 222 F. Supp. 3d at 1136; <u>Bates</u>, 2009 WL 2355834 at *1; <u>Wimmer</u>, 2009 WL 1066844 at *2.

1.      Under the Group Policy, no LTD benefits are payable unless a claimant first proves a continuous disability throughout a 180-day Elimination Period.  *See* LIB1461; LIB1465; LIB1466.  Even if a claimant initially proves such a disability, LTD benefits continue only so long as the claimant continues to prove that his absence from work remains due to the same disability.  *See*, *e.g*., LIB1490.

2.      During the Elimination Period and the next 24 months, the Group Policy defines "Disability" to mean that "the [claimant], as a result of Injury or Sickness, is unable to perform the Material Acts necessary to pursue his Own Occupation in the usual and customary way." LIB1465. After the first 24 months, the Group Policy's definition of "Disability" changes to mean that the claimant must prove that he "is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation" in order to maintain benefits. LIB1465.

3.      At all times, however, the claimant must give proof of continuing disability at his own expense. LIB1481. For purposes of the Group Policy, "Proof" means "written proof covering the occurrence, the character and the extent of the loss for which the claim is made." LIB1471. The Group Policy explicitly provides that LTD benefits will cease "the date the [claimant] is no longer Disabled according to this policy." LIB1490.

4.      Thus, absent proof of continuous disability, a claimant's coverage simply comes to an end once he is no longer actively working a regular schedule of at least 30 hours a week. *See* LIB1459 (eligibility requirements); LIB1463 (defining "Active Employment").

5.  Plaintiff worked for years with a variety of medical conditions, including hidradenitis suppurativa (an inflammatory skin condition that leads to abscesses), degenerative disc disease, and obesity. For instance, he had surgery to excise hidradenitis abscesses on August 21, 2014. LIB0272. A February 17, 2015, MRI of Plaintiff's cervical spine shows that his C5–6 disc was "severely degenerated and collapsed," that his C6–7 disc was "degenerated [and] compressed" with a "minor bulge," and that he generally suffered from multi-level spondylosis from C4–5 through C6–7. LIB0491. In July 2016, Plaintiff injured his back while golfing, and, although he continued working, he was still seeking medical treatment for the resulting back pain at least six weeks later. *See*, *e.g*., LIB0864, LIB1156. Progress notes from a routine visit to Dr. Victor Blake, his primary care physician, on the morning of October 4, 2016, show that Plaintiff's body-mass index ("BMI") was 39.37, "which qualifies as obese." LIB0852; LIB0856.

6.  In the late afternoon of October 4, 2016, Plaintiff was involved in a motor vehicle accident. His car was struck from behind. According to the police report, Plaintiff's vehicle sustained "[m]oderate" damage in the collision. LIB1436. At the scene, Plaintiff "complained of back pain but refused medical treatment." LIB1435.

8

7. Later that week, on October 7, 2016, Plaintiff had an MRI of his lumbar spine, which again showed "moderate degenerative spondylosis at all levels . . . most prominently at L5–S1." LIB1424. However, the MRI also confirmed,

> There is no evidence of fracture or bone destruction. There is a normal degree of lordosis. Signal intensity from the intervertebral discs appears normal. I see no evidence of a pars defect. I see no evidence of injury to the interspinous ligaments or the supraspinous ligaments.

LIB1424.

8. Plaintiff stopped work on October 14, 2016, and applied for short-term disability ("STD") benefits, which Lincoln approved on November 4, 2016. LIB1451. On November 7, 2016, Plaintiff visited gastroenterologist Dr. Clarence Clark to evaluate an anal fistula. LIB0849. Dr. Clark scheduled a colonoscopy and surgery to remove the fistula for November 28, 2016. LIB0851. The surgery was successful, and on the next day, Physician Assistant Chantel Lee wrote Plaintiff a work excusal note indicating he should stay off work until December 31, 2016, because he "was referred for surgery." LIB1440.

9. Plaintiff next visited Dr. Blake on December 6, 2016, again complaining of back pain. On examination, Dr. Blake recorded that Plaintiff was "well-appearing" and "ambulating without difficulty." LIB0844. Dr. Blake

9

described Plaintiff's symptoms as the result of "a benign musculoskeletal back injury" with a "favorable prognosis." LIB0844. But in a work excusal note Dr. Blake wrote the same day, he described Plaintiff as having "severe back problems" which required him to be off work until March 1, 2017. LIB1426.

