IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VIRGIL HARRIS | ) |
| | ) |
|     Plaintiff | ) |
| | )  CIVIL ACTION |
| v. | ) |
| | )  FILE NO. 1:19-cv-04257-CC |
| LINCOLN LIFE ASSURANCE | ) |
| COMPANY OF BOSTON | ) |
| | ) |
|     Defendant | ) |

## PLAINTIFFS' BRIEF IN SUPPORT OF HIS MOTION
## FOR SUMMARY JUDGMENT

Comes now the Plaintiff, Virgil Harris (hereinafter "Harris") and files this Brief

in Support of his Motion for Summary Judgment.

## I.    STATEMENT OF FACTS

### A.    OCCUPATION AND POLICY PROVISIONS

Harris worked for Robert Half International, Inc. as an accounting consultant.

(LIB 1).[1]  Harris' occupation was a full time sedentary occupation requiring the

ability to organize and reason, handle precise work, consult with staff and customers,

and calculate and evaluate data amongst other duties. (LIB 353-54).

---

[1]All LIB citations refer to the administrative record Bates- Labeled LIB-
000001 through 001577 attached to Defendant's Motion.  Harris hereby
incorporates these attachments by reference.

As a result of his employment, Harris was covered by a disability policy insured by Defendant, the Lincoln Life Assurance Company of Boston (hereinafter Defendant). (LIB 1455-1551).

Under the policy "Disability" or "Disabled" means:

I.  that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform with reasonable continuity the Substantial and Material Acts necessary to pursue his Own Occupation in the usual and customary way; and

ii. Thereafter, the Covered Person is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation, meaning that as a result of sickness or injury the Covered Person is not able to engage with reasonable continuity in any occupation in which he could reasonably be expected to perform satisfactorily in light of his age, education, training, experience, station in life, and physical and mental capacity. (LIB 1465)

## B.  MEDICAL CONDITION AND PAYMENT OF BENEFITS

Prior to an October 4, 2016 motor vehicle accident, Harris' medical records reflect some low intensity (2/10) back pain related to another motor vehicle accident in approximately 2013. (LIB 822).[2] Primarily the medical records prior to the October 2016 accident reflect hidradenitis suppurativa (a condition which causes painful lumps to form under the skin), elevated blood pressure and vitamin D deficiency. (LIB 1159-1175). The records show that he had a surgery for his

---

[2]This record reflects a 2012 accident, but elsewhere in the file 2013 is referenced. Compare LIB 822 with LIB 87.

hidradenitis on April 19, 2016. (LIB 118-120). The records show that Harris' hidradenitis was resistant to conservative management. (LIB 1068-69). He was also found to have Hepatitis B. (LIB 1237). He also had some moderate back pain in July and August of 2016 that was caused by playing golf. (LIB 1260-71, LIB 863-865).

On October 4, 2016 at 5:45 PM, Harris was struck from behind while driving. (LIB 1434-1435). This accident caused serious back pain. (LIB 1435). On October 7, 2016 an MRI of the lumbar spine revealed that there was moderate degenerative spondylosis at all levels T11-12 through L5-S1, most prominent at L5-S1; that the L4-5 disc space level demonstrated degenerative spondylosis and narrowing of the disc with modic changes related to stress response. (LIB 1424-25). A central bulging disc and bone spur indented the thecal sac across the midline and that the L5-S1 disc space level demonstrated <u>severe degenerative spondylosis</u> and narrowing of the disc with modic changes related to stress response. (LIB 1424-25). There was a central and right paracentral herniated disc protrusion with annular tear indenting the epidural space while touching the right S1 nerve root. (LIB 1424-25). There was foraminal bony stenosis due to facet arthropathy. (LIB 1424-25). Small foraminal herniated disc protrusions and bone spurs were also noted bilaterally. (LIB 1424-25).

Due to this October 2016 accident, Harris was not able to work beyond October

14, 2016.  (LIB 1).

