IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| VIRGIL HARRIS | ) |
| | ) |
|     Plaintiff | ) |
| | ) CIVIL ACTION |
| v. | ) |
| | ) FILE NO. 1:19-cv-04257-CC |
| LINCOLN LIFE ASSURANCE | ) |
| COMPANY OF BOSTON | ) |
| | ) |
|     Defendant | ) |

## PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Comes now the Plaintiff, Virgil Harris (hereinafter "Harris") and files this Brief

in Opposition to Lincoln Life Assurance Company of Boston's (hereinafter

"Defendant") Motion for  Judgment on the Administrative Record.

## I.    STATEMENT OF FACTS

### A.    OCCUPATION AND POLICY PROVISIONS

Harris worked for Robert Half International, Inc. as an accounting consultant.

(LIB 1).[1]     As a result of his employment, Harris was covered by a disability policy

insured by Defendant.  (LIB 1455-1551).  Under the policy  "Disabled" means after

---

[1]All LIB citations refer to the administrative record Bates- Labeled LIB-000001 through 001577 attached to Defendant's Motion.   Harris hereby incorporates these attachments by reference.

24 months: "the Covered Person is unable to perform, with reasonable continuity, the Substantial and Material Acts of any occupation... (LIB 1465).

### B.   MEDICAL CONDITION AND PAYMENT OF BENEFITS

Prior to an October 4, 2016 motor vehicle accident, Harris' medical records reflect hidradenitis suppurativa (a condition which causes painful lumps to form under the skin). (LIB 1159-1175).  The records show that he had a surgery for his hidradenitis on April 19, 2016.  (LIB 118-120).  He also had some moderate back pain in July and August of 2016 caused by playing golf. (LIB 1260-71, LIB 863-865).

On October 4, 2016 at 5:45 PM, Harris was struck from behind while driving and suffered back pain. (LIB 1434-1435).  On October 7, 2016 an MRI of the lumbar spine revealed that there was moderate degenerative spondylosis at all levels T11-12 through L5-S1, most prominent at L5-S1; that the L4-5 disc space level demonstrated degenerative spondylosis and narrowing of the disc with modic changes related to stress response.  (LIB 1424-25).  A central bulging disc and bone spur indented the thecal sac across the midline and that the L5-S1 disc space level demonstrated severe degenerative spondylosis and narrowing of the disc with modic changes related to stress response.  (LIB 1424-25). There was a central and right paracentral herniated disc protrusion with annular tear indenting the epidural space while touching the right S1 nerve root. (LIB 1424-25). There was foraminal bony stenosis due to facet

arthropathy.  (LIB 1424-25).  Small foraminal herniated disc protrusions and bone spurs were noted bilaterally.   (LIB 1424-25).

Due to this October 2016 accident, Harris was not able to work beyond October 14, 2016.  (LIB 1).  Harris' internal medicine doctor, Dr. Victor Blake, examined him on December 6, 2016 and stated that he could not work through March 1, 2017 due to severe back problems.  (LIB 1426).  On December 20, 2016, Harris went to see Dr. Erik Bendiks, an orthopaedic surgeon.  (LIB 822-23).  He recommended a cervical MRI to further assess Harris' neck pain and prescribed steroid injections in the lumbar spine.  (LIB 822-23).   At the next office visit on December 22, 2016, Dr. Bendiks diagnosed Harris as " status post vehicle collision on 10/4/16 with resultant cervicalgia and radiculopathy as well as aggravation of preexisting lumbago with disc herniation L5-S1 and thecal sac impingement." (LIB 819-20).  Dr. Bendiks wrote a letter stating that Harris was to remain off work until January 27, 2017.  (LIB 1357).

On January 23, 2017, Harris was examined by Dr. Mark Feeman, a physical medicine and rehabilitation specialist.  (LIB 251-253).  Dr. Feeman performed an examination and diagnosed intervertebral disc disorders with radiculopathy, lumbar region. (LIB 252).  He stated that Harris was totally and permanently disabled.  (LIB 252).  Dr. Feeman found that Harris could not sit for more than 30 minutes at a time and had to lie down for 30 minutes 4 times daily.  (LIB 252).

On January 24, 2017, Dr. Feeman filled out a detailed PCE stating that Harris could sit less than one hour, stand less than 1 hour, walk less than one hour in an eight hour day.  (LIB 254).  He could not lift or carry 10 pounds.  (LIB 254).  That same day Dr. Feeman drafted a letter to Defendant which stated:

> I have evaluated Mr. Harris['] medical records diagnostic studies and treatment to date.  It is my opinion within a reasonable degree of medical certainty that he is totally and permanently disabled due to his intervertebral disc disorders as a result of MVA....  (LIB 255).

