# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

VIRGIL HARRIS,
    Plaintiff,

v.

LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON,
    Defendant.

CIVIL ACTION NO.:
1:19-cv-4257-CC

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

**Table of Contents**

Table of Authorities  ...................................................................................  iii

Introduction  .............................................................................................  1

Argument  ................................................................................................  2

I.    Plaintiff's presentation of the case is flawed because he
      misleadingly focuses on medical evidence from the wrong
      time period and erroneously reverses the burden of proof.  .....................  2

II.   Plaintiff failed to meet his burden to prove any functional
      limitations that precluded him from sedentary-level work
      beyond April 13, 2019.  ............................................................  7

III.  Plaintiff's attacks on Lincoln's consulting physicians are
      flawed and misunderstand the role of such consultants
      in the claim review process.  .....................................................  12

      A.    There was no reason for Dr. Grattan—or Lincoln—to
            request an in-person examination of Plaintiff given the
            medical examinations in the record leading up to the
            Group Policy's change of definition on April 13, 2019.  .............  13

      B.    Dr. Natarajan fully considered Plaintiff's 2018 MRI,
            and that imaging study contains nothing that should
            have changed her opinion.  ..........................................  15

      C.    Plaintiff criticizes Dr. Houghton for relying on evidence
            that Plaintiff submitted, overlooks Dr. Houghton's
            detailed response to criticisms raised during the appeal
            process, and now attempts to raise additional criticisms
            that were not timely raised.  ........................................  18

IV.   Plaintiff's attempt to shift the basis of his claim to hidradenitis,
      based on his April 2019 flare-up, must fail because the medical

evidence as to that flare-up does not support functional
limitations as to sedentary-level seated work.  ......................................  24

Conclusion   .............................................................................................  25

## Table of Authorities

**Cases**

Abromitis v. Continental Casualty Co., 261 F. Supp. 2d 388
(M.D.N.C. 2003), *aff'd*, 114 Fed. App'x 57 (4th Cir. 2004) .................. 11

Black v. Jefferson Pilot Financial Ins. Co., 2006 WL 119409
(W.D. Ky. Jan. 12, 2006) ........................................................ 12

Black & Decker Disability Plan. v. Nord, 538 U.S. 822 (2003) ................ 12, 23

Blankenship v. Metropolitan Life Ins. Co., 644 F.3d 1350 (11th
Cir. 2011), *cert. denied*, 565 U.S. 1093 (2011) ....................................... 22

Bumpas v. Unum Life Ins. Co., 2005 WL 2428537 (M.D. Fla.
Sept. 30, 2005) ...................................................................... 10

Burt v. Metropolitan Life Ins. Co., 2005 WL 4712457 (N.D. Ga.
Sept. 16, 2005) ...................................................................... 12

Calvert v. Firstar Fin., Inc., 409 F.3d 286 (6th Cir. 2005) ............................... 14

Craine v. Hartford Life & Accident Ins. Co., 2011 WL 1130591
(M.D.N.C. March 25, 2011) ...................................................... 11

Cusson v. Liberty Life Assurance Co., 592 F.3d 215 (1st Cir. 2010) ............. 15

Cusumano v. Continental Casualty Co., 2008 WL 1711405 (N.D.
Fla. April 1, 2008) ................................................................. 8

Denmark v. Liberty Life Assurance Co., 566 F.3d 1 (1st Cir. 2009) ............... 22

Gipson v. Admin. Comm. of Delta Air Lines, 350 Fed. App'x 389
(11th Cir. 2009) ...................................................................... 12

Harris v. Trustmark Nat'l Bank, 287 Fed. App'x 283 (5th Cir.
2008) .................................................................................. 21

Hawkins v. First Union Corp. LTD Plan, 326 F.3d 914 (7th Cir.
    2003) ........................................................................................ 23

Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99
    (2013) ...................................................................................... 3

Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75 (2d Cir. 2009) .................. 14

Howard v. Hartford Life & Accident Co., 929 F. Supp. 2d 1264
    (M.D. Fla. 2013), *aff'd*, 563 Fed. App'x 658 (11th Cir.
    2014) ....................................................................................... 7

Hufford v. Harris Corp., 322 F. Supp. 2d 1345 (M.D. Fla. 2004) ............ 3, 7, 13

Johnson v. Metropolitan Life Ins. Co., 2008 WL 2302693 (N.D.
    Ga. May 30, 2008) .................................................................. 12

Killen v. Reliance Standard Life Ins. Co., 776 F.3d 303 (5th Cir.
    2015) ...................................................................................... 14

Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997) ........................................ 23

Montanile v. Board of Trustees of Nat'l Elevator Industry Health
    Benefit Plan, 577 U.S. 136 (2016) ......................................... 15

Nicula v. First Unum Life Ins. Co., 23 Fed. App'x 805 (9th Cir.
    2001) ................................................................................. 14, 15

Onofrieti v. Metropolitan Life Ins. Co., 320 F. Supp. 2d 1250
    (M.D. Fla. 2004) ................................................................. 3, 13

Rutledge v. Liberty Life Assurance Co., 481 F.3d 655 (8th Cir.
    2007) ...................................................................................... 14

Williams v. Aetna Life Ins. Co., 509 F.3d 317 (7th Cir. 2007) ....................... 14

Zorn v. Principal Life Ins. Co., 2012 WL 112949 (S.D. Ga.
        Jan. 12, 2012) ................................................................................ 7, 8

**Statutes and Regulations**

Employee Retirement Income Security Act of 1974 ("ERISA"),
        29 U.S.C. § 1001, *et seq.* ............................................................... *passim*

Defendant Lincoln hereby opposes Plaintiff's Motion for Summary Judgment (ECF Doc #36).  Lincoln incorporates by reference its Local Rule 56.1 Response to Plaintiff's Statement of Material Facts, as well as Lincoln's own dispositive motion papers (ECF Doc. #35), including its previously filed Memorandum in Support of its Motion for Judgment on the Administrative Record.  *See* ECF Doc. #35-1.