10. Plaintiff visited Dr. Erik Bendiks, an orthopedist, on December 22, 2016. His exam showed: the ability "to ambulate without difficulty"; "[p]ainless passive, full range of motion of bilateral hips"; and muscle strength of "5/5." LIB0823. Dr. Bendik recommended steroid injections for back pain and also recommended a referral to Dr. Mark Feeman, a physiatrist, "as [Plaintiff] wishes to explore disability evaluation." LIB0823.

11. Plaintiff visited Dr. Feeman on January 23, 2017. According to the progress note, Plaintiff "complained of neck pain but denied back pain." LIB0251. Dr. Feeman obtained another MRI of Plaintiff's cervical spine which showed "moderate degeneration" and noted it was "possible" that one apparent herniation might be "a recent and post-traumatic deformity." LIB0492. Dr. Feeman then completed a one-page, check-the-box Capacities Evaluation form, in which he opined that during an eight-hour work day, Plaintiff would be able to sit, stand, or walk for less than one hour each. LIB0254. According to the form, Plaintiff would "never" be able to lift "[u]p to 10 lbs." LIB0254. In addition to the form,

Dr. Feeman also wrote a three-sentence advocacy letter in which he said, based on this one visit that Plaintiff sought out for that very purpose, Plaintiff was "totally and permanently disabled due to his intervertebral disc disorders as a result of MVA." LIB0255.

12. On May 26, 2017, Lincoln's Disability Case Manager Danielle Alford approved LTD benefits and wrote to notify Plaintiff of that decision. LIB0765. In her letter, she wrote, "Please notify our office immediately if your condition changes or your physicians alter your treatment plan." LIB0766.

13. In accordance with Plaintiff's burden to prove his continuing eligibility for LTD benefits, Lincoln periodically requested updated medical evidence and made other investigations of the Plaintiff's condition. *See*, *e.g.*, LIB723.

14. On July 12, 2017, Plaintiff again visited Dr. Bendik complaining of back and neck pain. LIB0257. On exam, Plaintiff was "[a]ble to ambulate without difficulty," but demonstrated "[g]uarding" with respect to his neck and back and reported "pain at terminal ranges of motion." LIB0257. Plaintiff showed "[n]o evidence of shoulder impingement," and his strength was "5/5 and equal symmetrically." LIB0257. Dr. Bendik recommended Plaintiff for cervical fusion

surgery and referred him to pain management pending approval of surgery. LIB0258.

15.     In response to Lincoln's inquiries as to his treatment plan, Plaintiff told Lincoln on July 17, 2017, that his medical insurer refused to approve payment for the recommended back surgery.  LIB0738.  In the meantime, Plaintiff began visiting Dr. Jose Mathew, and various physician assistants and nurse practitioners in his office, for pain management and the prescription of opioid drugs.  *See*, *e.g*., LIB0673; LIB0671; LIB0 668; LIB0645.

16.     On September 1, 2017, Plaintiff visited Nurse Practitioner Dina Patel in Dr. Mathew's office for a refill of opioid pain medication.  LIB0668.  At that time, Plaintiff self-reported his pain as "10/10" and "worse with sitting and standing for prolonged periods."  LIB0668.  Yet on physical examination, Nurse Patel's note shows that Plaintiff was "in no acute distress" and "conversant." LIB0668.  His breathing was "unlabored," and his thoracic range of motion was "WNL," meaning within normal limits.  LIB0668–69.

17.     When Plaintiff returned to Dr. Blake on September 5, 2017, he reported low back pain, but he also reported exercising regularly—specifically, "4 to 5 x weekly x 45 mins to 1 hour."  LIB0692.  On exam, Dr. Blake found Plaintiff to be "[w]ell appearing, well nourished [and] in no distress."  LIB0693.

12

18. To evaluate Plaintiff's evolving condition, Ms. Alford asked a third-party vendor to select an independent physician to review the record. The vendor selected Dr. Arthur Kalman, who is board certified in physical medicine and rehabilitation, and he issued a report dated October 13, 2017. LIB0659. Dr. Kalman opined that the medical evidence supported the diagnoses of lumbar spondylosis and cervical radiculopathy, among others, and he opined that in light of the recommended back surgery, Plaintiff was likely to be functionally impaired. LIB0664. In an addendum report, Dr. Kalman opined that Plaintiff's impairment should not be re-evaluated for at least three months—enough time "to see if the [Plaintiff] has surgery and how he progresses." LIB0657.