Harris' internal medicine doctor, Dr. Victor Blake, examined him on December 6, 2016 and stated that Harris could not work through March 1, 2017 due to severe back problems.  (LIB 1426).  On December 20, 2016, Harris went to see Dr. Erik Bendiks, an orthopaedic surgeon, for his neck and back pain.  (LIB 822-23).  He recommended a cervical MRI to further assess Harris' neck and pain and prescribed steroid injections in the lumbar spine.  (LIB 822-23).   At the next office visit on December 22, 2016, Dr. Bendiks diagnosed Harris as " status post vehicle collision on 10/4/16 with resultant cervicalgia and radiculopathy as well as aggravation of preexisting lumbago with disc herniation L5-S1 and thecal sac impingement." (LIB 819-20).  That same day,  Dr. Bendiks wrote a letter stating that Harris was to remain off work until January 27, 2017.  (LIB 1357).

On January 23, 2017, Harris was examined by Dr. Mark Feeman, a physical medicine and rehabilitation specialist.  (LIB 251-253).  Dr. Feeman performed a comprehensive examination and diagnosed intervertebral disc disorders with radiculopathy, lumbar region.  (LIB 252).  He stated that Harris was at total and permanent disability for all occupations.  (LIB 252).  Dr. Feeman found that Harris worked as an accounting consultant and cannot sit for more than 30 minutes at a time and has to lie down for 30 minutes 4 times daily.  (LIB 252).

On January 24, 2017, Dr. Feeman filled out a detailed Physical Capacities Evaluation stating that Harris could sit less than one hour, stand less than 1 hour, walk less than one hour in an eight hour day.  (LIB 254).  He could not lift or carry 10 pounds. (LIB 254).  He also stated that Harris had other functional limitations due to the pain and how it affected his concentration, thought process, cognition and problem solving skills.  (LIB 254).  He stated that Harris also lacked productivity. (LIB 254).  That same day Dr. Feeman drafted a letter to Defendant. (LIB 252).  In his letter Dr. Feeman stated:

> I have evaluated Mr. Harris['] medical records diagnostic studies and treatment to date.  It is my opinion within a reasonable degree of medical certainty that he is totally and permanently disabled due to his intervertebral disc disorders as a result of MVA.  His last day of work was 10/16/2016.  (LIB 255).

Also, on January 24, 2017, Harris had his MRI of the Cervical Spine Without Contrast. (LIB 491-93).  It revealed at C4-5 that there was a left posterior herniation of moderate size causing cord compression. (LIB 492).  At C6-7 there was a right posterior combination of moderate size protrusion and a smaller spur causing compression of the right side of the cord. (LIB 492).  At C5-6 there was a focal, posterior and central disc protrusion that was less prominent than at other levels, but was still causing some impression upon the anterior margin of the cord, although

5

without spinal stenosis. (LIB 492-93).  Spurs caused moderate stenosis of the right foramen.  (LIB 493).  There were also less severe, but still potentially significant abnormalities at several other levels.  (LIB 493).  There was also a straightening of the lordosis, which can indicate a soft tissue injury.  (LIB 493).

On February 21, 2017, Harris was treated for his chronic hepatitis B infection at Grady Hospital.  (LIB 1098).  On February 28, 2017, Harris was treated by  Dr. Jose Mathew, a pain specialist, who found spondylosis with radiculopathy, lumbar region, low back pain, spondylosis in the cervical region inter alia.  (LIB 679-83).  On March 13, 2017, Harris' doctor noted that he did not have a serious flare of his hidradenitis suppurativa at that time.  (LIB 1105-07).    On March 28, 2017, Dr. Mathew treated Harris again and found the same problems and refilled his pain medicine.  (LIB 676-78).

Defendant found Harris disabled and began paying benefits on April 13, 2017.  (LIB 1).   On April 26, 2017, Dr. Bendiks noted that Harris' neck pain improved when on his narcotic medication, but his back pain remained severe with radiation into the right leg.  (LIB 259).   Dr. Bendiks reviewed the cervical MRI and recommended bilateral medial branch blocks at C4-6.  (LIB 260).  With regard to the lumbar spine, Dr. Bendiks stated:

> The  patient  has  persistent  pain  despite  adequate

conservative treatment to include time, activity modification, medications, therapy, and injections. Therefore I recommend anterior lumbar interbody fusion (5-S1 with PEEK cage, allograft/autograft and posterior facet screws. (LIB 260).

On May 16, 2017, Dr. Feeman completed a questionnaire for Harris. (LIB 500-02). He stated that Harris had severe back pain. (LIB 500). He noted that Harris was disabled from any and all occupations. (LIB 501). He stated that Harris' condition caused flare-ups and that he would have to be absent from work. (LIB 501). He estimated that the incapacity could last two through four years. (LIB 501).