Also, on January 24, 2017, Harris had his MRI of the Cervical Spine Without Contrast.  (LIB 491-93).  It revealed at C4-5 that there was a left posterior herniation of moderate size causing cord compression. (LIB 492).  At C6-7 there was a right posterior combination of moderate size protrusion and a smaller spur causing compression of the right side of the cord. (LIB 492).  At C5-6 there was a focal, posterior and central disc protrusion that was less prominent than at other levels, but was still causing some impression upon the anterior margin of the cord, although without spinal stenosis. (LIB 492-93).  Spurs caused moderate stenosis of the right foramen.  (LIB 493).

On February 28, 2017, Harris was treated by  Dr. Jose Mathew, a pain specialist, who found spondylosis with radiculopathy, lumbar region, low back pain, spondylosis in the cervical region inter alia. (LIB 679-83).  On March 28, 2017, Dr.

Mathew treated Harris again and refilled his pain medicine.  (LIB 676-78).

Defendant found Harris disabled and began paying benefits on April 13, 2017. (LIB 1).   On April 26, 2017, Dr. Bendiks noted that Harris' back pain remained severe.  (LIB 259).   Dr. Bendiks reviewed the cervical MRI and recommended bilateral medial branch blocks at C4-6. (LIB 260).  With regard to the lumbar spine, Dr. Bendiks stated:

> The patient has persistent pain despite adequate conservative treatment to include time, activity modification, medications, therapy, and injections.  Therefore I recommend anterior lumbar interbody fusion (5-S1 with PEEK cage, allograft/autograft and posterior facet screws. (LIB 260).

On May 16, 2017, Dr. Feeman completed a questionnaire for Harris.  (LIB 500-02).  He noted that Harris was disabled from any and all occupations and that the incapacity could last two to four years.  (LIB 501).

On May 19, 2017, Dr. Mathew noted that Harris suffered from chronic pain syndrome. (LIB 674). On June 16, 2017, Dr. Mathew's records documented ongoing pain. (LIB 671-72).  On July 12, 2017, Dr. Bendiks continued to recommend lumbar surgery.  (LIB 257-58).  He also recommended cervical surgery stating:

> I feel that too much time has transpired since the collision for injections to be an effective means of pain control.  Therefore, I recommend anterior cervical discectomy and fusion C4-7 with autograft, PEEK cage and anterior plate. (LIB 257-258).

That day, Dr. Bendiks advised Harris to remain off work and referred Harris to chronic pain management. (LIB 260, LIB 740). On July 17, 2017, Harris informed Defendant that his health insurance will not cover his surgery. (LIB 738).

Defendant performed a social media and corporate investigation on Harris on July 20, 2017. (LIB 723-36). This report concluded that he may have attended a music event and appeared to be active in his DJ career. (LIB 723-736). However, the years in which that these occurrences happened is not apparent. (Examine LIB 723-36). On August 1, 2017, the SSA denied Harris' claim due to a failure to pay into the system. (LIB 629). On August 11, 2017, Defendant performed surveillance on Harris and found no activity. (LIB 697-99). On September 1, 2017, Dr. Mathew treated Harris' "chronic pain syndrome." (LIB 668-69). On September 5, 2017, Dr. Blake found "chronic low back pain, obesity, osteoarthritis, lumbar radiculopathy and sciatica. (LIB 645-47).

On October 13, 2017, Dr. Arthur Kalman, board certified in physical medicine and rehabilitation, reviewed the file for Defendant and spoke with Dr. Bendiks' office. (LIB 659-666). A PA in Dr. Bendiks' office confirmed over the telephone that Harris could not perform sedentary work. (LIB 664). Dr. Kalman found the following diagnoses, Lumbar Spondylosis, Lumbar DDD, Lumbar spinal stenosis, Cervical radiculopathy, Hidradenitis suppurativa, elevated blood pressure, hepatitis,

obesity, and chronic pain syndrome amongst others. (LIB 664). Dr. Kalman concluded:

> After review of the records it is my opinion the claimant cannot sustain functionality for any period of time. He has multiple medical conditions as well as significant DDD and lumbar spinal stenosis. It was recommended that the claimant will need surgery. Complete functional impairment is supported. (LIB 664).