## Introduction

Plaintiff's Brief distorts the record by focusing primarily on medical evidence dating from 2016 and 2017, which Lincoln credited in its initial approval of LTD benefits, and downplaying Plaintiff's failure to submit evidence of functional limitations continuing up to and beyond April 2019, when Lincoln terminated benefits.  As is well established in the ERISA benefits context, neither a mere diagnosis nor a claimant's self-report of subjective symptoms can establish a disability claim absent actual evidence of functional limitations and an inability to work.  Similarly, it was not Lincoln's burden—nor was it the burden of Lincoln's consulting physicians—to disprove Plaintiff's claim.  At all times the burden was Plaintiff's to prove an ***ongoing*** disability.  This, Plaintiff simply failed to do.  He cannot fault the consulting physicians for his own failure to submit adequate proof or for their reliance on certain evidence that he now contends he submitted in error.

1

**Argument**

**I.     Plaintiff's presentation of the case is flawed because he misleadingly focuses on medical evidence from the wrong time period and erroneously reverses the burden of proof.**

The key date in this case is April 13, 2019.  That is the date on which the Group Policy's definition of disability changed from an "own occupation" to an "any occupation" standard.  *See* LIB1465.  Prior to that date, Lincoln paid LTD benefits in full.  After that date, Plaintiff failed to prove ongoing functional limitations that precluded his ability to work in any occupation.

Plaintiff's opening brief highlights the medical evidence between the dates of his October 2016 automobile accident and Dr. Kalman's October 2017 review.  *See*, *e.g*., Pl.'s Br. at 3–8 (ECF Doc. #36-1).  Whatever weight such evidence deserves, it is undisputed that Lincoln approved LTD benefits throughout that entire period, LIB765, and that Dr. Kalman opined that the restrictions from sedentary work identified in October 2017 might reasonably continue for another "[t]hree months," after which, Plaintiff's progress should be re-assessed.  LIB657.  As it happened, Lincoln actually continued paying LTD benefits for another eighteen months beyond the date of Dr. Kalman's report.  Lincoln paid until April 22, 2019.  *See*, *e.g*., LIB347.

2

Plaintiff largely glosses over the relevant medical evidence leading up to the April 2019 change of definition, and presents his arguments as if, having initially obtained LTD benefits, the burden somehow shifted to Lincoln to prove that Plaintiff had regained an ability to work.  Under ERISA, the burden does not shift that way.  The burden of proof remains at all times with the claimant to prove an ongoing and continuous disability under the terms of the plan.  *See*, *e.g*., LIB1471 (defining "Proof" under the Group Policy); Heimeshoff v. Hartford Life & Accident Ins. Co., 571 U.S. 99, 108 (2013) ("The plan, in short, is at the center of ERISA."); *see also*, *e.g*., Hufford v. Harris Corp., 322 F. Supp. 2d 1345, 1360 (M.D. Fla. 2004) ("As a result of the payment of benefits, the plan does not incur the burden of showing a change in the claimant's condition in order to justify a termination of benefits; the claimant retains the burden of proving continued disability."); Onofrieti v. Metropolitan Life Ins. Co., 320 F. Supp. 2d 1250, 1254 (M.D. Fla. 2004) ("[T]he Court concludes that past payment of benefits does not shift the burden of proof.").

Here, the medical evidence leading up to the time of Lincoln's change-of-definition review simply does not support Plaintiff's contention that he remained continuously disabled from all sedentary work.

3

Specifically, Plaintiff's June 11, 2018 MRI showed "mild" and "moderate" degeneration, but "[n]o vertebral compression deformity or significant listhesis . . . at any level." LIB0489. It also showed "[n]o paraspinal soft tissue pathology . . . in the lumbar region." LIB0489. Absent significant compression, listhesis, or soft tissue pathology, the report simply does not support the maximal levels of pain self-reported by Plaintiff to his treating physicians. The MRI certainly does not prove functional restrictions incompatible with sedentary work.