19. Deferring to Dr. Kalman's assessment, Lincoln continued paying LTD benefits for the next eighteen months while collecting updated medical evidence. During that time, Plaintiff continued to seek regular refills of opioid pain medications, *see*, *e.g*., LIB0642; LIB0639; LIB0615; LIB0612; LIB0609; LIB0602; LIB0558, and he also began treatment with a chiropractor. *See* LIB0277–302. However, he never had the back surgery recommended by his treating orthopedist.

20. Under the terms of the Group Policy, the definition of disability changed from an "own occupation" standard to an "any occupation" standard on

April 13, 2019.  *See*, *e.g*., LIB381.  In the months leading up to that change, Lincoln continued to request and review medical evidence from Plaintiff's treating practitioners.

21.  Plaintiff had an MRI of his lumbar spine in June 11, 2018.  LIB0489.  According to the diagnostic report, there was "moderate advanced disc degeneration" at L5–S1 and "mild disc degeneration at the remaining lumbar levels," but "[n]o vertebral compression deformity or significant listhesis [was] seen at any level."  LIB0489.  "No paraspinal soft tissue pathology [was] appreciated in the lumbar region."  LIB0489.

22.  Approximately monthly, Plaintiff visited Dr. Mathew, and others in his office, for refills of opioid pain medication.  The progress notes from these visits show that Plaintiff consistently self-reported pain of "10/10," but he also consistently presented at his appointments "in no acute distress" and consistently denied any side effects from the medication.  *See*, *e.g*., LIB0552; LIB0486; LIB0480; LIB0469; LIB0433.  When examined on January 29, 2019, for example, Nurse Practitioner Stephanie Bridges noted that Plaintiff's breathing was "unlabored," his strength was "5/5" in upper and lower muscle groups, and his neurological sensations and deep tendon reflexes were "grossly intact."  LIB0433–34.  Although Nurse Bridges observed decreased range of motion and "tenderness

14

to palpation" along Plaintiff's cervical and lumbosacral spine, she also noted that Plaintiff's thoracic range of motion was "WNL," or within normal limits, and that his thoracic region was "NTTP," or non-tender to palpitation. LIB0434.

23. Subsequent examination findings by other treating practitioners in Dr. Mathew's office—including a March 1, 2019 examination by Nurse Practitioner Deborah Wilkins and a March 27, 2019 examination by Registered Nurse Dalandra Belcher—were essentially identical, again showing no acute distress, "grossly intact" strength in all extremities, and no neurological deficits. *See* LIB0387–88; LIB0384–85.

24. On April 9, 2019, Plaintiff visited dermatologist Lauren Orenstein complaining of a new hidradenitis flare-up in his right armpit. LIB0327. She prescribed a topical ointment. LIB0329.

25. In connection with Lincoln's "any occupation" review, Ms. Alford asked a third-party vendor to select an independent, qualified physician to review all of the medical evidence in the file. The vendor selected Dr. Howard Grattan, who is board certified in pain medicine and physical medicine and rehabilitation. *See* LIB0360–69. In his report, dated April 17, 2019, Dr. Grattan summarized Plaintiff's medical records and attempted to contact Plaintiff's treating providers, but they did not return his calls. *See* LIB0363. Commenting on the medical

15

evidence, Dr. Grattan noted diagnoses of lumbar spondylosis, cervical radiculopathy, and degenerative disc disease. LIB0363. He observed that Plaintiff did not have the fusion surgery. LIB0364. Instead, Plaintiff "remained under the care of pain management" and "had an ongoing limited range of motion in the cervical and lumbosacral regions." LIB0364. Taking into consideration "the entire clinical picture," Dr. Grattan explained that while the Plaintiff's medically supported limitations were "significant," they "would not preclude all level of function." LIB0364.

26. Specifically, Dr. Grattan found that Plaintiff's medically necessary restrictions throughout a normal 40-hour work week would include:

> lifting, carrying, pushing and pulling up to 10 pounds occasionally (up to 1/3 of the day) and up to 5 pounds frequently (1/3 to 2/3 of the day). Sitting up to 40 minutes continually for a total of up to eight hours per day with the ability to alter the position. Walking and standing combined up to 20 minutes continually for a total of up to 3 hours out of an 8 hour day. . . . No crawling or balancing. Occasionally perform reaching below the waist. Occasionally, perform reaching overhead. No restrictions with reaching at waist level. Fingering, handling, feeling, and grasping is unrestricted.