On May 19, 2017, Dr. Mathew noted that Harris suffered from chronic pain syndrome amongst other problems. (LIB 674). On May 26, 2017, Defendant confirmed Harris' approval of benefits via letter. (LIB 765-66). On June 16, 2017, Dr. Mathew's records documented ongoing pain. (LIB 671-72). On July 12, 2017, Dr. Bendiks examined Harris and continued to recommend lumbar surgery. (LIB 257-58). He also recommended a cervical surgery stating:

> I feel that too much time has transpired since the collision for injections to be an effective means of pain control. Therefore, I recommend anterior cervical discectomy and fusion C4-7 with autograft, PEEK cage and anterior plate as the definitive procedure in the treatment of his neck pain. (LIB 257-258).

That day, Dr. Bendiks advised Harris to remain off work and referred Harris to chronic pain management. (LIB 260, LIB 740). On July 17, 2017, Harris wrote

Defendant a letter stating that his pain varied, one minute he is fine and the next he is in excruciating pain. (LIB 738). He also informed Defendant that his health insurance will not cover his surgery. (LIB 738).

For no apparent reason, Defendant performed a social media and corporate investigation on Harris on July 20, 2017. (LIB 723-36). This report concluded that he may have attended a music event and appeared to be active in his DJ career. (LIB 723-736). However, a definite year that these occurrences happened does not seem apparent from the report. (Examine LIB 723-36). On August 1, 2017, the Social Security Administration denied Harris' claim due to a failure to pay into the system long enough. (LIB 629). On August 11, 2017, Defendant performed surveillance on Harris and found no activity. (LIB 697-99). On September 1, 2017, Dr. Mathew treated Harris' "chronic pain syndrome, radiculopathy, cervical region, other spondylosis with radiculopathy, lumbar region." (LIB 668-69). On September 5, 2017, Dr. Blake found "chronic low back pain, obesity, osteoarthritis, lumbar radiculopathy and sciatica. (LIB 645-47).

On October 13, 2017, Dr. Arthur Kalman, board certified in physical medicine and rehabilitation, reviewed the file for Defendant and spoke with Dr. Bendiks' office. (LIB 659-666). He stated that a PA in Dr. Bendiks' office confirmed over the telephone that Harris could not perform sedentary work. (LIB 664). Dr. Kalman

found the following diagnoses, Lumbar Spondylosis, Lumbar DDD, Lumbar spinal stenosis, Cervical radiculopathy, Hidradenitis suppurativa, elevated blood pressure, hepatitis, obesity, and chronic pain syndrome amongst others. (LIB 664). Dr. Kalman concluded:

> After review of the records it is my opinion the claimant cannot sustain functionality for any period of time. He has multiple medical conditions as well as significant DDD and lumbar spinal stenosis. It was recommended that the claimant will need surgery. Complete functional impairment is supported. (LIB 664).

On November 1, 2017, Harris' lumbar spine showed decreased range of motion and tenderness. (LIB 642-44). On November 20, 2017, the firm to which Defendant referred Harris to obtain his Social Security informed Defendant again that he did not have enough credits to obtain Social Security. (LIB 622). Dr. Mathew's records from December 2017 through April 2018 revealed chronic pain, decreased range of motion and noted that Harris has tried physical therapy, chiropractic care, injections and massage amongst other treatments. (LIB 639-41, 615-617, 394-403, 612-614, 609-611, 602-04). Harris' chiropractor, Dr. Lori Okun recorded in April and May of 2018 that Harris suffered from intense pain, low back spasms and the inability to cross his legs. (LIB 277-302). Dr. Peter J. Symbas, an orthopaedic surgeon, treated Harris on April 27, 2018 for osteoarthritis of the knees and medial epicondylitis of the right elbow and prescribed an elbow strap and injections in both knees. (LIB 266-

268).