On November 1, 2017, Harris' lumbar spine showed decreased range of motion. (LIB 642-44). Dr. Mathew's records from December 2017 through April 2018 revealed chronic pain, decreased range of motion and noted that Harris has tried physical therapy, chiropractic care, injections and massage amongst other treatments. (LIB 639-41, 615-617, 394-403, 612-614, 609-611, 602-04). Harris' chiropractor, Dr. Lori Okun recorded in April and May of 2018 that Harris suffered from pain, spasms and the inability to cross his legs. (LIB 277-302). Dr. Peter J. Symbas, an orthopaedic surgeon, treated Harris on April 27, 2018 for osteoarthritis of the knees and epicondylitis of the right elbow. (LIB 266-268).

Harris' pain clinic records in May 2018, reveal back pain, radiculopathy, cervical pain with decreased range of motion, lumbarsacral pain with decreased range of motion and tenderness. (LIB 561-63, LIB 558-559). An MRI of the lumbar spine on June 11, 2018 revealed multi-level degenerative discs and a severe disc herniation at L5/S1 with right S1 nerve root impingement. (LIB 489-490, LIB 556). Pain clinic

records showed Harris remained in pain throughout June, July and August of 2018. (LIB 555-57, LIB 552-554, LIB 486-87). On September 17, 2018, Dr. Feeman's records demonstrated that Harris had severe pain which abated slightly with medications. (LIB 544). Dr. Feeman reiterated that Harris would not be productive. (LIB 546). He could not stand, walk or sit for prolonged periods of time, and would need to rest and change positions. (LIB 546). At times, the pain would reach levels where he might miss many days. (LIB 546). He stated that Harris was disabled from all employment. (LIB 546).

Harris' monthly pain clinic records from June 2018 to March 2019 reveal severe pain and need for narcotic medications. (LIB 552-54, 486-87, 544-46, 483-85, 480-82, 473-79, 469-71, 390-93, 387-89, 384-86). Harris' records from his family medicine clinic on April 9, 2019 explain his history of hidradenitis since 2001 noting multiple past surgeries with a current assessment of "hurley stage 2-3." (LIB 270).[2]

On April 17, 2019, a Dr. Howard Grattan reviewed the file for Defendant and attempted contact with one of Harris' doctors but failed to make contact. (LIB 360-366). Dr. Grattan conceded that Harris' findings in his records were significant, but

---

[2]Hurley stage 3 is the most severe form of HS. Due to this widespread and recurring nature, stage 3 can be very difficult to treat. Boils, tracts, and scars may be removed via surgery, when HS interferes with quality of life. https://www.healthline.com/health/hidradenitis-suppurativa-stages#hurley-stage-3

"would not preclude all level of function." (LIB 365). Without benefit of an examination, Dr. Grattan felt that Harris should have been able to perform sedentary work from October 15, 2016. (LIB 365-366).

Harris' chiropractic records in April of 2019 reveal Harris had pain. (LIB 236-40, LIB 241). On April 22, 2019, Defendant performed a TSA taking as true Dr. Grattan's opinion that Harris could perform work and found that Harris had the ability to be an accountant and a disc jockey amongst other similar jobs. (LIB 353-57).

## C.    FIRST DENIAL AND APPEAL

On April 30, 2019, Defendant denied Harris' ongoing benefits beyond April 22, 2019 via letter. (LIB 245-50). In the letter, Defendant relied upon Dr. Grattan's review of Harris' records and the vocational report. (LIB 245-50).

Dr. Blake's medical records on May 14, 2019 reveal that Harris suffered from back, arm, neck and knee pain. (LIB 262-65). Dr. Blake noted that Harris was on narcotic medications. (LIB 263). Upon examination, Dr. Blake stated that due to continuous pain Harris was unable to remain still for longer than 10 minutes. (LIB 264). He stated that Harris has known history of severe DDD complicated by several disc herniations and nerve impingement. (LIB 264). He found that Harris was unable to raise left arm above 90 degrees secondary to pain. (LIB 264). Dr. Blake stated: "in my clinical opinion, this patient is unable to return to work." (LIB 265).