Plaintiff was examined by Nurse Practitioner Stephanie Bridges on January 29, 2019. *See* LIB0433. She recorded that Plaintiff was not in acute distress, his respiration was "unlabored," his strength was "5/5" in upper and lower muscle groups, and his neurological sensations and deep tendon reflexes were "grossly intact." LIB0433–34. Nurse Bridges determined that Plaintiff's thoracic range of motion was within normal limits. LIB0434. She also noted the absence of any skin lesions at the time of her exam. LIB0434

Plaintiff was next examined by Nurse Practitioner Deborah Wilkens on March 1, 2019. *See* LIB0387–88. Again, Plaintiff was in no acute distress, his respiration was "unlabored," his strength was "grossly intact in major muscle groups of bilateral upper and lower extremity," his neurological sensation and deep tendon reflexes ("DTRs") were "grossly intact." LIB0387–88. Plaintiff's range of

4

thoracic motion "appear[ed] to be within normal limits," and his thoracic spine was "non-tender to palpation." LIB0388. Nurse Wilkins also wrote, "no gross skin lesions noted upon observation." LIB0388.

Plaintiff was then examined by Registered Nurse Dalandra Belcher on March 27, 2019. LIB0384–85. She too recorded that Plaintiff was not in acute distress, his breathing was "unlabored," his skin was free of lesions, and his "strength [was] grossly intact." LIB0384–85. Plaintiff's thoracic range of motion was "within normal limits," and his thoracic spine was "non-tender to palpation." LIB0385. As to Plaintiff's mental status, Nurse Belcher noted that he responded to commands, "converse[d] appropriately," and was "alert, aware, oriented to person, place, and time." LIB0385.

On April 9, 2019—four days before the Group Policy's change of definition—Plaintiff was examined by Dr. Lauren Orenstein, a dermatologist he consulted regarding a new hidradenitis flare-up. *See* LIB327. The flare-up was in Plaintiff's right armpit. Dr. Orenstein's exam describes Plaintiff as a "WDWN male, NAD," which means "well-developed, well-nourished male, not in acute distress." *See* LIB0328. Apart from Plaintiff's skin condition, Plaintiff's presentation was unremarkable. Indeed, the clinic note contains no mention of any

5

functional restrictions or limitations whether due to Plaintiff's hidradenitis flare-up or any other medical condition.

Moreover, the medical evidence immediately after the Group Policy's change of definition also confirms that Lincoln's determination was correct.  For example, Plaintiff visited Dr. Victor Blake on May 14, 2019.  LIB0262.  Dr. Blake's office note echoes Plaintiff's self-report of chronic pain, but the physical examination on that date states:

> Constitutional: [Plaintiff] is oriented to person, place, and time. He appears well-developed and well-nourished.
>
> * * *
>
> Neck: Normal range of motion.  Neck supple.
>
> Cardiovascular:  Normal rate, regular rhythm, normal heart sounds . . .
>
> Pulmonary/Chest:  Effort normal and breath sounds normal.  No respiratory distress.
>
> * * *
>
> Musculoskeletal:  Normal range of motion.  He exhibits no edema, tenderness or deformity.
>
> Neurological:  He is alert and oriented to person, place, and time. He has normal reflexes.  He displays normal reflexes.  No cranial nerve deficit.  He exhibits normal muscle tone. Coordination normal.
>
> Skin:  Skin is warm and dry.  No rash noted.  No erythema.  No pallor.

6

> Psychiatric:  He has a normal mood and affect.  His behavior is
> normal.  Judgment and thought content normal.

LIB0264.  Such objective medical examination evidence undercuts and refutes

Plaintiff's assertion—and Dr. Blake's *post-hoc* advocacy—that Plaintiff was

functionally disabled from all work at the time Lincoln terminated benefits.

## II.     Plaintiff failed to meet his burden to prove any functional limitations that precluded him from sedentary-level work beyond April 13, 2019.

Plaintiff argues that he "has objective evidence of his back problems and his

skin problems which are shown through repeated MRIs and other tests."  Pl.'s Br.

at 21.  Plaintiff also places great emphasis on his own subjective and self-reported

"10/10" pain—reports that his doctors dutifully recorded in their progress notes.

*See*, *e.g*., Pl.'s Br. at 10, 18.  But, as Courts have regularly admonished, a mere

diagnosis is not a disability, *see*, *e.g.*, Howard v. Hartford Life & Accident Co.,

929 F. Supp. 2d 1264, 1294 (M.D. Fla. 2013), *aff'd*, 563 Fed. App'x 658 (11th Cir.

2014) ("Indeed, doctors' diagnoses do not in and of themselves, establish a

disability and inability to work."), and subjective complaints of pain—without

objective evidence of functional limitation—are not sufficient to establish a

disability claim.  *See*, *e.g*., Hufford, 322 F. Supp. 2d at 1355 (explaining that

ERISA plans "would be open to fraudulent abuse if all that was required for receipt

of LTD benefits was the subjective complaints of a claimant"); Zorn v. Principal

Life Ins. Co., 2012 WL 112949 at *13 (S.D. Ga. Jan. 12, 2012) ("Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)."); Cusumano v. Continental Casualty Co., 2008 WL 1711405 at *7 (N.D. Fla. April 1, 2008) ("[Claimant's] subjective [pain] complaints do not become objective simply because a doctor wrote them down.").

Here, Plaintiff did not furnish, as was his burden, evidence sufficient to prove that he was functionally unable to perform the duties of "any occupation" after April 13, 2019. *See* LIB1465; LIB1471; LIB1481. As to his purported functional limitations, Plaintiff relies primarily on the reports prepared by Dr. Mark Feeman and Dr. Donald Capoferri, *see*, *e.g.*, Pl.'s Br. at 4, 12–13, but neither of those reports answer the relevant question or address the relevant time period.