LIB0364. In sum, he concluded that Plaintiff would "at least have the capacity to function at a sedentary level," provided he also had the opportunity to change position for comfort. LIB0364.

16

27.    Ms. Alford next asked Rehabilitation Counselor Alicia Powell to prepare a Transferable Skills Analysis ("TSA") to identify—in light of Plaintiff's education, training, and employment background—occupations that Plaintiff could perform within the medical limitations determined by Dr. Grattan.  Ms. Powell's report, dated April 22, 2019, identified six "sedentary" occupations, including Plaintiff's own occupation of accountancy, that met all search criteria.  LIB0354.

28.    Based on Dr. Grattan's medical opinion and the results of Ms. Powell's vocational assessment, Ms. Alford determined that Plaintiff had failed to meet his burden to prove ongoing entitlement to LTD benefits under the Group Policy.  She wrote to notify him of her decision on April 30, 2019.  *See* LIB0347–52.  In her letter, she recited the applicable Group Policy language, identified the medical evidence considered, and quoted at length from Dr. Grattan's report and from Ms. Powell's analysis.  After explaining the decision, Ms. Alford concluded, "Benefits will be paid through April 22, 2019, and your claim is closed as of April 23, 2019."  LIB0350.  The letter also notified Plaintiff of his right to appeal and said that any appeal submission should include "[a]ny additional office notes, diagnostic test results, hospital records, clinical evaluations, specific restrictions or limitations imposed, medical opinions from your treating physicians, a valid functional capacity evaluation and any other medical documentation you feel will

17

support you are unable to perform any occupation beyond April 22, 2019," as well as "any additional information that you feel will support your claim." LIB0351.

29. As permitted by the Group Policy, Plaintiff requested an administrative appeal of Lincoln's determination by letter dated May 15, 2019. LIB0339. In support of his appeal, Plaintiff submitted updated medical records and advised Lincoln that he was scheduled for hidradenitis surgery on June 24, 2019. LIB0340; *see also*, *e.g*., LIB0209; LIB0221; LIB0170; LIB0172.

30. The additional medical records showed that Plaintiff visited Dr. Blake, his primary care physician, on May 14, 2019. LIB0262. Dr. Blake's progress note described Plaintiff's "chronic" neck and back pain, but on physical exam, Dr. Blake wrote: "Neck: Normal range of motion. Neck supple." LIB0264. "Pulmonary/Chest: Effort normal and breath sounds normal. No respiratory distress." LIB0264. "Musculoskeletal: Normal range of motion. He exhibits no edema, tenderness or deformity." LIB0264. "Neurological: He is alert and oriented to person, place, and time. He has normal reflexes. . . . No cranial nerve deficit. He exhibits normal muscle tone. Coordination is normal." LIB0264. Despite such unremarkable exam findings, however, Dr. Blake also wrote, without any supporting rationale, "In my clinical opinion, this patient is unable to return to work at this time given his current diagnoses and comorbid conditions." LIB0265.

31. Plaintiff also submitted a report from chiropractor Dr. Donald Capoferri, dated May 21, 2019, which was apparently prepared in connection with Plaintiff's personal injury claims against the other driver in the October 2016 motor vehicle accident. LIB0175–82. While Dr. Capoferri's report contains narrative descriptions of certain neck and spine imaging results, the report appears to be more geared towards establishing causation—*i.e.*, attributing Plaintiff's symptoms to the accident—rather evaluating the degree or extent of Plaintiff's alleged functional limitations. The report concludes that Plaintiff's injuries "have caused permanent and consequential limitations," but Dr. Capoferri did not describe what those limitations were or what functional capacity the Plaintiff might retain.[3] *See* LIB0182.

32. Finally, Plaintiff also submitted records pertaining to his surgery on June 24, 2019, to remove a hidradenitis lesion from his right armpit. *See*, *e.g.*, LIB0171. Post-operative records from Plaintiff's dermatologist, later submitted, showed the "surgical site healing well" and "good arm mobility." LIB0062.

33. Lincoln assigned the appeal to Appeals Consultant Courtney Grygiel. Ms. Grygiel first asked medical consultant Dr. Sheila Natarajan, who is board-

---

[3] Instead, Dr. Capoferri purported to calculate a so-called "whole person impairment" rating of 39%. *See* LIB0181.

certified in physical medicine and rehabilitation, to review all of the medical evidence in the record. In her report, dated July 9, 2019, Dr. Natarajan discussed the Plaintiff's lumbar and cervical diagnoses as well as his skin condition. She concluded that the medical records "reasonably support" a number of "significant" activity restrictions but were nevertheless "insufficient to support an inability to sustain full-time capacity" within those restrictions. LIB0116–17.