Harris' pain clinic records in May 2018, reveal back pain, radiculopathy, cervical pain with decreased range of motion, lumbarsacral pain with decreased range of motion and tenderness to touch. (LIB 561-63, LIB 558-559). An MRI of the lumbar spine on June 11, 2018 revealed multi-level degenerative disc and severe disc herniation at L5/S1 with right S1 nerve root impingement. (LIB 489-490, LIB 556). Pain clinic records showed Harris remained in pain throughout June, July and August of 2018. (LIB 555-57, LIB 552-554, LIB 486-87). On September 17, 2018, Dr. Feeman's records demonstrated that Harris had failed injections and continued with severe pain which abated slightly with medications. (LIB 544). Dr. Feeman reiterated that Harris was not able to be predictably productive in the workplace. (LIB 546). He could not stand, walk or sit for prolonged periods of time, and would need to rest and change positions throughout the day. (LIB 546). At times, the pain would reach levels where he would not be able to go to work, might miss many days per month. (LIB 546). He stated that Harris was disabled from any and all employment. (LIB 546).

Harris' monthly pain clinic records from June 2018 to March 2019 reveal severe pain and need for narcotic medications. (LIB 552-54, 486-87, 544-46, 483-85, 480-82, 473-79, 469-71, 390-93, 387-89, 384-86). Harris' records from his family

medicine clinic on April 9, 2019 explain his history of hidradenitis since 2001 noting

multiple past surgeries with a current assessment of "Hidradenitis suppurativa, hurley

stage 2-3, Intertrigo; groin, interglutea; untreated." (LIB 270).[3]

On April 17, 2019, a Dr. Howard Grattan reviewed the file for Defendant and

attempted contact with one of Harris' doctors but failed to actually speak with

anyone. (LIB 360-366). Dr. Grattan conceded that Harris' findings in his records

were significant, but believed that the findings "would not preclude all level of

function." (LIB 365). Without benefit of an examination, Dr. Grattan felt that Harris

should have been able to perform sedentary work from October 15, 2016. (LIB 365-

366).

Harris' chiropractic records in April of 2019 reveal Harris had pain throughout

his body. (LIB 236-40, LIB 241). On April 22, 2019, Defendant performed a

transferrable skills analysis taking as true Dr. Grattan's opinion that Harris could

perform sedentary work and found that Harris had the ability to be an accountant and

a disc jockey amongst other similar jobs such as tax preparer. (LIB 353-57).

### C.    FIRST DENIAL AND APPEAL

---

[3]Hurley stage 3 is the most severe form of HS. It's characterized by more widespread development of lesions. Pain and scarring are expected. Due to this widespread and recurring nature, stage 3 can be very difficult to treat. Boils, tracts, and scars may be removed via surgery, when HS interferes with quality of life. https://www.healthline.com/health/hidradenitis-suppurativa-stages#hurley-stage-3

On April 30, 2019, Defendant denied Harris' ongoing benefits beyond April 22, 2019 via letter. (LIB 245-50). In the letter, Defendant relied upon Dr. Grattan's review of Harris' records and the vocational report. (LIB 245-50).

Dr. Blake's medical records on May 14, 2019 reveal that Harris suffered from back pain, arm pain, neck pain and knee pain. (LIB 262-65). Dr. Blake noted that Harris was on narcotic medications. (LIB 263). Upon examination, Dr. Blake stated that due to continuous pain Harris was unable to remain still for longer than 10 minutes. (LIB 264). He stated that Harris has known history of severe degenerative disc disease complicated by several disc herniations and nerve impingement. (LIB 264). He found that Harris was unable to raise left arm above 90 degrees secondary to pain. (LIB 264). Dr. Blake stated: "in my clinical opinion, this patient is unable to return to work at this time given his current diagnoses and comorbid conditions." (LIB 265).

On May 15, 2019, Harris appealed the denial via letter enclosing medical records and pointing out all the statements from Dr. Blake, Dr. Feeman and Dr. Bendiks that he was totally disabled. (LIB 242-44). On May 21, 2019, Harris attended an IME in conjunction with his car wreck with a chiropractor, Dr. Donald Capoferri. (LIB 175-199). Dr. Capoferri was largely focused on answering whether or not Harris' problems were caused by the motor vehicle accident on October 4,

2016 and found that the problems were a direct result of the accident. (LIB 182). Nevertheless, his examination results are instructive. (LIB 182). Dr. Capoferri noted Harris' many and varied attempts to treat his pain. (LIB 182). Dr. Capoferri agreed that Harris needed both cervical and lumbar surgery "to maintain any level of functionality for the balance of ...[his] life." (LIB 182). Overall he found that injuries caused permanent and consequential limitations. (LIB 182).

In June of 2019, Harris submitted Dr. Capoferri's report, notes regarding his recent surgery for his hidradenitis and pictures of his wounds. (LIB 172-173).