On May 15, 2019, Harris appealed the denial via letter. (LIB 242-44). On May 21, 2019, Harris attended an IME in conjunction with his car wreck with a chiropractor, Dr. Donald Capoferri. (LIB 175-199). Dr. Capoferri focused on answering whether or not Harris' problems were caused by the motor vehicle accident on October 4, 2016. (LIB 182). Nevertheless, his examination results are instructive. (LIB 182). Dr. Capoferri noted Harris' varied attempts to treat his pain. (LIB 182). Dr. Capoferri  agreed that Harris needed both cervical and lumbar surgery "to maintain any level of functionality for the balance of ...[his] life."  (LIB 182). Overall he found permanent and consequential limitations. (LIB 182). In June of 2019, Harris submitted Dr. Capoferri's report. (LIB 172-173).

**D.    FINAL DENIAL**

On July 9, 2019, Defendant had the file reviewed by a Dr. Sheila Natarajan. (LIB 116-119). Dr. Natarajan was not able to make contact with Harris' pain doctor. (LIB 117). Without benefit of examination, Dr. Natarajan concluded that Harris could perform sedentary work. (LIB 117). Dr. Natarajan stated that the MRIs were from 2017 (she did not examine the 2018 lumbar MRI at that time) and opined that Harris' discs could have been recovered from his herniations "given the amount of time that has passed" and stated that it is "possible for disc resorption and remodeling to occur around the previous herniations."  (LIB 118). She deferred comment on the

hidradenitis to a more appropriate specialist. (LIB 118). On July 23, 2019, Defendant had another vocational statement made based upon Dr. Natarajan's opinion. (LIB 120).

On July 24, 2019, Defendant had the file reviewed by Dr. David Houghton, an internist and pediatrician. (LIB 122-128). Dr. Houghton did not examine Harris. (LIB 122-128). Dr. Houghton did not even attempt to discuss Harris' case with any of his doctors. (LIB 122-128). Dr. Houghton's report is riddled with flaws. (LIB 122-128). For example, his main opinion was that Harris had long standing neck and back pain since before 2013, but that Harris was able to work with the pain and thus should be able to work with the pain he has had since the 2016 "minor automobile collision." (LIB 123, LIB 128). The most obvious problem with Dr. Houghton's theory that Harris had long standing pain since before 2013 is that Dr. Houghton only reviewed records from 2015 forward. (LIB 128). Another serious flaw with Dr. Houghton's report is that he failed to thoroughly examine the records. (LIB 123). Dr. Houghton begins his analysis stating that "the claimant has a long history of neck and back pain. In 2015 he had an MRI of the cervical spine that showed degenerative changes..." (LIB 123). Had Dr. Houghton thoroughly examined the 2015 MRI, he would have found that it was an MRI of another Virgil Harris who was born June 19, 1952 (ten years before the Virgil Harris in this case) that must have been placed in

Harris' file by accident.  (LIB 491).[3]  Harris' actual birth date is on the front page of

Dr. Houghton's report so ignorance cannot be an excuse here.  (LIB 122).  Thus, Dr.

Houghton's argument is based in large part on a mistake.  (LIB 122).  Further the

medical records that actually did concern Harris that Dr. Houghton examined did not

show serious pain prior to the October 2016 accident.   (LIB 123).   Dr. Houghton

himself admits that Harris' "annual exams in May 2015 and March 2016 said nothing

about neck and back pain."  (LIB 123).

Overall, Dr. Houghton stated that Harris' self documented recreational activity

suggested that his condition was not as severe as he indicated to his clinicians.  (LIB

123).  However  Dr. Houghton utilizes activity which occurred before the October

2016  motor vehicle collusion and before Harris claimed disability status in this

attempt to undermine Harris' credibility.  (LIB 124).  He references Harris being

upset with his doctors after one of his skin surgeries in April of 2016 and the back

strain after playing golf in July of 2016.  (LIB 124).   Neither of these events are

germane to Harris' condition after the October, 2016 accident.  (LIB 124). Dr.

Houghton then claimed that Harris' facebook posts and photos showed he was active

with his DJ career despite the fact that the investigative report did not actually

demonstrate what year any of the activities occurred.  (LIB 126).  In the previously

---

[3] The ID # is also different.  Compare LIB 491 with LIB 489.

attached affidavit, Harris explained that the events documented in the social media field investigation were all prior to the 2016 accident.  (See Exhibit A to MSJ).

Dr. Houghton admitted that the January 2017 MRI of the cervical spine showed more serious problems than the 2015 cervical MRI (the one which concerned another person entirely), but opined that Harris' main symptoms are caused by his low back and that **it** is caused by his obesity. (LIB 125).