Dr. Feeman's January 2017 "Physical Capacities Evaluation" is a conclusory, one-page, check-the-box preprinted form that asserts, *inter-alia*, that Plaintiff can sit for less than one hour total over the course of an eight-hour work day. LIB0254. On the form, Dr. Feeman also wrote that Plaintiff's pain "affects his concentration, thought process, cognition [and] problem solving skills." LIB0254. To the extent these opinions are credited, the form pre-dates the relevant

time period by more than two years and thus has no significance with respect to the relevant inquiry.  Lincoln initially approved benefits after receiving Dr. Feeman's report, despite the weakness of Plaintiff's claim, and paid benefits for two years thereafter.  Tellingly, Dr. Feeman did not offer an opinion in support of Plaintiff's claim after the April 2019 termination, nor did he ever update or attempt to reconcile his January 2017 report with all of the subsequent evidence, including multiple physical examinations leading up to the change of definition review, none of which support such extreme limitations.  *See*, *e.g*., LIB0433–34; LIB0387–88; LIB0384–85; LIB0327–28; LIB0264 (as discussed above).

Moreover, Dr. Feeman's "Physical Capacities Evaluation" form is not reliable even as to Plaintiff's functional status in January 2017 because it is at odds with Dr. Feeman's own contemporaneous examination notes.  *See* LIB0251–53. Those notes show that upon examination in January 2017, Plaintiff "complained of neck pain ***but denied back pain***, myalgias, . . . shoulder pain, arm pain, elbow pain, wrist pain, hand pain, hip pain, [and] leg pain."  LIB0251 (emphasis added). Likewise, Plaintiff "denied headache, numbness, weakness, confusion, [and] memory loss."  LIB0251.  Dr. Feeman assessed Plaintiff's strength as "5/5," his muscle tone as "normal," and "all testable reflexes [as] normal."  LIB0252. Plaintiff was "alert and oriented x3," and Dr. Feeman wrote that Plaintiff's

9

"immediate, recent, [and] remote memory [was] intact" and specifically noted Plaintiff's "normal concentration [and] intelligence." LIB0252. Thus, Dr. Feeman's own contemporaneous examination notes actually undercut his conclusory opinion, expressed to Lincoln, that Plaintiff's pain (as of January 2017) precluded his ability to perform sedentary seated work and interfered with his ability to concentrate. *See*, *e.g.*, Bumpas v. Unum Life Ins. Co., 2005 WL 2428537 at * 5 (M.D. Fla. Sept. 30, 2005) (finding administrator was correct "to rely on contemporaneous treatment notes of [claimant's] physicians, rather than [their] *post hoc* certification of disability.").

As Plaintiff acknowledges in his Brief, Dr. Capoferri's May 2019 report, submitted during the appeal phase, "was largely focused on answering whether or not [Plaintiff's] problems were caused by the motor vehicle accident." Pl.'s Br. at 12. That report is simply not geared to providing any functional assessment of the Plaintiff, and it does not provide any objective measures of Plaintiff's siting, standing, or walking tolerances, his functional limits on lifting, pulling, or pushing, or any evaluation whatsoever as to the alleged affects of pain or medication on Plaintiff's ability to concentrate. *See* LIB0175–82. Moreover, the fact that the report was generated in the context of Plaintiff's lawsuit against the other motorist

10

involved in the accident provides a sound reason to suspect bias in Dr. Capoferri's presentation.[1]

Far more accurate information about Plaintiff's functional abilities at the time of the April 2019 change of definition review is found in the medical examinations recorded monthly towards the end of 2018 by the nurse practitioners at Plaintiff's pain clinic, *see*, *e.g.*, LIB0433–34; LIB0387–88; LIB0384–85 (as discussed above) and in the record of Dr. Blake's physical examination of Plaintiff on May 14, 2019.  *See* LIB0264 (as also discussed above).  These show that Lincoln's determination was correct.

On Page 22 of his Brief, Plaintiff argues that the opinions of treating physicians (as distinct from such physician's contemporaneous examination notes) are intrinsically more reliable than the opinions of consulting physicians.  The very cases Plaintiff cites refute his contention.  While treating physicians may have a

---

[1] *See*, *e.g.*, Abromitis v. Continental Casualty Co., 261 F. Supp. 2d 388, 391 (M.D.N.C. 2003), *aff'd*, 114 Fed. App'x 57 (4th Cir. 2004) ("The Court notes further that it is a fact of litigation that parties routinely hire consultants and experts whose independence can be seriously questioned. . . .  [C]laimants . . . are frequently referred to physicians and consultants who benefit from referrals to the plaintiff's bar."); Craine v. Hartford Life & Accident Ins. Co., 2011 WL 1130591 at \*10 (M.D.N.C. March 25, 2011) ("[I]t can also be assumed that a treating physician . . . could be biased *towards* the award of LTD benefits, particularly where the treating physician first examined a claimant only after an initial denial of LTD benefits.") (emphasis in original).