34. In explaining her conclusion, Dr. Natarjaran noted that the MRIs closer in time to the motor vehicle accident evidenced disc herniation, however, "given the amount of time that has passed . . . , it is possible for disc resorption and remodeling to occur around the previous herniations." LIB0117. She cited the absence of "any electrodiagnostic studies to evaluate and confirm ongoing radiculopathy." LIB0117 Noting the consistent findings of "normal strength," she said, radiculopathy, "too, can improve over time and appears to have done so with no further neuromotor findings found on recent physical exams." LIB0117. Next, Dr. Natarjaran discussed "discrepanc[ies] within the different providers' notes." LIB0117. She contrasted, for example, Dr. Blake's "relatively benign" examination results on May 14, 2019, with his opinion the Plaintiff would be completely unable to work. LIB0117. "Lastly," she concluded, "the treatment plan . . . included a recommendation for surgical intervention in 2017 which has

20

not yet occurred." LIB0117. "In the absence of surgery, there does not appear to be any current escalation of medication or alternative pain management recommendations which does not correlate with the severity of claimed impairment of 'no workability.'" LIB0118.

35.     Upon receipt of the report, Ms. Grygiel asked Rehabilitation Counselor Lori Ashworth to prepare a new vocational assessment using the restrictions identified by Dr. Natarjaran. Ms. Ashworth concluded, "Based on these updated capacities, the previously identified occupations of Accountant, Budget Accountant, Cost Accountant, Budget Analyst and Tax Preparer remain viable." LIB0147.

36.     To have the benefit of a second opinion as to the medical evidence, Ms. Grygiel also asked medical consultant Dr. David Houghton, who is board-certified in internal medicine, to review the entire record and evaluate Plaintiff's functional capacity. Dr. Houghton's report, dated July 24, 2019, contains a lengthy and detailed review of Plaintiff's medical and treatment history, both before and after his October 2016 motor vehicle accident. He concluded that the following functional limitations were reasonably supported:

> No sitting longer than 1 hour without opportunity to stand. No standing or walking longer than 15 minutes without opportunity to sit. No more than occasional bending/twisting at the waist or neck. No exertion of more than 20 pounds of force.

LIB0134.  But Dr. Houghton also concluded that the evidence did not support

Plaintiff's alleged inability to perform sedentary work.  LIB0134.  He continued,

> There is no medical basis on which to restrict a patient's
> participation in sedentary productive activity because of chronic
> neck and back pain.  This is an issue of personal tolerance, and not
> one of objective medical science.  There is no medical risk
> involved.  There is much published evidence that restricting light
> activity in patients with chronic back pain is harmful rather than
> helpful. . . .  The claimant's self-documented recreational activity
> suggests that his condition is not as severe as he has indicated to
> his clinicians.
>
> *  *  *
>
> [T]he claimant has had chronic neck and back pain for years, with
> degenerative changes in the cervical and lumbar spine, including
> L5-S1 disc herniation.  It was apparently aggravated by a motor
> vehicle collision in 2013.  Despite this, the claimant continued
> working at his full-time sedentary job.  In the summer of 2016 he
> reported 10/10 low back pain after golfing (the maximum pain a
> person is capable of experiencing).  Nevertheless he continued
> working.  He was in another moderate motor vehicle collision in
> October 2016, at which time he declined medical attention.  Since
> then he has continued to complain of 10/10 back pain, as well as a
> lesser degree of neck pain. . . .  His clinicians have said that the
> collision exacerbated his chronic back pain, but objective
> abnormalities on exam have been mild and inconsistent.  In many
> instances the exam findings and pain intensity have been sharply at
> odds with demonstrated functional capacity.  Treatment has
> remained the same for over 2 years, consisting of a low potency
> opioid, a muscle relaxer, and low dose gabapentin. . . .  There is no
> objective support for the opinion of his clinicians that he is totally
> disabled, and there is substantial evidence that his functional
> capacity is sufficient for sedentary full-time productive activity.  A
> large number of studies show that patients involved in litigation or
> disability disputes or at-fault injury are much more likely to remain

22

out of work.  Unfortunately in this case it appears that the treating clinicians have contributed to this resistance rather than helping to overcome it.

LIB0135–40.