### D. FINAL DENIAL

On July 9, 2019, Defendant had the file reviewed by a Dr. Sheila Natarajan. (LIB 116-119). Dr. Natarajan was not able to make contact with Harris' pain doctor. (LIB 117). Without benefit of examination or even contact with Harris' doctor, Dr. Natarajan concluded that Harris could perform sedentary work. (LIB 117). Dr. Natarajan stated that the MRIs were from 2017 (she did not examine the 2018 lumbar MRI at that time) and opined that Harris' discs could have been recovered from his herniations "given the amount of time that has passed" and stated that it is "possible for disc resorption and remodeling to occur around the previous herniations." (LIB 118). She also opined that his radiculopathy could have improved. (LIB 118). She deferred comment on the hidradenitis to a more appropriate specialist. (LIB 118).

On July 23, 2019, Defendant had another vocational statement made based upon Dr. Natarajan's opinion stating that Harris could perform work as an Accountant but that Disc Jockey would be precluded. (LIB 120).

On July 24, 2019, Defendant had the file reviewed by Dr. David Houghton, an internist and pediatrician. (LIB 122-128). Dr. Houghton did not examine Harris. (LIB 122-128). Dr. Houghton did not even attempt to discuss Harris' case with any of his doctors. (LIB 122-128). Dr. Houghton's report is riddled with readily apparent flaws and inconsistencies. (LIB 122-128). For example, his main opinion was that Harris had long standing neck and back pain since before 2013, but that Harris was able to work with the pain and thus should be able to work with the pain he has had since the 2016 "minor automobile collision." (LIB 123, LIB 128). The most obvious problem with Dr. Houghton's theory that Harris had long standing pain since before 2013 is that Dr. Houghton only reviewed records from 2015 forward. (LIB 128). Another serious flaw with Dr. Houghton's report is that he failed to thoroughly examine the records. (LIB 123). Dr. Houghton begins his analysis stating that "the claimant has a long history of neck and back pain. In 2015 he had an MRI of the cervical spine that showed degenerative changes..." (LIB 123). Had Dr. Houghton thoroughly examined the 2015 MRI, he would have found that it was an MRI of another Virgil Harris who was born June 19, 1952 (ten years before the Virgil Harris

14

in this case) that must have been placed in Harris' file by accident. (LIB 491).[4]

Harris' actual birth date is on the front page of Dr. Houghton's report so ignorance cannot be an excuse here. (LIB 122). Thus, Dr. Houghton's argument is based in large part on a mistake. (LIB 122). Further the medical records that actually did concern Harris that Dr. Houghton examined did not show serious pain prior to the October 2016 accident. (LIB 123). Dr. Houghton himself admits that Harris' "annual exams in May 2015 and March 2016 said nothing about neck and back pain." (LIB 123). Dr. Houghton also noted that Harris was "working out" prior to the October 2016 accident to try and lose weight. (LIB 123).

Overall, Dr. Houghton stated that Harris' self documented recreational activity suggested that his condition was not as severe as he indicated to his clinicians. (LIB 123). However Dr. Houghton utilizes activity which occurred before the October 2016 motor vehicle collusion and before Harris claimed disability status in this attempt to undermine Harris' credibility. (LIB 124). He references Harris being upset with his doctors after one of his skin surgeries in April of 2016 and the back strain after playing golf in July of 2016. (LIB 124). Neither of these events are overly germane to Harris' condition after the October, 2016 accident. (LIB 124). Dr. Houghton then claimed that Harris' facebook posts and photos showed he was active

---

[4] The ID # is also different. Compare LIB 491 with LIB 489.

with his DJ career despite the fact that the investigative report did not actually demonstrate what year any of the activities occurred. (LIB 126). In the attached affidavit, Harris explains that the events documented in the social media field investigation were all prior to the 2016 accident. (See Exhibit A).

Dr. Houghton admitted that the January 2017 MRI of the cervical spine showed more serious problems than the 2015 cervical MRI (the one which concerned another person entirely), but opined that Harris' main symptoms are caused by his low back and that is caused by his obesity. (LIB 125).