Dr. Houghton examined Harris' facebook page which apparently had a video of his June 2019 skin surgery and appeared in Dr. Houghton's opinion to show Harris in no pain and with good range of motion in one of his shoulders.  (LIB 127).  Dr. Houghton also stated that the Facebook page showed a good social life and golfing "at the same time" as Harris reporting constant pain.  (LIB127).  However, Dr. Houghton does not actually provide copies of the Facebook page or the video with his report.  (LIB 127).  Overall, Dr. Houghton opined that Harris could perform full-time productive activity.  (LIB 128).

On August 2, 2019, Harris wrote Defendant stating amongst other things that his social life is down 80% since the October 2016 accident, that he has not worked as a DJ in years.  (LIB 81-88).  He also stated that the video of his June 2019 surgery was 13 seconds.  (LIB 85).  Harris further questioned whether a 2015 Cervical MRI was actually performed.  (LIB 86).

Dr. Houghton produced an addendum on August 16, 2019. (LIB 74-76). Again, Dr. Houghton relies upon the video of the skin surgery stating that Harris remained sitting longer than ten minutes during the surgery. (LIB 74).  Dr. Houghton does not address the obvious fact that Harris would have had at least local anesthesia during this time. (LIB 74).  Dr. Houghton again failed to notice that the 2015 cervical MRI does not concern the Harris in this case even after Harris questioned its existence. (LIB 75).  Dr. Houghton states that "review of the records showed that one was done on 2/17/15" without noticing that this MRI was done on a different person. (LIB 75).  Again he references the time Harris hurt himself golfing in July 2016. (LIB 74).  Dr. Houghton stated that Harris stated he had 10/10 pain as a result of the golf swing during that summer and yet continued to work.  (LIB 74).  However when Harris' records from July 2016 and August 2016 are examined there does not appear to be any statement from Harris regarding 10 out of 10 pain.  (LIB 1260-71 and  LIB 863-65).    Instead the pain is described as achy, dull and moderate.  (LIB 1260-71 and  LIB 863-LIB 865).  Here Dr. Houghton again appears to be incompetent.  (LIB 1260-71 and LIB 863-65).  In his addendum, Dr. Houghton stated that disc herniations are often asymptomatic. (LIB 74).  The remainder of Dr. Houghton's addendum appeared to be generalizations. (LIB 76).

On August 19, 2019, Harris submitted a letter from his dermatologist, Dr. Tava

14

Rogers, which stated:

> Mr. Virgil has active disease and when new lesions come up on his buttocks, it can be very painful to sit, especially for prolonged periods of time. This is a chronic disease without a cure and, unfortunately, patients will suffer throughout their lives with episodes of these debilitating skin lesions. (LIB 61).

Medical records from Dr. Blake on August 19, 2019 revealed neck and back pain since October 2016. (LIB 69-73). Harris stated that the pain was worse when turning his neck to the side, especially to the left. (LIB 69-73). The pain was also worse with sitting for long periods, standing up straight, walking for long periods, and raising his left arm. (LIB 69-73). The pain was worse when turning head to either side, especially the left. (LIB 69-73). The pain was made better with pain medication, leaning forward and maintaining motion. (LIB 69-73). The pain shoots down the leg and back all the way down to both feet, especially the right foot. (LIB 69-73). Dr. Blake found that the pain was chronic, severe and unchanged and that the pain was present in the thoracic spine, sacroiliac, lumbar spine and gluteal region. (LIB 69-73).

On August 22, 2019, Dr. Natarajan submitted an addendum in which she examined the 2018 MRI that she had failed to review previously. (LIB 56). She admitted that it showed similar problems as the 2017 lumbar MRI, but stated that it did not change her opinion as to Harris' limitations. (LIB 56).

On August 23, 2019, Defendant issued a final denial letter relying on Dr. Grattan, Dr. Houghton and Dr. Natarajan's reports. (LIB 47-55). This lawsuit ensued. (See Complaint).

## II.   ARGUMENT AND CITATION OF AUTHORITY

### A.   STANDARD OF REVIEW

The Eleventh Circuit has set out a multi-step test which governs most ERISA cases:

> (1) Apply the de novo standard to determine whether the claim administrator's benefits-denial decision is "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.
> (2) If the administrator's decision in fact is "de novo wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

Acree v. Hartford Life & Acc. Ins. Co., 917 F. Supp. 2d 1296, 1304–05 (M.D. Ga. 2013) (citations omitted).