11

"greater opportunity than consultants to . . . observe the patient," the Supreme Court specifically rejects the notion that the opinions of treating physicians should be accorded special evidentiary weight because, *inter alia*, "a treating physician, in a close case, may favor a finding of 'disabled,'" which undercuts reliability.  Black & Decker Disability Plan. v. Nord, 538 U.S. 822, 832 (2003); *see also*, *e.g.*, Gipson v. Admin. Comm. of Delta Air Lines, 350 Fed. App'x 389, 395 (11th Cir. 2009) ("A plan administrator has no obligation to give a treating physician's opinion more weight.") (citing Nord).[2]

## III.  Plaintiff's attacks on Lincoln's consulting physicians are flawed and misunderstand the role of such consultants in the claim review process.

Having failed to meet his burden to provide objective evidence of functional inability to perform sedentary work, Plaintiff also adopts a strategy of attacking the opinions expressed by the several board-certified physicians who independently

---

[2] In Zorn, 2012 WL 112949, the Court explained, "Most of the time, physicians accept at face value what patients tell them about their symptoms; but insurers . . . must consider the possibility that applicants are exaggerating in an effort to win benefits (or are sincere hypochondriacs not at serious medical risk)." *Id.* at *13.  The language Plaintiff quotes from Burt v. Metropolitan Life Ins. Co., 2005 WL 4712457 at *11 (N.D. Ga. Sept. 16, 2005), concerns only the reliability of "factual determinations" made by a treating physician, not a treating physician's potentially biased or unsupported opinions of disability.  And as this Court in Johnson v. Metropolitan Life Ins. Co., 2008 WL 2302693 (N.D. Ga. May 30, 2008), has also affirmed, "The Supreme Court has held that plan administrators are not required to accord special deference to the *opinions* of treating physicians." *Id*. at *12 (citing Nord, 538 U.S. at 825) (emphasis added).

reviewed the medical evidence.  In doing so, Plaintiff again reverses the applicable burden because the consulting physicians' role here was simply to assess whether the medical record supports the functional limitations that Plaintiff claims.  Their role was not to prove that Plaintiff was capable of sedentary work, and Lincoln had no burden to disprove Plaintiff's claim.  *See*, *e.g*., Hufford, 322 F. Supp. 2d at 1360; Onofrieti, 320 F. Supp. 2d at 1254.

> **A.** **There was no reason for Dr. Grattan—or Lincoln—to request an in-person examination of Plaintiff given the medical examinations in the record leading up to the Group Policy's change of definition on April 13, 2019.**

Plaintiff faults Dr. Howard Grattan for failing to speak with Plaintiff's treating physicians and for not undertaking an in-person examination of the Plaintiff.  *See* Pl.'s Br. at 11.  Both criticisms are baseless.  First, as his report makes clear, Dr. Grattan called Plaintiff's pain clinic twice in a reasonable effort to confer with Plaintiff's treating physicians or examining nurse practitioners.  *See* LIB0363.  Dr. Grattan is not responsible for Plaintiff's physicians and nurses choosing not to respond.

Next, in light of the multiple recent physical examinations contained in the medical evidence at the time of Dr. Gratten's review, there was simply no reason for him—or for Lincoln—to request yet one more in-person exam.  In his report, for example, Dr. Gratten summarized Plaintiff's 2018 medical records, including

13

the examinations recorded by Nurse Bridges, Nurse Wilkins, and Nurse Belcher that are discussed above. *See*, *e.g.*, LIB0362–63.

Under similar circumstances, at least six circuits have held that ERISA administrators are not obligated to obtain individual medical examinations ("IMEs") prior to denying a claim. *See*, *e.g*., Killen v. Reliance Standard Life Ins. Co., 776 F.3d 303, 308 n.3 (5th Cir. 2015) ("ERISA does not mandate an independent medical examination prior to a denial."); Hobson v. Metropolitan Life Ins. Co., 574 F.3d 75, 91 (2d Cir. 2009) ("[T]he administrator may elect not to conduct an IME, particularly where the claimant's medical evidence on its face fails to establish that she is disabled."); Williams v. Aetna Life Ins. Co., 509 F.3d 317, 325 (7th Cir. 2007) (administrator properly refused to order an IME where there was a lack of "objective support" regarding the claimant's "functional abilities"); Rutledge v. Liberty Life Assurance Co., 481 F.3d 655, 661 (8th Cir. 2007) ("An ERISA plan administrator need not order an [IME] when the insured's evidence supporting a disability claim is facially insufficient."); Calvert v. Firstar Fin., Inc., 409 F.3d 286, 295 (6th Cir. 2005) ("Although [the plan's] provision *allows* Liberty to commission a physical examination of a claimant, there is nothing in the plan language that expressly *bars* a file review by a physician in lieu of such a physical exam.") (emphasis in original); Nicula v. First Unum Life Ins.

14

Co., 23 Fed. App'x 805, 807 (9th Cir.2001) (finding no need for an IME where no "conflicting medical evidence" rebutted the treating physician's report); *cf.* Cusson v. Liberty Life Assurance Co., 592 F.3d 215, 227 (1st Cir. 2010), *abrogated in part on other grounds by* Montanile v. Board of Trustees of Nat'l Elevator Industry Health Benefit Plan, 577 U.S. 136 (2016) ("We see no reason why the nonexamining physicians' reports in this case are unreliable.").

Here, given that there was no shortage of recent examinations already in the record, there was simply no reason for Dr. Gratten to undertake—or for Lincoln to request—an IME.  There was no conflict among the most up-to-date examination evidence, and there was no reason to believe that the results of yet one more examination, if sought, might have compelled any different determination.