37.     To provide Plaintiff an opportunity to review and comment on Dr. Natarajan's and Dr. Houghton's reports and Ms. Ashworth's vocational assessment, Ms. Grygiel sent copies of those materials to Plaintiff on July 24, 2019.  LIB0114.  Plaintiff responded on August 2, 2019, by calling Dr. Houghton's report a "diatribe of insults, insinuations, and defamations" and accusing Dr. Natarajan of overlooking 2018 MRI evidence contained in the file.  LIB0081. Plaintiff subsequently submitted the additional dermatology records mentioned above, which showed that his armpit lesion surgery was "healing well."  LIB0062. In a separate letter, Plaintiff's dermatologist, Dr. Tova Rogers, said that hidradenitis suppurativa is a "chronic disease" and lamented that patients with the condition "suffer throughout their lives with episodes of these debilitating skin lesions."  LIB0061.  She did not identify any specific restrictions on Plaintiff's activities due to the disease or offer any opinion that he was unable to work. LIB0061.

38.     After reviewing Plaintiff's reply, Dr. Houghton provided an addendum report on August 16, 2019, which contained a detailed response.

LIB0074.  Dr. Houghton again emphasized that the records show that Plaintiff reported "the same severity level of pain"—10/10—both before and after his last day of work.  LIB0074.  Thus, "[t]here is no objective evidence in the available records that [Plaintiff's] lumbar condition has substantially worsened since he was working full-time."  LIB0074.  Similarly, Dr. Houghton explained, "The available MRI results have not substantially changed since before [Plaintiff] stopped working."  LIB0074.  Dr. Houghton also observed that the records do not show consistent neurological deficits and that Plaintiff's treatment regime has been stable for more than two years.  LIB0076.

39.  Dr. Natarajan also prepared an addendum, dated August 22, 2019, in which she specifically addressed Plaintiff's most recent 2018 MRI and explained that "there is no information from that scan that would change my conclusions" or otherwise indicate restrictions or limitations more extensive than those identified in her prior report.  LIB0056.

40.  On the basis of the peer review reports and addendums, the vocational assessment, and the entirety of the record before Lincoln, Ms. Grygiel concluded on August 23, 2019, that Plaintiff had again failed to prove his entitlement to LTD benefits under the Group Policy.  LIB0047.  In her letter notifying Plaintiff of the decision, she explained that "the existence of a medical condition/diagnosis in and

24

of itself does not equate to eligibility for long term disability benefits." LIB0053. Rather, the "focus" of the assessment is "whether or not [an] impairment exists that would preclude you from performing the duties of your own occupation or any occupation." LIB0053. After discussing the medical peer reviews at length, Ms. Grygiel acknowledged that the medical evidence reasonably supported certain physical restrictions and limitations. But despite such restrictions and limitations, as she explained, the evidence submitted failed to prove that Plaintiff would be unable to perform the duties of his own sedentary occupation, let alone the duties of other sedentary occupations also identified by Ms. Ashworth's analysis. LIB0053.

Respectfully Submitted,
LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON,
By its Attorneys,

/s/  Scott K. Pomeroy
Scott K. Pomeroy
Georgia Bar No. 583296
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
207-387-2961 direct
207-387-2986 fax
Email: scott.pomeroy@ogletree.com

/s/  Amy E. Jensen
Amy E. Jensen

25

Georgia Bar No. 874759
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
191 Peachtree Street, N.E., Ste. 4800
Atlanta, Georgia 30303
404-870-1796 direct
404-870-1732 fax
Email: amy.jensen@ogletree.com

Dated: November 13, 2020

| | |
|---|---|
| VIRGIL HARRIS,<br>　　　Plaintiff,<br><br>v.<br><br>LINCOLN LIFE ASSURANCE<br>COMPANY OF BOSTON,<br>　　　Defendant. | CIVIL ACTION NO.:<br>1:19-cv-4257-CC |

## CERTIFICATE OF SERVICE

I hereby certify that on this the 13th day of November 2020, the foregoing **Defendant's Local Rule 56.1 Statement of Undisputed Material Facts** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve an electronic copy on the following attorney(s) of record:

Heather K. Karrh
Rogers, Hofrichter & Karrh, LLC
225 South Glynn Street, Suite A
Fayetteville, GA 30214
hkarrh@rhkpc.com

/s/  Scott K. Pomeroy
Scott K. Pomeroy
Georgia Bar No. 583296

44809764.1

27