Dr. Houghton examined Harris' facebook page which apparently had a video of his June 2019 skin surgery and appeared in Dr. Houghton's opinion to show Harris in no pain and with good range of motion in one of his shoulders. (LIB 127). Dr. Houghton also stated that the Facebook page showed a good social life and golfing "at the same time" as Harris reporting constant pain. (LIB127). However, Dr. Houghton does not actually provide copies of the Facebook page or the video with his report. (LIB 127). Overall, Dr. Houghton opined that Harris could perform full-time productive activity. (LIB 128).

On August 2, 2019, Harris wrote Defendant stating amongst other things that his social life is down 80% since the October 2016 accident, that he does not dance and has not "DJed" or worked as a DJ in years. (LIB 81-88). He stated that there was

an IME report in 2013 where his back impairment was listed as only a 10% impairment as a result of a previous car accident. (LIB 81-88). He noted that his impairment rating post the 2016 accident is 39%. (LIB 81-88). He also stated that the video of his June 2019 surgery was 13 seconds. (LIB 85). Harris further questioned whether a 2015 Cervical MRI was actually performed. (LIB 86).

On August 12, 2019, Harris' dermatological records showed a new flare of his hydradenitis, but that the surgical site was healing. (LIB 62). On August 14, 2019, Defendant asked for an extension to make a decision despite the fact that Harris had appealed on May 15, 2019. (LIB 78-79).

Dr. Houghton produced an addendum on August 16, 2019. (LIB 74-76). Again, Dr. Houghton relies upon the video of the skin surgery stating that Harris remained sitting longer than ten minutes during the surgery. (LIB 74). Dr. Houghton does not address the obvious fact that Harris would have had at least local anesthesia during this time. (LIB 74). Dr. Houghton again failed to notice that the 2015 cervical MRI does not concern the Harris in this case even after Harris questioned its existence. (LIB 75). Dr. Houghton states that "review of the records showed that one was done on 2/17/15" without noticing that this MRI was done on a different person. (LIB 75). Again he references the time Harris hurt himself golfing in July 2016. (LIB 74). Dr. Houghton stated that Harris stated he had 10/10 pain as a result of the golf

swing during that summer and yet continued to work.  (LIB 74).  However when Harris' records from July 2016 and August 2016 are examined there does not appear to be any statement from Harris regarding 10 out of 10 pain.   (See LIB 1260-1271 and  LIB 863 - LIB 865).    Instead the pain is described as achy, dull and moderate. (See LIB 1260-1271 and  LIB 863 - LIB 865).  Here Dr. Houghton again appears to be incompetent.  (See LIB 1260-1271 and LIB 863-865).  In his addendum, Dr. Houghton stated that disc herniations are common and often asymptomatic. (LIB 74). The remainder of Dr. Houghton's addendum appeared to be generalizations regarding the value of FCEs and IMEs.   (LIB 76).

On August 19, 2019, Harris submitted a letter from his dermatologist, Dr. Tava Rogers, which stated:

> Virgil Harris is a patient under my care at Grady Dermatology Clinic.  He suffers from a disease called hydradenitis suppurativa, hurley stage 11-111.  This is a disease with waxing and waning painful, draining nodules that affect his axilla, groin, and buttocks.  The distinction Hurley stage 11-111 indicates that he has a severe form of this disease.  Mr. Harris has undergone multiple surgeries to remove painful nodules, but in this disease, despite surgical intervention, new nodules come up on sites that were not operated on.  Mr. Virgil has active disease and when new lesions come up on his buttocks, it can be very painful to sit, especially for prolonged periods of time. This is a chronic disease without a cure and, unfortunately, patients will suffer throughout their lives with episodes of these debilitating skin lesions.  (LIB 61).

Medical records from Dr. Blake on August 19, 2019 revealed neck and back pain since October 2016. (LIB 69-73). Harris stated that the pain was worse when turning his neck to the side, especially to the left. (LIB 69-73). The pain was also worse with sitting for long periods, standing up straight, walking for long periods, and raising his left arm. (LIB 69-73). The pain was worse when turning head to either side, especially the left. (LIB 69-73). The pain was made better with pain medication, leaning forward and maintaining motion. (LIB 69-73). The pain shoots down the leg and back all the way down to both feet, especially the right foot. (LIB 69-73). Dr. Blake found that the pain was chronic, severe and unchanged and that the pain was present in the thoracic spine, sacroiliac, lumbar spine and gluteal region. (LIB 69-73).