In its Memorandum, Defendant admits that there is no discretionary language in the plan. (Doc. 35-1 at 4). Defendant then completely misrepresents Eleventh Circuit law. Defendant claims that in ERISA cases decided under the *de novo* standard "the district court sits more as an appellate tribunal than as a trial court" citing Curran v. Kemper Nat. Servs., Inc., No. 04-14097, 2005 WL 894840, at *7 (11th Cir. Mar. 16, 2005). (Doc. 35-1 at 4). However, when the case is examined it

16

is clear that the Eleventh Circuit was referring to cases in which the plan contained

discretionary language.   The Curran Court stated:

> The Supreme Court, however, has explained that " '[w]here discretion
> is conferred upon the trustee with respect to the exercise of a power, its
> exercise is not subject to control by the court except to prevent an abuse
> by the trustee of his discretion.' " Firestone Tire & Rubber Co. v. Bruch,
> 489 U.S. 101, 111, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989) (citation
> omitted) (alteration in original). "[I]n an ERISA benefit denial case ...
> in a very real sense, the district court sits more as an appellate tribunal
> than as a trial court. It does not take evidence, but, rather, evaluates the
> reasonableness of an administrative determination in light of the record
> compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d
> 11, 17-18 (1st Cir.2002).

Id.

Under the *de novo* standard, an ERISA court acts as a normal court.   It gives

no deference to Defendant in anyway.  Further a court conducting a *de novo* standard

of review may consider any relevant evidence  regardless of whether this evidence

was made available to the administrator.  See Kirwan v. Marriott Corp., 10 F.3d 784,

789 (11th Cir.1994) (a court conducting a *de novo* standard of review may consider

any relevant evidence in existence regarding an individual's disability at the time the

plan administrator's decision was made regardless of whether this evidence was made

available to the administrator).   Thus in no way does a district court act as an

appellate court in an ERISA case decided under a *de novo* review in the Eleventh

Circuit.  The only issue is in this case is whether Harris is disabled by preponderance

of the evidence.

### 1.   DEFENDANT'S DECISION WAS *DE NOVO* WRONG

Harris has overwhelming support from his doctors.  Dr. Blake, Dr. Feeman and Dr. Bendiks have made repeated and detailed statements supporting Harris' disability. Harris has objective evidence of his back problems and his skin problems which are shown through repeated MRIs and other tests.  These problems are known to cause pain.  Harris has been recommended to have both neck and back surgery.  Harris' skin condition interferes with his ability to sit.  Harris has the results of his PCE with Dr. Feeman and the results of his IME with Dr. Capoferri.  Harris has medical records showing that short of surgery (which is not covered), he has undergone every possible treatment for his pain.  Harris' medical records also show consistent reports of pain since October 2016.  Harris' records show that he has to take narcotic medications. Finally, one of Defendant's own doctors, Dr. Kalman, reviewed the file and agreed that Harris was totally disabled. (LIB 659-666).   In contrast, Defendant has the record reviews of three doctors who never even spoke with Harris' treating physicians much less actually examined Harris himself.

In its Memorandum, Defendant argues that "absent proof of functional limitation, mere subjective reports of pain cannot establish disability benefits" citing case law.  (Doc. 35-1, p. 26).   The problems with this argument are manifold.  First

Harris has proof of functional limitations.  Amongst other evidence, Harris has the results of a PCE performed by an occupational medicine specialist, Dr. Feeman. Second, Harris does not have "mere subjective reports of pain."  Harris has MRIs demonstrating objectively his need for both back and neck surgery.  Third, all of the case law cited by Defendant is irrelevant to the case *sub judice.*  Defendant cites Taylor v. Broadspire, 314 Fed. Appx. 187(11th Cir. 2008) for the idea that reports of pain alone are insufficient.  However, Defendant fails to mention that the main reason the plaintiff's evidence was found to be insufficient was that the plaintiff failed to submit hardly any evidence at all.  Id. at 188.  The plaintiff in Taylor submitted one statement from one of her treating doctors and one day of medical records.  Id. at 188. The plaintiff stated that  she "could not afford to make copies of her medical records." Id. at 189.  Clearly this case bears no resemblance to Harris' case .  Likewise Richey v. Hartford Life & Accident Ins. Co., 608 F.Supp.2d 1306 (M.D. Fla. 2009) is unhelpful.  The District Court in Florida found that pain complaints were not enough to prove disability primarily because two of plaintiff's own doctors had stated in writing that plaintiff could perform full-time work.  Id. at 1311.  Harris' doctors have consistently supported his case.  Finally, Defendant cited Howard v. Hartford Life & Accident Ins. Co., 929 F. Supp. 2d 1264, 1295 (M.D. Fla. 2013).   In Howard, the District Court did not find against the plaintiff because she failed to submit objective

medical evidence of functionality.  Id. at 1295.  The Court disregarded the plaintiff's

pain complaints because the insurance company had 20 hours of surveillance showing

plaintiff generally conducting normal activities in a normal manner.  Id. at 1295.