**B.    Dr. Natarajan fully considered Plaintiff's 2018 MRI, and that imaging study contains nothing that should have changed her opinion.**

Plaintiff's central criticism of Dr. Natarajan is that she allegedly overlooked Plaintiff's June 11, 2018 MRI, and that this somehow undermines the reliability of her opinion.  *See*, *e.g.*, Pl.'s Br. at 13, 23.  Plaintiff's arguments are flawed.

As is clear in Dr. Natarajan's addendum report, LIB0056, she specifically reviewed the 2018 MRI and considered it before confirming her final opinion. While she concluded that the medical evidence supported certain restrictions—*e.g.*,

15

no more than occasional walking and standing, no more than occasional lifting up to 10 pounds, and no climbing, crawling, or crouching—she also found that it did not support Plaintiff's alleged inability to sustain full-time sedentary work within those restrictions. *See* LIB0117. In her addendum, Dr. Natarajan wrote,

> The lumbar MRI from 2018 reveals similar degenerative changes and degenerative disc disease as the lumbar imaging in previous years. There is no information from that scan that would change my conclusions or otherwise indicate the claimant is unable to participate in activity as outlined in the previously recommended restrictions . . . .

LIB0056.

Contrary to Plaintiff's contentions, the 2018 MRI report does not contain anything that should have changed Dr. Natarajan's opinion. According to the report, there was "moderate to advanced disc degeneration" at L5–S1 and "mild disc degeneration at the remaining lumbar levels," but "[n]o vertebral compression deformity or significant listhesis [was] seen at any level." LIB0489. Also, "[n]o paraspinal soft tissue pathology [was] appreciated in the lumbar region." LIB0489. While the report notes that the degeneration at L5–S1 "may be a source of nonspecific low back symptoms," nothing in the report shows the kind of severe deformities, listhesis, or nerve impingements that might call into question Plaintiff's functional ability to sit for long periods, provided he was given opportunity to periodically adjust his position for comfort. And that was the

16

medical opinion of Dr. Natarajan, an opinion also reached by consulting physicians Drs. Grattan and Houghton, both of whom also reviewed the 2018 MRI report.

Moreover, Dr. Natarajan reached her conclusion based on the totality of the medical evidence in the record, which included the records of multiple physical examinations all dating from after the June 2018 MRI. *See*, *e.g*., LIB0433–34; LIB0387–88; LIB0384–85; LIB0327–28; and LIB0264 (as discussed above). Dr. Natarajan specifically discussed and evaluated such examination records as part of her review. *See*, *e.g*., LIB0117–18 (discussing, *e.g*., Nurse Belcher's March 27, 2019 examination and Dr. Blake's May 14, 2019 examination). She also examined Plaintiff's treatment history: "In the absence of surgery, there does not appear to be any current escalation of medication or alternative pain management recommendations." LIB0118. In light of the whole record that was before Dr. Natarajan, her initial conclusion was sound, and nothing about the supposedly overlooked June 2018 MRI overrides the great weight of all the other evidence in the record which, in the words of Dr. Natarajan, "does not correlate with the severity of [the] claimed impairment of 'no workability.'" LIB0118.

17

**C.      Plaintiff criticizes Dr. Houghton for relying on evidence that Plaintiff submitted, overlooks Dr. Houghton's detailed response to criticisms raised during the appeal process, and now attempts to raise additional criticisms that were not timely raised.**

Plaintiff attacks Dr. Houghton's detailed and persuasive report on a variety of grounds, but is it the Plaintiff's own criticisms that are "riddled with readily apparent flaws and inconsistencies."  *See* Pl.'s Br. at 13.

Plaintiff contends that Dr. Houghton could not have reviewed Plaintiff's medical history back through 2013 because the earliest records that Plaintiff submitted date only to 2015.  *See* Pl.'s Br. at 14.  However, even a cursory review of the records submitted show that many contain narrative histories of Plaintiff's medical conditions and treatments going as far back as 2009.  *See*, *e.g*., LIB1214; LIB1235–36; LIB0849; LIB0822.  A progress note by Dr. Blake dated December 6, 2016, for example, specifically notes Plaintiff's "chronic history of back pain . . . made worse by an MVA in Oct of this year."  LIB0843.  Dr. Blake referred Plaintiff to Dr. Erik Bendicks, an orthopedic surgeon, who described the history of Plaintiff's back pain as stemming from an earlier 2012 automobile accident:

> [Plaintiff] was last seen by my practice in 4/11/13 status post motor vehicle collision on 10/6/2012 with resultant lumbago and symptomatic lumbar internal disc disruption and disc herniation L5–S1 with lumbar and radiculopathy and with a recommendation for lumbar surgery.  He did not have that surgery . . .

18

LIB0822.  Thus, the record is clear that Plaintiff's reports of chronic back pain date back at least to 2013, just as Dr. Houghton observed.