On August 22, 2019, Dr. Natarajan submitted an addendum in which she examined the 2018 MRI that she had failed to review previously. (LIB 56). She admitted that it showed similar problems as the 2017 lumbar MRI, but stated that it did not change her opinion as to Harris' limitations. (LIB 56).

On August 23, 2019, Defendant issued a final denial letter relying on Dr. Grattan, Dr. Houghton and Dr. Natarajan's reports. (LIB 47-55). Notably Dr. Kalman's report which supported Harris was not mentioned. (LIB 47-55). This lawsuit ensued. (See Complaint).

During the pendency of this case, Harris continued to submit updated medical records to Defendant as per the Eleventh Circuit guidelines. <u>Levinson v. Reliance Standard Life Ins. Co.</u>, 245 F.3d 1321, 1329 (11th Cir. 2001)( "The district court noted that Levinson continued to provide proof of his continuing total disability throughout the litigation.")

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. STANDARD OF REVIEW

The Eleventh Circuit has set out a multi-step test which governs most ERISA cases:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

<u>Acree v. Hartford Life & Acc. Ins. Co.</u>, 917 F. Supp. 2d 1296, 1304–05 (M.D. Ga. 2013) (citations omitted).

In this case, there does not appear to be any discretionary language in the plan. (LIB 1455-1551). This is likely due to the fact that this policy is governed by the laws of California and was issued on January 1, 2015. (LIB 1458). California outlawed discretion in disability insurance policies effective January 1, 2012. Cal.

Ins. Code § 10110.6 (West). Thus while there is no doubt that Defendant operated under a conflict of interest and acted in bad faith, it is not necessary for Harris prove either. The only issue is whether Defendant was wrong in terminating benefits.

**1. DEFENDANT'S DECISION WAS *DE NOVO* WRONG**

Harris has overwhelming support from his treating doctors. Dr. Blake, Dr. Feeman and Dr. Bendiks have made repeated and detailed statements supporting Harris' disability. Harris has objective evidence of his back problems and his skin problems which are shown through repeated MRIs and other tests. These problems are known to cause pain. Harris has been recommended to have both neck and back surgery. Harris' skin condition has worsened overtime and his dermatologist explained that it interferes with his ability to sit. Harris has the results of his FCE with Dr. Feeman and the results of his IME with Dr. Capoferri. Harris has medical records showing that short of surgery (which is not covered under his insurance), he has undergone every possible treatment for his painful conditions. Harris' medical records also show consistent and credible reports of pain since October 2016. Harris' records show that he has to take narcotic medications to attempt to control his pain. Finally, one of Defendant's own doctors, Dr. Kalman, reviewed the file and agreed that Harris was totally disabled. (LIB 659-666).

In contrast, Defendant has the record reviews of three doctors who never even

spoke with Harris' treating physicians much less actually examined Harris himself. While it is true that administrators do not have to apply the "treating physicians rule" and accord *per se* special evidentiary weight to the opinions of treating physicians, "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Black & Decker Disability Plan v. Nord</u>, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003). In <u>Nord</u>, the Supreme Court recognized that "treating physicians, as a rule, have a greater opportunity than consultants to know and observe the patient." <u>Id</u>. at 832. Moreover Courts in this Circuit have recognized that "[c]ommon sense and a stream of legal precedent suggest... factual determinations of a treating physician <u>are</u> objectively more reliable." <u>Burt v. Metropolitan Life Ins. Co.</u>, 2005 WL 4712457, *11 (N.D.Ga. September 16, 2005) (emphasis in original); <u>Johnson v. Metropolitan Life Ins. Co.</u>, 2008 WL 2302693, *12 (N.D.Ga. May 30, 2008); <u>Zorn v. Principal Life Ins. Co.</u>, 2012 WL 112949, at *14 (S.D. Ga. Jan. 12, 2012).

Further, each of Defendant's doctors' reports are flawed. Dr. Grattan did not provide any reasoning to support his opinion. All Dr. Grattan stated was that Harris had significant problems, but should be able to perform sedentary work. Dr. Grattan did not provide any actual explanation of why he believed Harris was able to perform sedentary work. Conclusive opinions without evidence are not persuasive.