Defendant has no such evidence in this case.  Defendant's surveillance revealed

nothing.  Defendant attempted to characterize Harris' social life as being active, but

all the evidence of his social activities referenced in the file appear to be prior to his

October 2016 accident and thus irrelevant.

Defendant next complains that there are inconsistencies in the medical records.

Defendant states that while Harris "consistently self-reported pain of '10/10,' pain,

the contemporaneous examination evidence consistently showed that he presented in

'no acute distress'" citing seven days of pain clinic records at LIB 552, LIB 486, LIB

480, LIB 469, LIB 433, LIB 387, LIB 384.  (Doc. 35-1 at 28).   However when the

actual records are examined it is clear that Harris' pain reports varied.  On three of

these days he did report 10/10 pain.  (LIB 433) (LIB 486) (LIB 552).  But on one of

these days, Harris' pain was "8/10 average.  The severity of the pain without pain

medication is 10/10.  The severity of the pain with pain medication is 6/10."  (LIB

384).  On another day, Harris' pain was 8/10 average and with medication 7/10. (LIB

460).   On October 29, 2018, it was 8/10 average.  (LIB 480). On March 1, 2019,

Harris' records reflect no pain scale report at all.  (LIB 387). Obviously, Defendant's

argument would be more convincing if it were factually true.

The problem with Defendant's argument regarding inconsistencies in the medical records is not only that Defendant is misrepresenting what the actual records state, but also that Defendant is "cherry picking" the records. Defendant states that the records show that Harris' breathing was "unlabored" that he maintained muscle strength, spoke normally and was oriented to person, place or time. Most of these items are irrelevant. Harris is not claiming disability due to respiratory distress or mental illness. Harris is claiming disability in large part due to neck and back pain for which he needs surgery. However, Defendant is also taking these phrases out of context. Such interpretations are not lawful and a myriad of courts have held that medical records must be read completely. See e.g., Glenn v. Metro. Life Ins. Co., 461 F.3d 660, 663 & 669 (6th Cir. 2006), aff'd sub nom. Metro. Life Ins. Co. v. Glenn, 554 U.S. 105, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) ("doing clinically well" and "improvement" in the medical records not enough to show not disabled); Elliot v. Metropolitan Life Ins. Co., 473 F.3d 613, 619-620 (6th Cir. 2006)("logically speaking, evidence of improvement, without a starting or ending point, does not help answer the question of whether an individual can perform her occupation"); Myers v. Hercules, Inc., 253 F.3d 761, 767(4th Cir. 2001)(defendant took phrases such as "no pain at this time" out of context and ignored the thrust of the doctor's opinions).

Defendant's next argument is that Harris' spine did not worsen between the February 17, 2015 MRI when Harris was working full time and the October, 2016 accident comparing the February 17, 2015 MRI and the October 7 MRI. (Doc. 35-1 at 29). The problem with this argument is that the February 17, 2015 MRI was a MRI of a different Virgil Harris, as is obvious by the birth date on the MRI. (LIB 491). In reality, Defendant has no actual evidence that Harris' spine did not worsen after October 2016 and thus this argument is without merit.

Defendant then complains that only Dr. Blake offered a supportive opinion after Lincoln's termination of benefits. Again there are obvious flaws with this argument. First, it does not appear to be true. The May 21, 2019 IME which found "permanent and consequential limitations" occurred after the April 30, 2019 termination of benefits. (LIB 182). Further, Harris' dermatologist wrote a supportive letter on August 19, 2019 explaining his problems with prolonged sitting. Second, Defendant has no evidence indicating that Dr. Bendik or Dr. Feeman have changed their opinions regarding Harris' functionality.

Defendant then argues that it was right to discount Dr. Blake's "advocacy" because his medical records were essentially normal on the two days that he stated in his records that Harris was disabled, December 6, 2016 and May 14, 2019. (Doc. 35-1 at 30). Here again Defendant misrepresents what the evidence actual shows.