Plaintiff denies that his medical records show complaints of "serious pain prior to the October 2016 motor vehicle collision" or while Plaintiff was still working full time.  *See* Pl.'s Br. at 15.  Indeed, Plaintiff's brief flatly denies that his pre-accident records contain "any statement from [Plaintiff] regarding 10 out of 10 pain."  Pl.'s Br. at 18.  However, Dr. Houghton's report specifically cites to (and even summarizes) Dr. Seema Kini's progress note dated July 18, 2016.  *See*, *e.g.*, LIB0129.  At that visit, Plaintiff complained of "back pain with spasms," and Dr. Kini recorded his pain score as "10 - Worst pain ever," even as the balance of her physical examination showed (like many later examinations) that Plaintiff was "NAD," or not in acute distress.  LIB1236.  In subsequent visits to other doctors, Plaintiff attributed his July 2016 back pain to playing golf, and variously described the pain as "achy" or "exacerbated by certain movements," *see*, *e.g.*, LIB1267; LIB864, but there is no question that the pre-collision records do show that Plaintiff continued working full-time despite his self-report of "10" level back pain.

Plaintiff attacks Dr. Houghton's observation that Plaintiff was regularly "'working out' prior to the October 2016 accident to try and lose weight."  Pl.'s Br.

19

at 15.  But in light of the foregoing, Dr. Houghton's point hits its mark.  Prior to the October 2016 accident, the record shows that Plaintiff was "working out" to lose weight, *see*, *e.g.*, LIB1201, golfing, and working full-time despite his years-long history of chronic back pain, *see*, *e.g.*, LIB0822, and even though he variously described that pain as rising to level "10" and being the "[w]orst pain ever." LIB1236.  Following the October 2016 accident, Plaintiff claimed that he was no longer able to work due to "10/10" back pain, but he nevertheless continued his exercise regime.  *See*, *e.g.*, LIB0692 ("4 to 5 x weekly x 45 mins to 1 hour").  Thus, Plaintiff's activities—both before and after the October 2016 collision—are simply not consistent with his subjective self-report of "10" level pain.  Similarly, post-accident and leading up to the time of Lincoln's determination, Plaintiff's physical exams regularly showed no acute distress, full "5/5" muscle strength, and no loss of reflexes or coordination.  *See*, *e.g.*, LIB0433–34; LIB0387–88; LIB0384–85; LIB0327–28; LIB0264.  Such documented examination results, which occur throughout the record, are likewise inconsistent with Plaintiff's self-report of "10" level pain.

Plaintiff asserts that Dr. Houghton must be "incompetent" because his report is purportedly based on a 2015 MRI of some other person who shares the same name as the Plaintiff.  *See*, *e.g.*, Pl.'s Br. at 23.  Whether the MRI in question

20

merely contains an erroneous birth date or actually pertains to some other "Virgil Harris," the burden was at all time on Plaintiff to support his claim, and the February 17, 2015 MRI that Dr. Houghton cites is a document that Plaintiff and Plaintiff's own physicians submitted to Lincoln, representing it to be a truthful record of Plaintiff's medical condition.

During the administrative process, Plaintiff had an opportunity to respond to Dr. Houghton's report, and despite asserting a variety of other criticisms, Plaintiff did not then assert that the MRI belonged to a different person. *See* LIB0081–83; LIB0086. He cannot raise such an objection now. *See*, *e.g*., Harris v. Trustmark Nat'l Bank, 287 Fed. App'x 283, 288 (5th Cir. 2008) ("A plaintiff has not exhausted his administrative remedies on an issue if he fails to raise it before the plan administrator.").

Moreover, even if Plaintiff's physicians did erroneously submit an MRI belonging to another patient, that would in no way strengthen Plaintiff's claim or help him overcome his burden. The file contains ample evidence, wholly apart from the 2015 MRI, which confirms the existence of Plaintiff's pre-accident chronic back condition. The records of Drs. Blake, Bendicks, and Kini, as discussed above, continue to support Dr. Houghton's common-sense analysis, as expressed in his August 16, 2019 addendum report:

21

> The claimant reported 10/10 low back pain during the summer of 2016 after golfing, which continued for more than a month.  And the claimant continued to work.  This is the same severity of pain he has reported since the motor vehicle collision in October 2016.  His physical exams have been largely the same since the collision as they were before, with the exception of some inconsistent findings of lower extremity sensory changes and inconsistent findings of pain with hip flexion/knee extension.  These minor and questionable changes do not represent a fundamental deterioration that should be expected to render an individual totally disabled.

LIB0074.

Plaintiff improperly attempts to reconfigure the record by submitting a new affidavit to deny his continued employment as a disc jockey.  *See* Blankenship v. Metropolitan Life Ins. Co., 644 F.3d 1350, 1354 (11th Cir. 2011), *cert. denied*, 565 U.S. 1093 (2011) ("Review of the plan administrator's denial of benefits is limited to consideration of the material available to the administrator at the time it made its decision."); *see also*, *e.g.*, Denmark v. Liberty Life Assurance Co., 566 F.3d 1, 10 (1st Cir. 2009) (explaining that extra-record discovery "would reconfigure [the] record and distort judicial review").  Even though Plaintiff's new affidavit is inadmissible because it was never considered by the administrator, its contents are nevertheless irrelevant and cumulative.  In his August 2, 2019 response to Dr. Houghton, Plaintiff asserted that he had not "worked as a DJ for years, anywhere."  LIB0083.  As the above quoted excerpt from Dr. Houghton's addendum report makes clear, Dr. Houghton did not reach his conclusion on the basis of any

assumption that Plaintiff continued working as a DJ after his October 2016 automobile accident. *See*, *e.g.*, LIB0074–77. Thus, Plaintiff's denial of DJ work does not undercut Dr. Houghton's analysis or Lincoln's ultimate determination.