Dr. Natarajan did have some reasoning to support her position, but she undermined that reasoning in her addendum. In her first report, Dr. Natarajan reasoned that the 2017 MRIs were somewhat dated/older and that Harris could have improved by this time. In her addendum she reviewed the 2018 MRI that she had missed previously. She noted that the 2018 MRI revealed that the herniations were still present, but stated that it did not change her mind as to Harris' limitations. In other words, she decided that it did not matter that Harris had not actually improved despite that being the central reason she did not originally find him to be totally disabled. Inconsistency in reasoning is unpersuasive.

Dr. Houghton's reasoning was worse than inconsistent. It was incompetent. Dr. Houghton has two main theories neither of which are convincing. One was that Harris' pain was long standing and that he was able to work with the pain, because it had not worsened since the 2016 accident. The actual evidence shows that while Harris had some pain prior to October 2016, the October 2016 accident caused serious, long standing, debilitating problems. Dr. Houghton based his theory in large part on a 2015 cervical MRI of another person. Even when Harris questioned this MRI, Dr. Houghton failed to notice that <u>it was not actually performed on the Virgil Harris in this case</u>. Further, Dr. Houghton misread or mis-characterized Harris' actual medical records prior to the 2016 accident which show much lower levels of pain.

Dr. Houghton's other theory was that Harris was overstating his pain because his activities/hobbies were not consistent with 10/10 pain. However, as noted above Dr. Houghton seemed to be referring mainly to activities that occurred prior to his October 2016 accident and thus are irrelevant to the time frame here (such as playing golf in the summer of 2016 and arguing with his doctors concerning his April 2016 skin surgery). Finally even if Harris were still active in his hobbies post October 2016 this does not demonstrate that his pain does not interfere with his ability to work legally. The great majority of cases regarding this issue consistently hold that performing everyday activities such as golfing or dining out does not translate into the ability to perform work. See e.g., Black v. Jefferson Pilot Financial Co., 2006 U.S. Dist. LEXIS 1186,*10 (W.D. Ky. January 12, 2006)("Jefferson Pilot's contention that 'if a fellow can hike the woods in pursuit of the elusive wild turkey he can surely do some kind of work' fails to consider the entire question" of whether someone can maintain work and earn a salary); Thivierge v. Hartford Life & Accident Ins. Co., 2006 U.S.Dist.LEXIS 25216, *34-36 (N.D.Cal. March 28, 2006)(good days and bad days prevent consistent work); Hillock v. Continental Casualty Co., 2004 U.S.Dist. LEXIS 3907,*20-21 (N.D. Ill. March 1, 2004)("CNA also assumed that the ability to do some activities at home by itself shows that a claimant can perform the material duties of her job. This assumption is not supported by case law or common

sense"); <u>Hawkins v. First Union Corp.Long-Term Disability Plan</u>, 326 F.3d 914, 918 (7th Cir. 2003)(claimant's ability to do some activities at home did not establish that he could do a full time job).  In the Social Security context, the Eleventh Circuit has held that "participation in everyday activities of short duration such as housework or fishing" does not disqualify a claimant from disability and does not establish that a claimant can perform sedentary work.  <u>Lewis v. Callahan</u>, 125 F.3d 1436, 1441 (11th Cir. 1997).  Thus Dr. Houghton's second theory is unpersuasive.

## III.  CONCLUSION

For the reasons stated above, Harris respectfully moves this Court to grant his Motion For Summary Judgment and further moves this Court to award disability benefits payable to date and any other relief available including but not limited to attorneys' fees and interest.

Respectfully submitted this <u>13th</u> day of November, 2020.

ROGERS,  HOFRICHTER & KARRH, LLC


*s/Heather K. Karrh*

225 S. Glynn St., Ste. A     Heather K. Karrh
Fayetteville, GA 30214     Attorney for Plaintiff
(770) 460-1118     Ga. State Bar No. 408379

## CERTIFICATE OF COMPLIANCE AND

## CERTIFICATE OF SERVICE

I do hereby certify that this brief complies with the paper requirements in Local Rules. I hereby certify that I have this day attached a copy of the within and foregoing Plaintiff's Brief in Support of his Motion for Summary Judgment upon all parties to this matter by the ECF system with service to:

Amy E. Jensen

Scott Pomeroy

This 13th day of November, 2020.

ROGERS, HOFRICHTER & KARRH, LLC

*s/Heather K.Karrh*

225 S. Glynn St., Ste. A          Heather K. Karrh
Fayetteville, GA 30214           Attorney for Plaintiff
(770) 460-1118                   Ga. State Bar No. 408379