On December 6, 2016, Dr. Blake stated the symptoms and exam were most consistent with a back injury. (LIB 844).  On May 14, 2019, Dr. Blake found back pain due to severe degenerative disc disease complicated by several herniations and nerve impingement, arm pain, neck pain and knee pain.  (LIB 262-264).  He found severe pain and loss of range of motion of the left upper extremity 2/2 herniated C-Spine Disc including the inability to raise the left arm above 90 degrees.  (LIB 262-264).  Obviously this was not a "normal" exam.

Defendant then makes a strange argument that it has a duty to preserve fund assets so it is obligated to ignore Dr. Blake.  Defendant is an insurance company.  This is not a self-funded plan involving a trust fund.

Defendant's next argument is that its three non-examining doctors issued well reasoned reports.  Harris has already demonstrated in his previous briefing that each of these "expert" reports were intrinsically flawed.  To summarize, Dr. Grattan did not provide any actual explanation of why he believed Harris was able to work.  Conclusive opinions without evidence are not persuasive.

Dr. Natarajan did have some reasoning to support her position, but she undermined that reasoning in her addendum.  In her first report, Dr. Natarajan reasoned that the 2017 MRIs were somewhat dated/older and that Harris could have improved by this time.  In her addendum she reviewed the 2018 MRI that she had

missed previously.  She noted that the 2018 MRI revealed that the herniations were still present, but stated that it did not change her mind.  In other words, she decided that it did not matter that Harris had not actually improved despite that being the central reason she did not originally find him to be totally disabled.   Inconsistency in reasoning is unpersuasive.

Dr. Houghton's reasoning was worse than inconsistent.  It was incompetent. Dr. Houghton has two main theories neither of which are convincing.  One was that Harris' pain was long standing and that he was able to work with the pain, because it had not worsened since the 2016 accident.  The actual evidence shows that while Harris had some pain prior to October 2016, the October 2016 accident caused serious, long standing, debilitating problems.  Dr. Houghton based his theory in large part on a 2015 cervical MRI of another person.  Even when Harris questioned this MRI, Dr. Houghton failed to notice that <u>it was not actually performed on the Virgil Harris in this case</u>.

Dr. Houghton's other theory was that Harris was overstating his pain because his activities/hobbies were not consistent with 10/10 pain.  However, Dr. Houghton referred mainly to activities that occurred prior to his October 2016 accident and thus are irrelevant.  Finally even if Harris were still active in his hobbies post October 2016 this does not demonstrate that his pain does not interfere with his ability to work

legally. Dr. Houghton's second theory is unpersuasive.

Defendant then argues that its experts are more convincing because they are the only ones who examined the medical records.  However, Dr. Feeman appears to have examined Harris' medical records prior to making his conclusions.  (LIB 255). Moreover, Harris' doctors had the advantage of being able to actually examine Harris.

Defendant then incredibly claims that Harris' proof is not objective. It is difficult to imagine more objective proof then two MRIs which show the need for two surgeries.   The Eleventh Circuit agrees stating: "traditionally, laboratory and other quantitative medical testing, such as MRIs, CAT Scans, and functional impairment tests, are considered objective medical evidence." Lee v. BellSouth Telecommunications, Inc., 318 F. App'x 829, 837 (11th Cir. 2009).

## III.    CONCLUSION

For the reasons stated above, Harris respectfully moves this Court to DENY Defendant's Motion For Judgment on the Administrative Record.

Respectfully submitted this 4th day of December, 2020.

ROGERS,  HOFRICHTER & KARRH, LLC

*s/Heather K. Karrh*

225 S. Glynn St., Ste. A          Heather K. Karrh
Fayetteville, GA 30214           Attorney for Plaintiff
(770) 460-1118                        Ga. State Bar No. 408379

## CERTIFICATE OF COMPLIANCE AND
## CERTIFICATE OF SERVICE

I do hereby certify that this brief complies with the paper requirements in Local Rules. I hereby certify that I have this day attached a copy of the within and foregoing Plaintiff's Brief in Support of his Motion for Summary Judgment upon all parties to this matter by the ECF system with service to:

Amy E. Jensen

Scott Pomeroy

This 4th day of December, 2020.

ROGERS, HOFRICHTER & KARRH, LLC

*s/Heather K.Karrh*

225 S. Glynn St., Ste. A         Heather K. Karrh
Fayetteville, GA 30214           Attorney for Plaintiff
(770) 460-1118                   Ga. State Bar No. 408379