In his Brief, Plaintiff cites a number of cases for the common-sense proposition that a claimant's ability to perform some household chores does not necessarily mean that the claimant can return to a prior occupation, particularly where that prior occupation might require more than sedentary level work. *See* Pl.'s Br. at 24–25.[3] By citing such cases, Plaintiff seems to be refuting an argument that Dr. Houghton did not make. Dr. Houghton did not argue that Plaintiff's intermittent housework showed his ability to work a full-time job. Rather, he reasoned that Plaintiff's prior full-time work and ongoing regular exercise gave the most accurate representation of his current functional ability. If,

---

[3] This is the most generous reading of the Plaintiff's cases, all of which otherwise seem to be inapplicable. Lewis v. Callahan, 125 F.3d 1436 (11th Cir. 1997), was a Social Security benefits case. Hawkins v. First Union Corp. LTD Plan, 326 F.3d 914 (7th Cir. 2003), was a pre-Nord decision in which the Court applied Social Security's "treating-physician preference" rule to an ERISA benefits case. But in Nord, 538 U.S. at 833, the Supreme Court held that this "treating-physician" rule has no place in the ERISA setting. In Black v. Jefferson Pilot Financial Ins. Co., 2006 WL 119409 (W.D. Ky. Jan. 12, 2006), the administrator failed to evaluate the salary potential of other work—specifically, the plan's 60% of prior earnings requirement. *See id.* at *3. The Court did not reject the administrator's assumption, as to functional capacity, that "if a fellow can hike the woods in pursuit of the elusive wild turkey he can surely do some kind of work." *See id.*

23

prior to the October 2016 accident, Plaintiff could perform sedentary work as an accountant despite his chronic back condition and self-reported "[w]orst pain ever," then it is reasonable to conclude that after the accident, he could continue in such work (just as he continued in his exercise regime) since neither his medical condition nor his reported pain levels substantially changed.

**IV.   Plaintiff's attempt to shift the basis of his claim to hidradenitis, based on his April 2019 flare-up, must fail because the medical evidence as to that flare-up does not support functional limitations as to sedentary-level seated work.**

Finally, Plaintiff attempts to shift the basis of his claim based on his April 2019 hidradenitis flare-up and the August 2019 advocacy of his dermatologist Dr. Tova Rogers. *See*, *e.g*., <u>Pl.'s Br.</u> at 17–18. However, the record shows that this hidradenitis outbreak occurred near his right armpit ("axilla"), *see*, *e.g*., LIB0270, a location unlikely to interfere with seated work. The lesion was excised on June 24, 2019, and by August 12, 2019, Dr. Rogers noted that the "surgical site [was] healing well" with "good arm mobility." LIB0062. Nothing in Dr. Rogers's August 12, 2019 progress note indicates any functional restrictions that would preclude sedentary work. *See* LIB62. Moreover, the record makes clear that Plaintiff's flare-ups are intermittent and thus do not impose any permanent limitations. For example, the examination records repeatedly show extended periods where Plaintiff was free of lesions. *See*, *e.g*., LIB0434; LIB0388. Even to

24

the extent that Plaintiff might have been temporarily limited by one lesion or another, he certainly was not continuously restricted from work by such symptoms from the date of the October 2016 accident, through April 13, 2019, and beyond.

## Conclusion

For the foregoing reasons, and those contained in Lincoln's principal brief, the Court should grant judgment in favor of Lincoln and dismiss Plaintiff's claims with prejudice.

Respectfully Submitted,
LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON,
By its Attorneys,

/s/  Scott K. Pomeroy
Scott K. Pomeroy
Georgia Bar No. 583296
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
One Boston Place, Suite 3500
Boston, MA 02108
207-387-2961 direct
207-387-2986 fax
Email: scott.pomeroy@ogletree.com

/s/  Amy E. Jensen
Amy E. Jensen
Georgia Bar No. 874759
OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P.C.
191 Peachtree Street, N.E., Ste. 4800
Atlanta, Georgia 30303
404-870-1796 direct

25

404-870-1732 fax
Email: amy.jensen@ogletree.com

Dated: December 4, 2020

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

VIRGIL HARRIS,
    Plaintiff,

v.

LINCOLN LIFE ASSURANCE
COMPANY OF BOSTON,
    Defendant.

CIVIL ACTION NO.:
1:19-cv-4257-CC

## CERTIFICATE OF SERVICE

I hereby certify that on this the 4th day of December 2020, the foregoing **Opposition to Plaintiff's Motion for Summary Judgment** was filed electronically with the Clerk of Court using the CM/ECF system, which will automatically serve an electronic copy on the following attorney(s) of record:

Heather K. Karrh
Rogers, Hofrichter & Karrh, LLC
225 South Glynn Street, Suite A
Fayetteville, GA 30214
hkarrh@rhkpc.com

/s/  Scott K. Pomeroy
Scott K. Pomeroy
Georgia Bar No. 583296

45066369.2

27