**Clinical Review Memo**

| Customer Name | Claimant Name | Claim Number |
|---|---|---|
| ROBERT HALF INTERNATIONAL INC. | VIRGIL HARRIS | 7223420 |

| | | | |
|---|---|---|---|
| **Report Date:** | 03/30/2023 | | |
| **Referred By:** | Jodi George | **Claimant DOB:** | 01/16/1962 |
| **Referral Date:** | 03/14/2023 | **Job Title:** | ACCOUNTING CONSULTANT |
| **Due Date:** | 03/23/2023 | **Medical/ Surgical Condition:** | cervical and lumbosacral spondylolisthesis with radiculopathy, right knee osteoarthritis, hidradenitis suppurativa, morbid obesity |
| **Referral Type:** | Addendum | **Disability Occupational Type:** | |
| **Reason for Priority Handling:** | | **Product Type:** | LTD |
| **Other Considerations** | | **LDW:** | 10/14/2016 |
| | | **DOD:** | 10/15/2016 |
| **Physical Demands:** | | **BBD:** | 04/13/2017 |
| **Non-Medical Issue:** | yes | **Non-Medical Issue Details:** | holding off on surgery until litigation is concluded |

This second review of medical records submitted in support of Mr Harris' disability claim incorporates the original records reviewed for the original July 2019 report as well as additional records made available since then, including records recently submitted by the claimant.

**Questions for Medical Reviewers:**

1**. Taking into consideration the entire clinical picture, including all of the evidence submitted since the date of your last review and addendum, does your opinion as to Mr Harris's functional capacity as of April 22, 2019 remain the same?  Please explain why or why not.**

The conclusions of the original review are strengthened by the enlarged clinical picture rendered by the additional evidence subsequently made available. Since that time, complaints, exam findings, and treatment for the claimant's condition have all remained unchanged, and documented activities have also remained unchanged, standing in stark contrast to the assertions made by certain clinicians and consultants that the claimant is unable to engage in usual activities. Despite the assertion that pain and medication side effects render the claimant incapable of sustaining the cognitive demands of work, clinical documentation consistently says the medications cause no side effects and never mentions any cognitive complaints. No cognitive assessment has been documented. The records and other evidence fail to support inability to engage in full-time, sustained, productive light activity.

**2. In further explaining your answer above, please specifically address the weight or consideration you have given to each of the following:**

**(a) The newly-submitted medical records, reports, and other documents that date from before August 23, 2019, from: Dr Eric Bendiks (see, eg, 680, 779); Dr Donald Capoferri (see, eg, 232, 239, 270); Dr Mark Feeman (see, eg, 80, 81); Dr Chad Lee (see, eg, 488); Dr Jose Mathew (see, eg, 583, 678); Dr Amit Patel (see, eg, 492); Physician Assistant Scott Linacre (see, eg, 500); Physician Assistant Chinyere Okonkwo (see, eg, 496); and Nurse Practitioner Dina Patel (see, eg, 580).**

The documentation from the orthopedist Dr Bendiks (dated 12/20/2016) was considered in the original review and was reviewed again for this report. Important points from that clinical encounter include the following. Dr Bendiks stated that the claimant was involved in a motor vehicle collision in 2012 and at that time was found to have herniation of the L5-S1 disc but he refused surgery. The records indicate he also continued to work. After another motor vehicle collision in 2016 Dr Bendiks concluded that the claimant was "unable to work as an accountant secondary to the injuries sustained" but he didn't document any new injuries. Instead he said the previously noted herniation was nonspecifically "aggravated," based entirely on the claimant's subjective pain score, only 2 months after the collision. This conclusion is contradicted by extensive published research that shows flares of back pain usually decrease over time, and 2 months is far too little time to determine that someone can no longer work because of an increase in chronic back pain. His conclusion is also contradicted by the guidelines of the American College of Occupational and Environmental Medicine, and other major medical organizations, that emphatically state that subjective complaints are insufficient to establish objective impairment. Subjective tolerance is not a valid basis for restricting activity. Dr Bendik documented that the claimant wanted "to explore disability evaluation" and so he was referred to Dr Feeman, a physiatrist. As already mentioned, 2 months is far too little time to entertain the idea that someone is permanently disabled because of an increase in chronic back pain, especially when they have a sedentary occupation that could be accomplished sitting or standing or both.

The chiropractic documentation from Dr Capoferri (who documented an independent medical evaluation dated 5/20/2019, with attached radiological findings) was also addressed in the original review and was reviewed again for this report. As noted in the original report, Dr Capoferri's conclusions are seriously flawed. In his report he attaches great importance to MRI findings, which extensive published research has shown are not predictive of symptoms or functional capacity, and in this case existed years before the claimant stopped working. His report also makes the claim that spinal surgery is needed to "lessen the danger of a catastrophic spinal cord injury from another fall or accident." This statement is completely untrue. As explained in the references listed at the end of this report, surgery is specifically *discouraged* by published guidelines unless an individual with degenerative lumbar spine disease is already experiencing significant motor weakness, which the records show is not the case here (in a few clinical encounters significant motor weakness is documented, but is contradicted by the vast majority of encounters documented as well as observed physical activity; more on that later). As explained in the references at the end of this report, extensive published research shows that surgery for individuals like Mr Harris does *not* significantly reduce risk of poor functional outcomes, "catastrophic" or otherwise. On the contrary, abundant published research demonstrates that such "catastrophic" *thinking* is what actually reduces functional capacity. The available records do not contain any recommendation from a surgeon that surgery be performed to prevent spinal cord injury (only to reduce pain, which research indicates is an uncertain outcome), and chiropractors are not trained nor licensed to make surgical recommendations. The documentation made available for review indicates the claimant argues he never had any cervical spine disease before the 2016 collision, but Dr Capoferri stated in his report that the collision "represents a traumatic aggravation of a prior disc herniation" at C4-5. His report cites the AMA *Guides to the Evaluation of Permanent Impairment*, noting their use of subluxation of cervical vertebrae during neck flexion seen on x-rays (as his attached reports show), but published research shows that such findings are not helpful for directing treatment and are therefore of no prognostic significance. As explained in many publications addressing determination of physical impairment, demonstrating abnormalities and making diagnoses does not constitute impairment. Many individuals experiencing paraplegia continue to work full-time despite the presence of abnormal findings and various diagnoses.

Dr Capoferri documented that the claimant had 3/5 strength of all muscle groups in the left upper extremity and the right biceps. This means he was unable to do anything with the left arm and hand except lift them up, and unable to lift anything with the right arm. He also documented 3/5

LIN SUPP000002

strength in the right iliopsoas, quadriceps and extensor digitorum longus and brevis, meaning the claimant was unable to do anything with the left leg and foot except lift them up. If these findings were legitimate, that would mean the claimant was incapable of walking or using the left upper extremity for anything. But there is nothing in the records to indicate the claimant was forced to use a wheelchair because of severe left arm and right leg weakness (which would be necessary in that situation). On the contrary, there is plenty of evidence showing the claimant was indeed walking. There is plenty of evidence that says the claimant was using his arms normally at the time, and other clinicians at the time documented normal strength. All of this combines to result in a lack of credibility for Dr Capoferri's report, which the records show was obtained at the request of the claimant's attorney. The claimant's treating chiropractor documented the same unsupported ratings of muscle strength in 2018 and 2019, further stating the claimant could not raise his arms, could not rotate his arm to the side, and could not bend his knees (2018), which would make it impossible to drive, and could not extend his knees (2019), which would also make it impossible to drive, let alone stand or walk. As with Dr Capoferri's findings these are contradicted by extensive contemporary documentation by other clinicians.

Dr Feeman signed a form dated 1/24/2017, and then resubmitted the same form with the date whited out and the new date of 5/16/2019 written over it. Dr Feeman signed a legal affidavit on 5/2/2022 stating the original date was wrong. The affidavit says he examined the claimant on 5/16/19 but no clinical documentation from that date has been made available. It's hard to understand why he would go to the trouble of signing an affidavit saying he examined the claimant on that date but not submit the documentation of the exam. On the other hand, there is documentation of a clinical encounter on the 1/24/2017 date. It's also hard to understand how it is that the orthopedist documented a clinical encounter in December 2016 and said he was referring the claimant to Dr Feeman for a disability evaluation, then see Dr Feeman date a disability form the following month, only to see him state more than 2 years later that the form was actually completed in 2019, at the time Mr Harris's claim was being prepared for peer review. The only clinical documentation made available from him is dated 1/24/2017, 9/17/2018 and 12/16/2020. On 1/24/2017 he documented that the claimant was "totally and permanently disabled" due to the spine disease resulting from a motor vehicle collision 3 months earlier. As already noted, this is far too little time to reach maximal improvement following an episode of acute back pain. He documented that physical therapy and epidural steroid injections had not provided relief, but there is no documentation of these interventions between October 2016 and January 2017, so this appears to refer to treatment given before the motor vehicle collision, when the claimant was still working, directly contradicting Dr Feeman's assertion of total disability on the basis of failure to obtain relief from those treatments. He documented that the claimant appeared distressed from pain, walking with a limp, with only mild objective exam abnormalities. A week later the claimant posted a photo to Facebook advertising his business as a DJ and operator of music/dance club (see below). This would appear to contradict Dr Feeman's assertion of "total disability." Despite the form (originally dated on the same date as the 1/24/2017 exam) stating the claimant's pain "affects his concentration, thought process, cognition & problem solving skills," the clinical documentation from 2017 and 2018 says nothing about cognitive complaints. That doesn't appear in clinical documentation until December 2020, and then there is no documented cognitive evaluation or treatment. At that last documented clinical encounter, Dr Feeman stated the claimant was walking slowly and cautiously in acute distress from pain, and yet only a few days later the claimant posted to Facebook a 7-minute video of himself driving, moving his neck and back freely, smiling and moving to the music he was playing, identifying himself as a DJ (see below). This was the same person that just a few days earlier had been declared by Dr Feeman to be permanently "disabled from any and all employment" in his clinical documentation.

Dr Mathew is one of the many pain management group clinicians from whom clinical documentation has been made available for review, both for the original peer review and for this update. He documented the claimant's first visit to the clinic on 1/10/2017. His documented exam

was much the same as all subsequent documentation from that clinic over the ensuing 5 years, showing normal strength, sensation and reflexes, with spinal tenderness and stiffness. The opioid prescribed on that date increased only 28% over the subsequent year and has remained stable over the past 4 years. The records show gabapentin was added in May 2017 and the dose has been minimally increased since. Importantly, half the urine drug screens documented in the records show no detectable opioid pain medication, strongly suggesting that much of the time the claimant wasn't even using the medication for several days prior to the clinical encounter, since the amount prescribed is at the high end of typical dosing and would be expected to appear on the drug screen (on a couple occasions the clinician documented that the claimant was told these negative drug screens, used explicitly by the clinic to confirm patients are using the specific drug being prescribed, were problematic for that reason). Contrary to what Dr Feeman documented just 2 weeks later, Dr Mathew stated that chiropractic was helping. Dr Matthew documented another clinical encounter on 5/16/2017 with the same exam findings, and the rest of his documented clinical encounters are not substantially different, other than the eventual addition of right knee arthritis. Dina Patel is a nurse practitioner at the same clinic. She documented a clinical encounter on 1/31/2017, with the same findings as Dr Mathew. Dr Lee is another physician in the same clinic. On 8/20/2019 he documented the same subjective pain scores that have been documented from January 2017 to the present, indicating pain was reduced to a moderate (5/10) level with medication. As with the many other documented clinical encounters from the pain clinic, he stated there were no side effects from medications and that they help the claimant remain functional. The documented exam was much the same as all the other pain clinic encounters, with only a mild decrease in strength in the lower extremities, normal sensation, normal reflexes, with some tenderness and stiffness of the spine. He documented a small decrease in the pain medication since the claimant had recovered from axillary skin surgery 2 months before (mentioned in the original peer review). His other documented clinical encounters are not substantially different except that later he began documenting right knee osteoarthritis with knee tenderness. Dr Patel is another physician at the same pain management clinic. On 7/24/2019 he documented the same pain scores and exam except he also documented the recent surgical wound in the right axilla. Like the others he documented that the pain medications helped keep the claimant functional without any side effects. His other documented clinical encounters are not substantially different except that later he added documentation of right knee arthritis. Scott Linacre is a physician's assistant in the same clinic, and he documented a clinical encounter on 4/26/2019, again documenting the absence of treatment side effects with a similar exam except for an unspecified decrease in sensation in the dorsal area of the feet. His other documented encounters aren't substantially different but they do document normal sensation. Chinyere Okonkwo is a nurse practitioner in the same clinic and documented a clinical encounter on 6/27/2019. At that time it was again documented that pain medications help the claimant remain functional without side effects, with normal strength and sensation and the same spinal tenderness and stiffness. It was documented that pain from his axillary skin surgery 2 days earlier was bothering him more than his chronic neck and back pain, so the opioid pain medication was increased by 9%. Other documented encounters by this clinician are similar to the rest of the clinic's documentation. Nothing in these many pain management clinic encounters supports inability to engage in sustained productive activity.

**(b) The newly submitted medical records, reports, and other documents that date from after August 23, 2019.**

As already mentioned, all the new documentation has been thoroughly reviewed and is discussed in this report. It has been carefully considered and given weight equal to that of the documentation submitted for the original review. It strengthens the conclusions in that report.

LIN SUPP000004

**(c) The various MRI reports contained in the record and the newly submitted documents (including the MRI reports dated February 2, 2015; October 7, 2016; January 24, 2017; June 11, 2018), and Mr Harris's contention that the February 2, 2015 MRI report does not actually pertain to him, but to some other person who happens to have the same name but a different birth date.**

The 2/2/2015 MRI report does have a date of birth that differs from the claimant's birthdate, so either it belongs to someone else with the same name who also happens to have cervical spine disease, or else the birthdate was wrongly entered. As already mentioned, multiple clinicians have documented in the records that the 2016 motor vehicle collision exacerbated pre-existing degenerative disc disease of the cervical spine.

The MRI report from 1/24/2017 says there is moderately severe stenosis of the C3-4 neural foramina and moderate disc herniation at C4-5 (which Dr Capoferri documented was already present before the 2016 motor vehicle collision), moderate foraminal stenosis at this level, with similar findings at C5-7. It states there is come compression of the spinal cord, but the documented physical exams at the time indicated strength and sensation were normal in the upper extremities, and there was no report of upper extremity symptoms in the clinical encounters documented at that time. The MRI report does not say there is any evidence of myelopathy (degeneration of the spinal cord). This is consistent with abundant published research showing the spinal abnormalities on imagining are not predictive of symptoms or functional capacity. The MRI report from 3/16/2023 says the stenosis at C3-5 is severe rather than moderate but doesn't say whether it was compared to the 2017 images, so it's hard to say whether there is an absolute change or whether it's simply a case of different radiologists having different thresholds for what is moderate or severe. Regardless, as already explained, even if the findings have progressed over 6 years, such radiographic changes don't necessarily correlate with symptoms or functional capacity, and the most recent documented physical exams show no significant limb weakness or loss of sensation.

The MRI report dated 10/7/2016 states there were degenerative changes at multiple levels of the lumbosacral spine, with some foraminal stenosis at L4-S1 with protruding disc touching the right S1 nerve, which could explain the claimant's documented complaint of pain radiating from the back to the right leg. As already mentioned, the records show that the L5-S1 disc herniation had been present since at least 2012 and had not stopped the claimant from working. As already mentioned in the original peer review, the MRI report states that annular tears in the discs might represent aggravation from the motor vehicle collision, but this is only conjecture. Lots of published research shows that annular tears are common in the general population. They are of no prognostic significance. The MRI report from 6/11/2018 shows essentially unchanged findings in the lumbosacral spine.

**(d) Mr Harris's subjective self-reports of pain, both before and after his October 4, 2016 automobile accident, and the extent to which, in your opinion, they would impair Mr Harris's ability to perform the non-physical duties of his occupation as an accountant.**

Published guidelines make clear that subjective ratings of pain are not reliable predictors of impairment or functional capacity. The records clearly show that the claimant's pain scores after starting pain medications in the wake of the October 2016 motor vehicle collision are significantly lower than they were after he sought care for low back pain following a game of golf in July 2016, at which time he reported the maximal possible pain that can be experienced, despite no visible evidence of distress as documented at multiple clinical encounters, and despite continuing to work.

**(e) Mr Harris's self-reported work activity, exercise, and recreational activities at different times, as reflected in the record and the newly submitted documents.**

See below.

**(f) Mr Harris's contention that undated social medial postings apparent in the record pertain to events that occurred prior to his October 4, 2016 automobile accident.**

Review of the claimant's Facebook photos shows that in July 2017 his cover photo was from Southern Soul Blues Club which identifies him as a DJ. A 2020 post from the club's Facebook page states that he started the club in 2011. The earliest post, dated 2/2/2017, is a message from "DJ Virge" inviting people to join the club. As shown below, the claimant has identified himself as "DJ Virge" elsewhere on the page. A post dated 1/16/2021 says "Today is my birthday." January 16th is the claimant's birthday, confirming that he runs the club's Facebook page. A similar post is dated 1/17/2018, saying "Thank you for all the birthday wishes yesterday" and signed "DJ Virge". A post dated 5/21/2022 states that he is the owner and operator of the club. The page links to another Facebook page that didn't feature in the investigation from July 2017, one called Djvirge Harris Virgil. It posted a new cover photo on 1/17/2023 that shows him smiling on a golf course. The same photo was posted on his Virgil Harris page on 12/27/2020. A photo was posted on 1/13/2023 showing the claimant smiling with a man the caption says is Martin Luther King Jr's nephew. The caption references the upcoming 1/16/2023 Martin Luther King, Jr holiday, and upcoming weekend events featuring the nephew. Although occasionally photos from years earlier get posted as nostalgia (photos that predate the earliest post in 2017), the Martin Luther King, Jr Day post, along with other posts, shows that since 2017 the claimant has been in the habit of posting photos shortly after they were taken and not months or years later. On 11/8/2022 another photo was posted of the claimant standing on a golf course smiling. Another such photo was posted on 6/16/2022. On 8/2/2020 the club's Facebook page posted multiple photos of the claimant at the club, smiling with various people. Photos show that sometime since 2018 he got dental implants or veneers because earlier photos show a gap between his top central incisors. All the photos mentioned above show him with the gap closed by his more recent dental work, proving they were not taken before October 2016. The page posted a 7-minute live video of the claimant on 12/26/2020, in which he is driving a car while capturing video of himself with his phone. Throughout the video he is commenting on the music playing in the car, smiling, moving his head freely with the music in all directions, and craning his neck normally while making turns or lane changes. In the video he calls himself "DJ Virge".

A photo was posted to his personal Facebook page on 6/18/2017 with a caption that reads "Atlanta Father's Day Blues Show." 6/18/2017 was Father's Day. This is further evidence that since 2017 the claimant has been in the habit of posting photos shortly after they were taken and not months or years later. An uncaptioned photo was posted on 6/17/2017, which appears to show the claimant standing at a music venue. Another uncaptioned photo was posted on 4/5/2017, showing the claimant smiling inside what appears to be an entertainment venue. Another photo was posted on 4/4/2017 that shows the claimant standing and smiling at what appears to be an entertainment venue. There is no evidence these photos were taken before October 2016, 6-8 months earlier. On 2/2/2017 the claimant's profile picture was updated, showing him standing and smiling with the website of his DJ business displayed (the same one associated with the club). It strains credulity to imagine he used his business website in his profile picture if he wasn't doing such work at the time. At the time of the initial review of this claim in 2019, the claimant's Facebook page had photos with captions and dates that indicated participation in golfing and dancing that year. It appears they have since been removed from the page or made invisible to the public. A video that was publicly visible when the initial review was done in July 2019 (and referenced in the report) showed the claimant having surgery on his axillary skin. He recorded the video since he was fully conscious, smiling and lying still for the procedure, which contradicts his statements and those of his physiatrist saying he can't remain still for long. The video is no longer publicly visible. His medical records confirm this procedure occurred in June 2019 (the video appeared to have been posted live), so the video was not taken prior to October 2016. On 8/16/2021 a photo was posted of the claimant smiling at an entertainment venue. On 6/17/2022 two photos were posted of the claimant holding a driver on a golf course and another of him in front of the open hatch on a vehicle with golf clubs inside. All the evidence combined indicates he is a savvy user of social media to promote his music club and also

uses it to document current personal recreational activities, and it appears highly unlikely that all the recreational photos were posted months or years after they were taken.

It might be asked why reviewing the claimant's social media posts is relevant to this medical review. It's widely known within the medical profession that observing a patient's behavior and activity when medical professionals are not present, or when the patient is unaware of their presence, is very helpful for making an accurate assessment of the patient's functional status. The activities seen in the photos and videos and documented with text demonstrate inconsistency with the degree of impairment asserted by some of the claimant's clinicians and consultants, and when it comes to assessing functional status, behaviors and activities documented outside a medical setting should be given at least as much weight as those documented within a medical setting, if not more.

**(g) The diagnoses of Mr Harris's various neck and back conditions (including cervical and lumbosacral disc disorders, spondylosis, radiculopathy, and sciatica) and the opinions expressed by his treating practitioners, for example, in Dr Mark Feeman's letter dated January 24, 2017; Dr Mark Feeman's "Physical Capacities Evaluation" dated January 24, 2017; Dr Mark Feeman's "Physical Capacities Evaluation" dated May 16, 2019; Dr Donald Capoferri's "Spinal Biomechanical Engineering Study" dated May 20, 2019; Dr Donald Capoferri's report dated May 21, 2019; Dr Mark Feeman's affidavit dated May 2, 2022; and Nurse Practitioner Dalandra Belcher's Questionnaire dated October 25, 2022.**

As noted above, Dr Feeman's documentation is quite problematic. His assertion dated 1/24/2017 that the claimant is "totally and permanently disabled" is sharply contradicted by the rest of the medical evidence available and is medically inappropriate. His assertion that the claimant cannot sit, stand or walk more than an hour each day means the claimant was required to remain supine for more than 21 hours a day. There is no evidence that this has ever been the case. His assertion that the claimant cannot lift any amount of weight is also medically unsupportable. It would mean the claimant could not feed himself. His assertion that the claimant was incapable of any pushing or pulling is similarly unbelievable. It would mean he was unable to open or shut his car door. His assertion that the claimant was incapable of operating any foot controls would mean the claimant was unable to drive a car, but the claimant has posted video of himself driving. His assertion that the claimant cannot bend at all would mean he could not get in or out of a vehicle. His assertion that the claimant cannot be around any machinery is unsupported by any medical evidence, as is his assertion that he cannot tolerate any marked changes in temperature or humidity. It might be argued that the claimant should avoid high temperature and high humidity because of hidradenitis suppurativa, which could be worsened by sweating, but there is no support for avoidance of low temperature or low humidity. All this shows the form was not completed with care and is not credible. As already noted, this same unsupported form was resubmitted with a different date (5/20/2019), but its contents and handwriting are identical. The concerns about the affidavit have already been addressed above, as have the extensive problems with Dr Capoferri's documentation.

The disability form completed by Ms Belcher on 10/25/2022 states that the claimant's medications cause sedation that would interfere with full-time employment. This stands in direct contrast to numerous documented clinical encounters by her and her colleagues at the pain control clinic that universally declare the pain medications cause no side effects and help him remain functional, rather than interfere with function. This includes the clinical encounter with the same date as the disability form. Never did any of those encounters document any cognitive complaints. Asserting otherwise when asked to complete a disability form is ethically problematic. She states on the form that the claimant has had an "unreasonable number of absences from work" but the record shows that her clinic didn't start treating the claimant until 3 months after he stopped working. The form states the claimant has been disabled since 4/22/2019, but the extensive documentation from her clinic shows no difference in symptoms or exam findings after 4/22/2019 than before, going back to January 2017 when the claimant was first treated there.

LIN SUPP000007

**(h) Mr Harris's hidradenitis suppurativa diagnosis and the opinions expressed by his treating dermatologist, Dr Tova Rogers, in her letter of August 19, 2019.**

The claimant asserted in writing that the peer review shows no understanding of more advanced stages of hidradenitis suppurativa, and that his clinicians are continually wanting to do more skin surgeries. More than 6 years of medical records only document one such surgery, in June 2019. At no time since the claimant stopped working has there been any documentation of uncontrolled disease except for just before that one outpatient surgery, which healed well as documented by his dermatologist. It was documented at that time that the claimant declined the type of medical therapy recommended for more advanced disease, which is inconsistent with an assertion of a disabling skin condition. Last year his primary care provider documented that the claimant hasn't followed up with his dermatologist since 2020. That also contradicts the assertion of a disabling skin condition. There is no clinical documentation available from Dr Rogers, who might be one of the residents in training working in the dermatology clinic. On 8/12/2019 Dr Orenstein at the dermatology clinic documented that the only ongoing treatment was doxycycline, which is the treatment used for mild disease, and he told the claimant he was willing to operate on the left axilla or groin if he wanted that. He documented that the claimant should follow up in 3 months but no further dermatology documentation appears in the records. It was a week later that the claimant documented that the dermatologist wanted to do more surgery, but that's not what the dermatologist documented. Contrary to the claimant's assertion otherwise, the nature, course and treatment of hidradenitis suppurativa is sufficiently understood by this reviewer.

**(i) Any other significant comorbid diagnoses or conditions apparent in the record.**

The claimant's primary care provider documented in August 2016 that obesity had recently been worsening, and since then the records show it has worsened further since he stopped working. Because abundant published research shows that weight control is much more dependent on diet than exercise, this cannot be reasonably blamed on reduced activity, especially since there is evidence of continued golfing. This increase in obesity can only be reasonably attributed to increased caloric intake, which commonly occurs when people stop working. After the October 2016 motor vehicle collision a different primary care provider documented that worsening obesity was just as important as the collision in the worsening of back pain. The records show the claimant gained about 25 pounds between September 2016 and January 2017, and even more in following months. Fortunately the records show he's lost weight since then, but still hasn't returned to the weight that preceded the increase of summer 2016. Weight reduction through dietary controls can be expected to reduce back pain. The same is true for knee pain. Clinicians began documenting osteoarthritis of the right knee in 2020, which has been treated with occasional steroid injections along with the pain medications originally prescribed for back pain. There is no reason knee arthritis should interfere with full-time, productive light activity, and the claimant's well-documented golfing supports that. Published guidelines for management of chronic musculoskeletal pain resistant to first-line treatment recommend addressing pain psychology with the help of mental health professionals with that expertise, since all pain is perceived in the brain and how it processes pain has a large impact. There is no evidence that pain psychology has been addressed by the claimant's clinicians. Following these guidelines can be expected to reduce the impact of the claimant's chronic pain on daily activities. Lastly the claimant's pain clinic has repeatedly documented that he was postponing surgery for his chronic back pain until his litigation is concluded. It's not clear from the records whether his insurance coverage hinges on that. There is abundant published research showing that individuals engaged in litigation tend to have worse functional outcomes. Prioritizing legal or financial or insurance objectives over comprehensive efforts to achieve functional improvement can be one of the reasons this is true.

LIN SUPP000008

**(j) The evidence, if any, of medication side effects or limitations or restrictions due to Mr Harris's medication or his other treatments.**

Only one instance of treatment side effects was found in the hundreds of pages of records. Once the pain management clinic documented that the prescribed muscle relaxer caused drowsiness. But it's prescribed to be used only at bedtime. The drowsiness is one of the intended treatment effects.

**(k) Any other evidence contained in the newly submitted documents that you believe to be particularly relevant to Mr Harris's functional capacity as of April 22, 2019.**

As already noted the newly submitted documents strengthen the conclusions of the original review. They contradict the assertion of incapacity for sustained, productive light activity.

**3. To the extent your opinion as to Mr Harris's functional capacity has changed since your prior review and last addendum, please identify and describe the extent of any medically supported restrictions and limitations that, in your professional medical opinion, existed as of April 22, 2019, which might affect his ability to perform the physical or non-physical duties of his occupation as an accountant. Where possible, please express any restrictions or limitations found in terms of how frequently (ie, never, occasionally, frequently, or constantly) Mr Harris could have been expected to perform various occupational tasks (eg, sitting, standing, walking, lifting up to x pounds, carrying, reaching, pushing, and pulling) in connection with full-time work.**

The records do not support any change in functional capacity. Some of the claimant's clinicians and consultants have asserted he is incapable of prolonged sitting because of back pain, but his chiropractor documented in 2018 that in late 2017 the claimant went on a long flight that resulted in knee pain, not back pain. Individuals with chronic low back pain can use desks that may be raised or lowered to allow switching between sitting and standing. There is no reason ergonomic adjustments cannot enable someone with the claimant's conditions to engage in sustained, full-time productive activity.

**4. To the extent your opinion as to Mr Harris's functional capacity has changed and you now believe that his medically supported restrictions and limitations as of April 22, 2019, exceed those that you identified in your prior report and addendum, please also identify all medically supported restrictions and limitations from April 22, 2019, to the present. Please specifically identify the time periods for which such restrictions and limitations would, in your professional medical opinion, be supported.**

The records do not support any change in functional capacity.

**All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent record in the file which is:** MRI report dated 3/16/2023

David Carl Houghton, MD, FACP
Consulting physician (internal medicine), Lincoln Financial

*I affirm that I have no conflict of interest in this review. My compensation is not dependent on the specific outcome of this review nor on the opinions it contains. All opinions are advisory only, independently developed by myself, and are based upon the preponderance of evidence available from the records made available, as well as current standards of medical practice contained in broadly acknowledged professional medical publications.*

Representative/relevant data from 1569 pages of medical records made available for review:

1/10/17 Jose Mathew, MD (pain mgmt): R hip/leg and low back pain. New pt. Began Oct 2016 after MVA. Pain 10/10. BMI 40.7. Strength, DTRs and sensation normal, decr cervical and LS ROM w/ TTP, +SLR R. Lumbar spondylosis w/ radiculopathy. Start cyclobenzaprine HS, hydrocodone 10mg #90. UDS+ benzo. Continue chiro since it's providing relief. Consider facet joint injections.

1/24/17 Mark Feeman, DO (physiatry): Pain impairs concentration & cognition and problem-solving skills, "he also lacks productivity."

1/31/17 Dina Patel, NP; Jose Mathew, MD (pain mgmt): Pain 10/10, L hip, L leg, low back. Better w/ meds. No side effects, helps to perform daily activities. Hydrocodone 10mg #90 and cyclobenzaprine HS. BMI 40.7. Strength, sensation, DTRs normal, normal cervical ROM, LS spine stiff and TTP, neg SLR. Lumbar radiculopathy. Wants to hold off on ESI.

1/31/17 Meredith Magner, PA-C: Disability parking placard. Permanent disability. Severely limited in ability to walk.

2/28/17 UDS: +opiate.

5/16/2017 Jose Mathew, MD (pain mgmt): BMI 41.6, No distress, normal strength, sensation, DTRs, TTP/stiffness of cervical and lumbar spine, neg SLR.

5/9/18 L Okun, DC: Plays golf for exercise 2mos ago hurt his elbow golfing, got a steroid shot that didn't help. 6mos ago had a long flight that caused his knees to hurt. Back can only flex 10 degrees (unable to sit in car). Normal DTRs. Iliopsoas 3/5 R, 2/5 L. Hamstrings 3/5 B/L. B/L foot dorsiflexion 3/5. BL calf 1/5. L spine severely spasms if knees are bent (unable to sit in car).

4/22/19 L Okun, DC: Recommend prolonged standing. R anterior shoulder, L dorsal neck, L posterior shoulder pain. 10/10 on average throughout the day (continuous). Never gets better than 10/10. Bilateral LS/buttock pain 10/10 continuously, at best 8/10. "Dr Mark Feeman of Rehabilitation Physicians Group told patient he is 'permanently and totally disabled.'" Normal cervical ROM. L deltoid 2/5 strength, L triceps 3/5, B/L iliopsoas 3/5, B/L quadriceps 3/5, B/L hamstrings 3/5. SLR+ on R at 0 degrees w/ severe pain (unable to sit in a car). Only able to externally rotate R shoulder 10 degrees and extend 30 degrees. Only able to abduct L shoulder 40 degrees, flex 40 degrees, externally rotate 10 degrees. Can't raise arms.

4/26/19 Scott M Linacre, PA (pain mgmt): Pain 10/10 w/o meds, 8/10 with. No side effects. BMI 38.2. Normal strength, decr sensation in both L4-5 dermatomes, TTP cervical and LS spine w/ stiffness, SLR+ bilaterally. Starting chiro and "decompression treatments." Consider injections although they didn't work before.

5/16/19 Mark Feeman, DO (physiatry): Duplicate form from 1/24/17 with new date using whiteout (5/2/22 affidavit states the original date was wrong). The affidavit says he examined the claimant on 5/16/19 but no clinical documentation has been made available.

5/20/19 Donald A Capoferri, DC (chiropractic independent medical evaluation): In addition to spondylolisthesis mentioned in original review, decreased ROM of cervical and lumbar spine was documented. Constant neck pain 9/10, constant LB+ buttocks+posterior R leg/foot 9/10, constant R knee pain 9/10. Constant pain/paresthesia L posterior shoulder/arm and dorsal hand related to 10/4/16 MVA, 9/10. Severe pain w/ provocative tests but no radicular pain w/ SLR. Some LUE radicular pain w/ compression. Decr sensation R C4-6, S1, 1+DTR R triceps & BR, all other UE DTRs 0. 3+ L patellar DTR, 2+R, 2+ L ankle, 0 R ankle. 3/5 bilateral biceps, 3/5 L triceps, 3/5 L wrist and finger extensors/abductors. 3/5 R iliopsoas & quads & great toe dorsiflexion, 5/5 all other LE. Severe spasm R back.

6/27/19 Chinyere Okonkwo, FNP; Jose Mathew, MD (pain mgmt): Pain 10/10 average, 7/10 w/ meds. Meds help w/ daily fxn, no side effects. BMI 39. Strength, DTRs, sensation normal. Cervical and LS spine TTP and stiff, neg SLR. 2d ago had surgery on R axilla hidradenitis mass, pain mostly from that. Incr from 105 hydrocodone tabs to 115 per month.

7/24/19 Amit M Patel, MD (pain mgmt): Pain 8/10 average, 10/10 w/o meds, 5/10 with. Meds help w/ daily fxn, no side effects. BMI 39. R axilla w/ dressing, oozing, TTP. Sensation/DTRs normal, TTP cervical and LS spine w/ stiffness, neg SLR. Hidradenitis mass removed from R axilla a month ago. Pain mostly from that. Continue 115 tabs hydrocodone per month.

8/12/19 Dr Orenstein (derm): R axilla open wound healing well w/ small granulation and tender SC nodules. L groin nodules. Multiple scars (axilla, buttocks, groin). Continue doxy and exercises, f/u 3mos. Call if you want surgery for lesions on buttocks or L axilla.

8/19/19 Virgil Harris (appeal): "They want me to schedule the next surgeries for other active areas [of hidradenitis] include armpits, buttocks, groin, and are continuous and never ending… The reviewing physicians are…demonstrating a lack of effort to review the entire file, and a lack of knowledge on hidradenitis suppurativa Hurley stage 2-3."

8/19/19 Victor J Blake, MD (IM): Htn f/u. Neck/back pain since Oct 2016 MVA. 8-10/10 better w/ meds. Radiates to feet R>L. Had surgery R axilla, still has 8-10/10 pinching pain in both axillae. Paresthesia from neck pain. ROS neg. Neck TTP/stiffness. Crouched gait w/ small footsteps. R axillary incision CDI L axilla contracture w/ nodules. Exam o/w normal. Continue same tx.

8/20/19 Chad Lee, MD (pain mgmt): Pain average 8/10, w/o meds 9/10, with 5/10. Meds help w/ daily fxn, no side effects. BMI 39. Same exam as 4/24/20. Had hidradenitis surgery, will decr to 105 tabs of hydrocodone per month.

9/26/19 Chad Lee, MD (pain mgmt): Pain 9/10 average, 10/10 w/o meds, 7/10 with. Meds help w/ daily fxn, no side effects. Same exam as 4/24/20. Taking more meds due to hidradenitis, go back from 105 to 115 tabs of hydrocodone a month.

10/22/19 Chad Lee, MD (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. Meds help w/ daily fxn, no side effects. Same exam as 4/24/20. "He is in litigation for [neck and back pain] and is planning on getting surgery once it is settled."

11/22/19 Scott M Linacre, PA; Jose Mathew, MD (pain mgmt): Pain 9/10 average, 10/10 w/o meds, 8/10 with. Meds help w/ daily fxn, no side effects. Same exam as 4/24/20. "Awaiting attorney to clear lumbar surgery. His pain is stable."

12/23/19 Dalandra Belcher, APRN, FNP-C; Amit Patel, MD (pain mgmt): Pain 8/10 average, 10/10 w/o meds, 6/10 with. Meds help w/ daily fxn, no side effects. Normal strength and sensation and DTRs. TTP cervical and LS spine w/ stiffness, SLR neg. UDS+ opiate. "Lumbar surgery pending funding." UDS+ opiate.

1/22/20 Chad Lee, MD (pain mgmt): Pain 9/10 average, 5/10 w/ meds, 10/10 w/o. No side effects. Same exam as 4/24/20. Steroid taper for pain flare after trying to do jumping jack.

2/25/20 Scott M Linacre, PA; Jose Mathew, MD (pain mgmt): Pain 9/10 w/ meds, 10/10 w/o. Meds help w/ daily fxn, no side effects. Same exam as 4/24/20. Deposition done, waiting for approval for surgery.

3/24/20 Chinyere Okonkwo, FNP; Chad Lee, MD (pain mgmt): Pain average 8/10, 10/10 w/o meds, 4/10 with. Meds help w/ daily fxn, no side effects. Normal strength and sensation and DTRs. TTP cervical and LS spine w/ stiffness, SLR neg. Recently had R knee injection by ortho. Waiting for approval for back surgery, "deposition is already done" but covid is slowing things down.

4/24/20 Scott M Linacre, PA; Jose Mathew, MD (pain mgmt): Pain average 8/10, 10/10 w/o meds, 4/10 with. Meds help w/ daily fxn, no side effects. BMI 38.8. Same exam as 10/21/20. UDS neg. Surgery has been delayed due to covid.

5/19/20 Chad Lee, MD (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. Meds help w/ daily fxn, no side effects. BMI 38.8. Same exam as 10/21/20. Had legal deposition 2wks ago, "waiting for clearance for surgery."

6/23/20 Gerald Chai, DO (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. Meds help w/ daily fxn, no side effects. BMI 38.9. Same exam as 10/21/20. UDS+ hydrocodone.

7/21/20 Gerald Chai, DO (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. Meds help w/ daily fxn, no side effects. Same exam as 10/21/20. "Still researching neurosurgeons."

8/19/20 Deborah Wilkens, FNP; Chad Lee, MD (pain mgmt): Pain averages 7/10, 3/10 w/ meds, 10/10 w/o. No side effects, helps w/ performing daily functions. Same exam as 10/21/20.

8/26/20 Logan M Eberly, MD (cardiology): Feeling well, no complaints. Chronic back pain. Hydrocodone 10mg bid, gaba 300mg tid, cyclobenzaprine 5mg tid prn.

9/22/20 Gerald Chai, DO (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. LBP rad down legs, knees R>L, neck pain rad to LUE. No side effects, helps w/ performing daily functions. Same exam as 10/21/20. "Proposed upcoming back surgery. Pt had second opinion of Ortho Atlanta and diagnosed with neuritis." Pain tolerable w/ meds and no side effects.

10/21/20 Deborah Wilkens, FNP; Adam Gover, MD (pain mgmt): Pain in neck/LUE/low back/hips/R knee. 8/10 average, 10/10 max, 4/10 w/ meds. No side effects. BMI 37. 4/5 strength in BLE, normal DTRs and sensation, TTP cervical and LS spine w/ stiffness, equivocal SLR. "He sees Dr Bendicks and is waiting on approval for both lumbar and cervical surgeries, it's related to a MVA from 2016." Meds help him stay functional.

11/18/20 Deborah Wilkens, FNP; Adam Gover, MD (pain mgmt): Pain 8/10 average. 9/10 w/o meds. 7/10 with. Slight drowsiness w/ muscle relaxant (used at HS). Able to do daily life activities. BMI 36.8. Normal strength and DTRs and sensation, TTP/stiff neck/LS spine w/ neg SLR. Same tx. "Following with surgeon… This past week he had court case regarding his MVA and hopes cases will be closed by the beginning of the year." Meds allow him "to remain functional."

12/15/20 Scott M Linacre, PA; Chad Lee, MD (pain mgmt): 8/10 average pain, 10/10 w/o meds, 6/10 with. Neck, LUE, low back, RLE. No side effects, helps daily activities. Same exam as 8/11/21. Same tx. "Awaiting approval of his case to move forward with surgery."

12/16/20 Mark Feeman, DO (physiatry): LBP 8/10 w/ bilateral sciatica. ROS: trouble sleeping, claudication, neck pain, confusion, memory loss, inability to concentrate, HA. Slow, cautious gait, acute distress, decr light touch R L5/S1, L S1; L dorsiflexion 4/5, bilateral great toe dorsiflexion 4/5. Decr LS spine motion, TTP bilateral gluteus, iliolumbar, piriformis, quadratus lumborum. "Not able to be predictably productive in the workplace. They cannot stand, walk or sit for prolonged periods of time, and will need to rest and change positions throughout the day. At times, the pain will reach levels where they will not be able to go to work, may miss many days/month. This patient is disabled from any and all employment."

1/19/21 Scott M Linacre, PA; Chad Lee, MD (pain mgmt): 8/10 average pain. Mostly neck, low back, leg. No side effects. Helps w/ ADLs. Same exam as 2/16/21. Same tx. UDS neg. "Case is near completion and will hopefully be cleared for surgery."

2/16/21 Chad Lee, MD (pain mgmt): 7/10 average pain. BMI 39. R knee TTP and stiff, 4/5 BLE strength, DTRs normal UE/LE, c-spine TTP and stiff, LS spine TTP w/ equivocal SLR. Same tx. Awaiting approval for surgery. No side effects.

3/17/21 Deborah Wilkens, FNP; Chad Lee, MD (pain mgmt): 7/10 average pain, 10/10 w/o meds, 6/10 with. Mostly LBP w/ R leg/foot, also neck w/ LUE. No side effects. Does ADLs. BMI 40.2. Same exam as 8/11/21 but +SLR R. Same tx. Awaiting approval for surgery.

4/20/21 Dalandra Belcher, APRN, FNP-C; Jose Mathew, MD (pain mgmt): 9/10 average pain, 10/10 w/o meds, 7/10 with. LBP, R leg and foot. No side effects, can do daily activities w/ less pain. Same exam as 8/11/21 but neg SLR. Same tx.

LIN SUPP000011

5/17/21 Chad Lee, MD (pain mgmt): 8/10 average pain, 10/10 w/ meds, 3/10 with. Mostly neck & LUE. No side effects. Same exam as 8/11/21. Same tx. "Awaiting approval for surgery."

6/2/21 Nurcan Ilksoy, MD (IM): Here to establish care. Hidradenitis suppurativa, R knee arthritis chronic back pain. Neck pain/stiffness. Stands at times during the visit to help w/ back pain. Neck stiffness. Exam o/w unremarkable. No skin lesions in groin/gluteal cleft.

6/16/21 Adam Gover, MD (pain mgmt): 7/10 average pain, 10/10 w/o meds, 6/10 with. Mostly neck and low back. No side effects. BMI 39.8. Same exam as 8/11/21. Same tx.

7/14/21 Christine L Nell-Dybdahl, NP (cardiology): BMI 37.5. Feeling well, no complaints. Exercise limited by back pain and R foot neuroma. Golfs, rides in cart.

7/15/21 Thomas Cheriyan, MD (pain mgmt): 8/10 pain w/ meds, 10/10 w/o. BMI 39.8. Same exam as 8/11/21. Same tx. Waiting on surgery.

8/11/21 Ngoc Tran, PA-C, Chad Lee, MD (pain mgmt): 8/10 pain average. Low back, neck. No side effects, better ADLs. Same exam as 9/8, equivocal SLR. Same tx. Will get surgery in next few months. UDS+ opiate.

9/8/22 Ngoc Tran, PA-C, Adam Gover, MD (pain mgmt): 8/10 pain average. Neck, low back. RLE. No side effects. BMI 39.8. TTP R knee w/ stiffness, 4/5 strength BLE, DTRs normal, TTP c-spine and LS spine w/ stiffness. Same tx. UDS shows meds not being used. Database shows no other use.

9/22/21 Adam Gover, MD (pain mgmt): Pain 6/10 w/ meds. Low back and neck. No side effects. BMI 39.8. R knee TTP w/ decr ROM. 4/5 strength in BLE, DTRs normal, decr ROM neck/low back w/ TTP and equivocal SLR. Same tx. UDS+ opiate.

10/7/21 Anna P Kho, MD (IM): Telemedicine. Had 1 day of R leg swelling, neg US at ED. Resolved. No current skin abscesses. Neck stiffness, R knee pain.

10/11/21 Douglas Freilberger, MD (pain mgmt): 7/10 pain w/ meds, 10/10 w/o. Neck, low back, R knee. No side effects from meds, they help complete daily activities. BMI 39.8. Normal strength and crepitus. TTP R knee. Decr ROM LS spine w/ TTP. Same tx. LBP w/ sciatica R>L, neck pain. ESI no help. Considering surgery. Knee injection helped.

10/25/21 Inho Kim, MD (EM): Exposed to covid on the golf course, SOB, nausea, diarrhea x2d. ROS neg. BP 156/84. Exam o/w normal. Normal gait, normal cervical ROM, normal skeletal ROM. Neg PCR. Hydrocodone 10mg qid, gaba 300mg tid.

12/9/21 Chad Lee, MD (pain mgmt): 8/10 pain, 9/10 w/o meds, 7/10 with. 80% pain reduction from knee injection. No side effects of meds. Normal strength and DTRs, R knee TTP w/ crepitus. Decr ROM w/ TTP lumbar spine. Bilateral primary OA knee, LS radiculopathy. Same tx. Will speak to spine surgeon.

1/10/22 Chenoa Dickerson, NP, Amit M Patel, MD (pain mgmt): Telemedicine. Had good relief of knee pain w/ injection. 7/10 average pain, 10/10 w/o meds, 5/10 with. "Able to walk with much less pain when previously they were not able." No side effects. UDS neg.

1/19/22 Christine L Nell-Dybdahl, NP (cardiology): Same hx as 7/14/21. Normal exam. Encouraged "regular activity."

2/10/22 Ngoc Tran, PA-C (pain mgmt): Pain 8/10 average, 9/10 w/o meds, 5/10 with. BMI 39.8. Normal strength, TTP R knee w/ crepitus, normal DTRs, decr ROM L spine w/ TTP. Cervical and lumbar radiculopathy. Same tx. Hasn't seen spine surgeon yet.

3/8/22 Dalandra Belcher, APRN, FNP-C; Jose Mathew, MD (pain mgmt): Pain 8/10 w/ meds, 10/10 w/o. BMI 39.8. Normal strength and DTRs, decr ROM and TTP of neck and L spine, neg SLR. Cervical and lumbar radiculopathy. Same tx.

4/7/22 Jose Mathew, MD (pain mgmt): Same pain as 6/8/22. No side effects. BMI 37.8. Normal strength, R knee TTP w/ crepitus, normal DTRs, decr ROM lumbar spine w/TTP. Same tx.

5/10/22 Dalandra Belcher, APRN, FNP-C, Jose Mathew, MD (pain mgmt): Same pain as 6/8/22. Mostly LBP w/ RLE radiation. No side effects. Meds improve mobility. Normal strength, BLE L4-S1 decr sensation. Decr ROM neck/low back w/ TTP and SLR+. Cervical and lumbar and radiculopathy. Same tx. "Awaiting for case to be settled to have surgery."

6/8/22 Ngoc Tran, PA-C (pain mgmt): Average pain 8/10, 5/10 w/ meds, 10/10 w/o. Mostly low back and neck. No side effects. Normal strength. Decr sensation and TTP and stiffness as noted on 9/26/22. Cervical and lumbar radiculopathy. Same tx. "Waiting for case to be settled to have surgery."

6/30/22 Tracey Lynn Henry, MD (IM): Telemedicine. Has healed from prior skin excisions but still has "pinched, sharp pains" in the groin. Stopped following up with derm in 2020. Planning for L4-S1 fusion "after going through the disability case." Some relief with meds. Some numbness in leg and feet. No weakness. BMI 36.4. "Some tract involvement from HS along left groin region, no drainage."Referred to derm, keep using topical steroid.

7/6/22 Ngoc Tran, PA-C (pain mgmt): 6/10 pain w/ meds, 7/10 w/o. No side effects. Can perform daily activities. Same exam as 9/26/22. Cervical radiculopathy. Same tx. LBP rad to LE. "Waiting for case to be settled to have surgery."

7/16/22 Dr Jose Matthew: Jury excusal for LS spondylosis and chronic pain.

7/21/22 Christine L Nell-Dybdahl, NP (cardiology): Same hx as 1/19/22. Normal exam. Encouraged "regular activity."

8/8/22 Jose Mathew, MD (pain mgmt): 8/10 average pain, 10/10 w/o meds, 6/10 with. Pain neck and low back w/ rad to LUE and RLE. Same exam as 9/26/22. Cervical and lumbar radiculopathy. Same tx. UDS neg.

9/7/22 Deborah Wilkens, FNP (pain mgmt): 7/10 pain average w/ meds, 9/10 without. Low back and neck. No side effects, can do all ADLs w/ meds. Same exam as 9/26. Cervical radiculopathy. Same tx. "Injections didn't help and he's waiting on a case to settle and likely have surgery." Last urine screen showed no opiate use. He says he's taking it. UDS+ opiate.

9/26/22 Jose Mathew, MD (pain mgmt): Average pain 8/10, with meds 5/10. 4/5 strength generally. Decr sensation L4-S1 R, decr ROM neck w/ TTP, same for L spine w/ +SLR bilaterally. Same tx.

10/7/22 Sarah Koumtouzoua, MD (IM): Same hx. Chronic back/neck pain. Same exam. Same plan.

10/25/22 Dalandra Belcher, FNP-C (pain medicine): Supervised by Jose Mathew, MD. Disability form. 1st seen 1/10/17. Lumbar spondylosis w/ radiculopathy. Taking hydrocodone 10mg qid, gabapentin 400mg bid, cyclobenzaprine 10mg/day. Causes sedation which would make competitive full-time employment difficult. Cannot even do sedentary work. Continuously disabled since 4/22/19. Has had an unreasonable number of absences form work (stopped working in 2016 before she began seeing him). Needs to lie down during an 8hr day. Pain in neck, LUE, low back, hips, R knee, R foot. 7/10 average w/ meds. Mostly neck and LBP rad to legs. No side effects from meds, which help him perform daily functions. 4/5 strength in BLE. Decr ROM neck, TTP. Decr ROM LS spine, TTP, SLR neg. Continue meds and exercise.

References

North American Spine Society. Clinical Guidelines for Multidisciplinary Spine Care: Diagnosis and Treatment of Degenerative Lumbar Spondylolisthesis. North American Spine Society, 2014. https://www.spine.org/Portals/0/Assets/Downloads/ResearchClinicalCare/Guidelines/Spondylolisthesis.pdf

North American Spine Society. Clinical Guidelines for Multidisciplinary Spine Care: Diagnosis and Treatment of Adult Isthmic Spondylolisthesis. North American Spine Society, 2014. https://www.spine.org/Portals/0/assets/downloads/ResearchClinicalCare/Guidelines/AdultIsthmicSpondylolisthesis.pdf

White AP, et al. Utility of flexion-extension radiographs in evaluating the degenerative cervical spine. Spine. 2007 Apr 20;32(9):975-9. https://journals.lww.com/spinejournal/Abstract/2007/04200/Utility_of_Flexion_Extension_Radiographs_in.9.aspx

UpToDate monograph "Treatment and prognosis of cervical radiculopathy" updated 2/28/2023 https://www.uptodate.com/contents/treatment-and-prognosis-of-cervical-radiculopathy

UpToDate monograph "Subacute and chronic low back pain: surgical treatment" updated 2/7/2023 https://www.uptodate.com/contents/subacute-and-chronic-low-back-pain-surgical-treatment

UpToDate monograph "Lumbar spinal stenosis: treatment and prognosis" updated 2/1/2021 https://www.uptodate.com/contents/lumbar-spinal-stenosis-treatment-and-prognosis

UpToDate monograph "Subacute and chronic low back pain: Nonpharmacologic and pharmacologic treatment" updated 8/2/2022 https://www.uptodate.com/contents/subacute-and-chronic-low-back-pain-nonpharmacologic-and-pharmacologic-treatment

American College of Occupational and Environmental Medicine guideline "Low back disorders" accessed 3/30/2023 https://app.mdguidelines.com/acoem-section/acoem%2Fdisorders%2Flow-back-disorders

LIN SUPP000013

American College of Occupational and Environmental Medicine guideline "Chronic pain: behavioral interventions" accessed 3/30/2013
https://app.mdguidelines.com/acoem-section/acoem%2Fdisorders%2Fchronic-pain%2Fbehavioral-interventions

Rogers AH, et al. A meta-analysis of the associations of elements of the fear-avoidance model of chronic pain with negative affect, depression, anxiety, pain-related disability and pain intensity. European Journal of Pain 26:8, 1611-1635; September 2022.
https://onlinelibrary.wiley.com/doi/epdf/10.1002/ejp.1994

Linton SJ, et al. Understanding the etiology of chronic pain from a psychological perspective. Physical Therapy 98:5, 315-324; May 2018.
https://academic.oup.com/ptj/article/98/5/315/4925492

Crofford LJ. Chronic pain: where the body meets the brain. Transactions of the American Clinical and Climatological Association 126, 167-183; 2015.

American College of Occupational and Environmental Medicine Position Statement: The personal physician's role in helping patients with medical conditions stay at work or return to work. Journal of Occupational and Environmental Medicine 59:6, e125-e131; June 2017.
https://acoem.org/Guidance-and-Position-Statements/Guidance-and-Position-Statements/The-Personal-Physician-s-Role-in-Helping-Patients-with-Medical-Conditions-Stay-at-Work-or-Return-to

LIN SUPP000014

**Clinical Review Memo**

| Customer Name | Claimant Name | Claim Number |
|---|---|---|
| ROBERT HALF INTERNATIONAL INC. | VIRGIL HARRIS | 7223420 |

| Report Date: | 05/04/2023 | | |
|---|---|---|---|
| Referred By: | Barbara Peterman | Claimant DOB: | 01/16/1962 |
| Referral Date: | 04/18/2023 | Job Title: | ACCOUNTING CONSULTANT |
| Due Date: | 04/27/2023 | Medical/ Surgical Condition: | cervical and lumbosacral spondylolisthesis with radiculopathy, right knee osteoarthritis, hidradenitis suppurativa, morbid obesity |
| Referral Type: | Addendum | Disability Occupational Type: | |
| Reason for Priority Handling: | | Product Type: | LTD |
| Other Considerations | | LDW: | 10/14/2016 |
| | | DOD: | 10/15/2016 |
| Physical Demands: | | BBD: | 04/13/2017 |
| Non-Medical Issue: | yes | Non-Medical Issue Details: | holding off on surgery until litigation is concluded |

The last review was submitted on 3/30/2023. Since then the entire collection of records for this claim was resubmitted for review, including reports for new MRI studies of the cervical and lumbar spine, the findings of which are similar to those in previous MRI reports. Also included are a few recent pharmacy records. The entire file was reviewed again going back to October 2016 and no new clinical information was found. There is nothing there to contradict the findings of the last review.

**All medical records provided by Lincoln Financial Group as of today's date were reviewed, including the most recent record in the file which is:** MRI of the cervical and lumbar spine dated 3/16/2023

David Carl Houghton, MD, FACP
Consulting physician (internal medicine), Lincoln Financial

*I affirm that I have no conflict of interest in this review. My compensation is not dependent on the specific outcome of this review nor on the opinions it contains. All opinions are advisory only, independently developed by myself, and are based upon the preponderance of evidence available from the records made available, as well as current standards of medical practice contained in broadly acknowledged professional medical publications.*

**Clinical Review Memo**

| Customer Name | Claimant Name | Claim Number |
|---|---|---|
| ROBERT HALF INTERNATIONAL INC. | VIRGIL HARRIS | 7223420 |

| | | | |
|---|---|---|---|
| **Report Date:** | 4/28/23 | | |
| **Referred By:** | Jodi George | **Claimant DOB:** | 01/16/1962 |
| **Referral Date:** | 03/30/2023 | **Job Title:** | SALARIED PROFESSIONAL- ACCOUNTING CONSULTANT |
| **Due Date:** | 04/08/2023 | **Medical/ Surgical Condition:** | Low Back Pain and Radiculopathy, cervical region |
| **Referral Type:** | Addendum | **Disability Occupational Type:** | |
| **Reason for Priority Handling:** | | **Product Type:** | LTD |
| **Other Considerations** | | **LDW:** | 10/14/2016 |
| | | **DOD:** | 10/15/2016 |
| **Physical Demands:** | | **BBD:** | 04/13/2017 |
| **Non-Medical Issue:** | No | **Non-Medical Issue Details:** | |

**Core Questions**

1. **Taking into consideration the entire clinical picture, including all of the evidence submitted since the date of your last review and addendum, does your opinion as to Mr. Harris's functional capacity as of April 22, 2019 remain the same? Please explain why or why not.**

All available medical records (those prior to the last review as well as the newly provided medical records) have been reviewed for the purposes of this addendum. The clinical information within the available medical records and the significant discrepancies and inconsistencies contained within them precludes coming to any evidenced-based clinical conclusion other than the ones stated within the last review.

A-Inconsistency in neuromuscular physical exam findings pertinent to functionality

In the case of significant neuromuscular impairment caused by an objective neuromuscular diagnosis there should be congruence and consistency in objective physical exam findings amongst providers, especially on findings that should not be temporally variable such as muscle strength, skin sensation, and maneuvers indicative of mechanically pinched nerves. This is not the case within the available medical records for Mr. Harris. For example, on 10/25/22,

Dalandra Belcher NP states 4/5 strength in lower extremities, sensation grossly intact in upper and lower extremities, and negative straight leg raise (exam maneuver testing for spinal pinched nerve related pain) but on 5/10/22 she indicates strength grossly intact in upper and lower extremities, sensation decreased in lower extremities, and positive straight leg raise; on 9/26/22, Dr. Jose Matthew indicates 4-4+/5 strength in lower extremities, decreased sensation in the lower extremities, and positive straight leg raise but on 4/7/22 indicates strength is grossly intact in upper and lower extremities and sensation grossly intact in upper and lower extremities; on 7/6/22, PA Ngoc Tran indicates strength grossly intact in upper and lower extremities, decreased sensation in lower extremities, and positive straight leg raise.

The above discrepancies are just a few amongst others found within the most recent office visit notes from 2022 and are all from pain management specialists who are trained in evaluating and documenting spinal musculoskeletal and pain related physical exam findings. Not only are these discrepancies found amongst different providers but are sometimes found within different notes by the same provider, as evidenced above.

A few more examples: on 12/9/21, Dr. Chad Lee indicates strength grossly intact in upper and lower extremities and sensation grossly intact in upper and lower extremities but on 9/26/19 indicates strength 4/5 in bilateral lower extremities, sensation grossly intact in upper and lower extremities, and equivocal straight leg raise; Dr. Inho Kim on 10/25/21 indicates no focal neurological deficits and normal gait, Dr. Douglas Freiberger on 10/11/21 notes strength is grossly intact in upper and lower extremities and sensation is grossly intact in upper and lower extremities; Dr. Adam Gover on 9/22/21 indicates 4/5 bilateral lower extremity strength, sensation grossly intact in upper and lower extremities, and equivocal straight leg raise; Dr. Mark Feeman on 12/16/20 indicates slow and cautious gait, decreased sensation to light touch in right L5/S1 and left S1 dermatomes and strength is 5/5 throughout in upper and lower extremities except for 4/5 in left ankle flexion and bilateral toe extensors, Dr. Peter Symbas (ortho) indicates on 3/6/20 normal gait, no limp, sensation on right dermatomes L2-L5 all normal, strength of right knee flexion and extension 5/5; Ms. Dalandra Belcher NP on 12/23/19 indicates strength grossly intact in upper and lower extremities, sensation grossly intact in upper and lower extremities, and negative straight leg raise; on 7/24/19 Dr. Amit Patel indicates sensation grossly intact in upper and lower extremities and negative straight leg raise; on 6/27/19 NP Chinyere Okonkwo indicates strength is grossly intact in upper and lower extremities, sensation is grossly intact in upper and lower extremities, and negative straight leg raise; on 5/20/19, Dr. Capoferri indicates strength 3/5 in almost all left arm muscles and 3-5/5 in right arm muscle groups, 5/5 strength in left leg muscles, and 3-5/5 strength in right leg muscle groups; on 12/20/18, Dr. Erik Bendiks indicates able to ambulate without difficulty, positive bilateral seated straight leg raise, muscle strength 5/5 in upper and lower extremities and equal symmetrically, diminished sensation of thumb and fingers of right hand and intact sensation in lower extremities, and on 9/1/17 NP Dina Patel indicates strength 5/5 in upper and lower extremities, sensation grossly intact in upper and lower extremities, and negative straight leg raise bilaterally.

Given the biomechanical nature of the stated cervical and lumbar medical diagnoses, if there was significant impairment, one would expect to see consistency and not such stark and frequent variability with these objective measures. The fact that there is such frequent discrepancies across numerous medical providers on the same exam maneuvers calls into question the validity and significance of the above-mentioned findings.

The neuromuscular exam finding consistencies that <u>do</u> appear within the available notes, however, include decreased range of motion within the cervical and lumbar spine and tenderness to palpation along the paraspinals and facet joints which are consistent with the MRI findings of cervical and lumbar degenerative disc disease and spondylosis. These consistent findings were taken into consideration within the restrictions and limitations outlined in the previous report.

B- Inconsistency with pain related exam findings and severity of reported pain

Since pain intensity is a subjective measure, correlation with objective data such as physical exam findings and the level/intensity of pain management provided is necessary to validate the level of claimed pain.

There is a discrepancy within the available medical records between the degree of reported pain and pain related exam findings. For example, within notes where there is a reported 7-10/10 pain which is generally considered very severe pain, one would expect to see any one or more of the following physical exam findings: increased heart rate, laboured breath, difficulty/inability to converse, associated affect disturbances (distorted facial expressions, moaning, crying out), inability to move, walk, or drive, etc. There are no consistent physical exam findings similar to any of the above-mentioned signs in the pain management notes where the specialists are specifically evaluating and treating the claimant as it pertains to his pain and are evaluating him quite regularly (almost monthly since 2017) for this. Rather, there is consistent documentation in all pain management office visit notes from various providers, even within the office visits that have reported pain levels of 7-10/10, that the claimant is in "NAD"/no acute distress, has normal heart rate and unlabored respirations, converses appropriately, is alert and oriented, and has appropriate affect (observable facial and behavioral expressions of how one is feeling). Other specialty provider notes indicate similar findings such as "resting in chair comfortably, in no acute distress" (Dr. Samuel Parks 10/7/22 and Dr. Tony Zhuang 6/30/22, internal medicine); "sitting upright in chair in NAD… easy work of breathing…" (Dr. Amara Zulfiqar 11/8/21); "NAD…normal gait, no limp…normal mood and affect and active and alert" (Dr. Peter Symbas 3/6/20, ortho); "patient appears comfortable, not anxious or diaphoretic…" (Dr. Salih Samo 01/21/20); "no distress…resp non labored" (Neil Kapil 10/28/19); "able to ambulate without difficulty" (Dr. Erik Bendiks 12/20/18, spine surgeon). In contrast, Dr. Feeman and Dr. Capoferri are some of the few providers that document exam findings of "in acute distress" or "in pain, antalgic, visibly uncomfortable", which seems to be in stark contrast to the opposing information found in multiple other notes by multiple other providers, across multiple medical specialities including pain management, spine surgery, and orthopedics, as outlined above. The variability and opposing physical exam findings

LIN SUPP000018

documented within the records as it pertains to pain and functionality prevents the ability to use them to come to any justifiable conclusions.

C- Inconsistency of level of treatment plan and severity of reported pain

Furthermore, a claim of severe and impairing pain (including no ability to carry out work or other of one's usual life activities due to pain) indicates poorly controlled pain and standard of care would necessitate escalation of treatment, dose increases, or trials of different or additional medications until one's pain was either controlled to manageable levels that still allow functioning or one was found to have severe and debilitating pain refractory to medical management. The records, however, indicate the claimant has been on a very stable regimen of one lower potency opiate (hydrocodone), one neuropathic agent (gabapentin), and one muscle relaxer only at night (cyclobenzaprine) for years. A relatively stable medication regimen for years without need for significant dosage escalations or medication changes is not consistent with severe functional impairment from pain.

D- Inconsistency of usage of medications and severity of reported pain

Additionally, there have been two instances of an inconsistent urine drug screen on monthly pain office visit notes that were discussed with the claimant because it was a breach in his pain contract, ie. no appreciable drug levels were detected of hydrocodone or it's metabolites on random urine drug screens. If a hydrocodone level is undetectable on a urine drug screen, given the half-life of hydrocodone, it means there has not been use of that pain medication for at least 1-3 days, including the day of examination where it was still noted that the claimant was in no acute distress and appropriately conversant. This information is also not consistent with a significant level of impairment from a chronic pain condition.

E- Inconsistency with report of side effects of medications

There is also a discrepancy regarding claimed cognitive impairment from medication side effects. Within the available medical records are monthly pain management office visit notes from 2017 onwards (more than 60) including the last available pain management office visit note dated 10/25/22 by Ms. Delandra Belcher, NP. Ms. Belcher and all of her other pain medicine colleagues within her practice have clearly indicated in all the previous 60-70 office visits notes: "patient denies any side effects from the medication". Furthermore, in the wide array of medical pain management options, ordinarily if a medication is found to produce side effects that are impairing, one would expect to see consideration of one of the many other medications or non-medication options for managing pain that would allow continued function. This does not appear to be the case within the available medical records. Additionally, both Dr. Feeman and PA Lisha Davis (1/23/17 and 9/17/18) have specifically indicated within their notes "alert and oriented, immediate, recent, remote memory intact and normal concentration, intelligence"; the claimant had the same three medications prescribed (hydrocodone, gabapentin, cyclobenzaprine) during the time period of both of these visits and per these medical evaluations, displayed normal concentration abilities. Accordingly, in view of the above

LIN SUPP000019

information in medical treatment records, there is no medical basis upon which to conclude that the claimant has been significantly impaired by side effects from the prescribed medications. However, there is a subsequent questionnaire dated 10/25/22 (that does not appear to be part of the regular medical treatment records from an unidentified source that appears to have been sent to Georgia Pain and Wellness Center) that is signed by NP Dalandra Belcher which contains questions that have elicited responses that appear to be inconsistent with the information noted above from actual treatment records.

The number and type of discrepancies contained within the records are not consistent with a significant degree of impairment. Despite the above-mentioned discrepancies, significant activity restrictions were still outlined in the previous review based on data that was clinically consistent. Please reference the original review dated 8/22/19 for the full description of restrictions or limitations.

2.  **In further explaining your answer above, please specifically address the weight or consideration you have given to each of the following:**

   (a)   **The newly-submitted medical records, reports, and other documents that date from before August 23, 2019, from: Dr. Eric Bendiks (*see*, *e.g.*, 680, 779); Dr. Donald Capoferri (*see*, *e.g.*, 232, 239, 270); Dr. Mark Feeman (*see*, *e.g.*, 80, 81); Dr. Chad Lee (*see*, *e.g.*, 488); Dr. Jose Mathew (*see*, *e.g.*, 583, 678); Dr. Amit Patel (*see*, *e.g.*, 492); Physician Assistant Scott Linacre (see, e.g., 500); Physician Assistant Chinyere Okonkwo (*see*, *e.g.*, 496); and Nurse Practitioner Dina Patel (*see*, *e.g.*, 580).**

All available records including the above have been reviewed for the purposes of this report. Relevant specifics have been discussed elsewhere either within this review or within previous reviews.

   (b)   **The newly-submitted medical records, reports, and other documents that date from after August 23, 2019.**

All the available medical records have been reviewed for the purposes of this report.

   (c)   **The various MRI reports contained in the record and the newly submitted documents (including the MRI reports dated February 2, 2015; October 7, 2016; January 24, 2017; June 11, 2018), and Mr. Harris's contention that the February 2, 2015 MRI report does not actually pertain to him, but to some other person who happens to have the same name but a different birth date.**

All cervical and lumbar MRIs within the available medical records have been reviewed for the purposes of this review except that of the 2015 MRI which contains inconsistent information regarding date of birth. The cervical and lumbar spine MRIs indicate multilevel degenerative disc disease and multilevel spondylosis (arthritic changes). These findings correlate with the consistent physical exam findings of decreased range of motion and pain with palpation along

facet joints. There are no findings of acute or chronic spinal cord pathology (myelomalacia) or definitive nerve root impingement. The 2018 lumbar MRI suggests possible nerve root irritation but states no definite impingement is seen. The 2023 lumbar MRI does not mention any nerve root impingement or irritation. The above findings were taken into consideration along with other pertinent data within the available medical records and influenced the restrictions and limitations outlined within the previous review and continue to support those conclusions.

**(d)     Mr. Harris's subjective self-reports of pain, both before and after his October 4, 2016 automobile accident, and the extent to which, in your opinion, they would impair Mr. Harris's ability to perform the non-physical duties of his occupation as an accountant.**

Please see previous answers regarding reported pain levels.

**(e)     Mr. Harris's self-reported work activity, exercise, and recreational activities at different times, as reflected in the record and the newly-submitted documents.**

The available medical office visit notes indicate self-reports of being a golfer where he "rides the course and will golf." The available medical records also mention "patient is stable on current medication regimen, which keeps the pain at a tolerable level allowing function without side effects", "pain is improved with light activity, back brace, and Epsom salt", "pain is improved with pain medication and exercise", "pain is improved with rest, light exercise, and medication" "the functional benefits from the medications include: Allows patient to attempt working out", "Pt was exercising (jumping jacks) and injured right knee". These reported activities do not appear consistent with severe functional impairment.

**(f)     Mr. Harris's contention that undated social medial postings apparent in the record pertain to events that occurred prior to his October 4, 2016 automobile accident.**

This reviewer does not use social media to any significant degree and has not given weight to any specific social media postings for the purposes of this review. I defer comment on any social media questions to those with more experience.

**(g)     The diagnoses of Mr. Harris's various neck and back conditions (including cervical and lumbosacral disc disorders, spondylosis, radiculopathy, and sciatica) and the opinions expressed by his treating practitioners, for example, in: Dr. Mark Feeman's letter dated January 24, 2017; Dr. Mark Feeman's "Physical Capacities Evaluation" dated January 24, 2017; Dr. Mark Feeman's "Physical Capacities Evaluation" dated May 16, 2019; Dr. Donald Capoferri's "Spinal Biomechanical Engineering Study" dated May 20, 2019; Dr. Donald Capoferri's report dated May 21, 2019; Dr. Mark Feeman's affidavit dated May 2, 2022; and Nurse Practitioner Dalandra Belcher's Questionnaire dated October 25, 2022.**

LIN SUPP000021

All available records including the above have been reviewed for the purposes of this report. Relevant specifics have been discussed elsewhere either within this review or within previous reviews. Additionally, Dr. Feeman's letter dated 1/24/17 indicates an opinion that the claimant is totally and permanently disabled due to his disc disorders as a result of a motor vehicle accident. The records indicate this accident occurred in October 2016. This statement from Dr. Feeman is written 3-4 months post-accident. The basis for Dr. Feeman's statement is unclear since 4 months is not enough time to account for adequate healing and improvement of spinal disc disorders with future treatment or natural recovery. It would be quite premature to make such a final conclusion. Even for such significant injuries as strokes, brain injuries, and spinal cord injuries, clinicians typically wait at least 1-2 years before commenting on maximum medical improvement.

It is also difficult to ascertain the justifications for some of Dr. Feeman's recommendations within his "Physical Capacities Evaluation" form dated 5/16/19. Within this form he recommends various restrictions including restrictions against using "feet for repetitive movements as in operating foot controls" but later in the form indicates that there are no restrictions on "driving automotive equipment". Most automotive equipment require use of foot controls with accelerators and brakes. The reasoning for some of these restrictions is unclear. He also references that the claimant's concentration, thought processes, cognitive, and problem-solving skills are affected; however, as indicated above, he and his colleague have specifically indicated in office visit notes that the claimant demonstrates normal concentration, intact memory, and normal alertness and orientation.

**(h)     Mr. Harris's hidradenitis suppurativa diagnosis and the opinions expressed by his treating dermatologist, Dr. Tova Rogers, in her letter of August 19, 2019.**

This report has focused primarily on impairment associated strictly with physical medicine diagnoses. I defer comment on impairment associated with any dermatologic condition to the appropriate specialist.

**(i)     Any other significant comorbid diagnoses or conditions apparent in the record.**

There is mention of right knee osteoarthritis that has been characterized as "mild" per PA Daniel Delozier's review of bilateral knee xrays. The last available orthopedic note is dated 7/20/20 from Mr. Delozier and indicates "…significant improvement of his knee pain following the injection given this past March… he was offered another injection but states the knee does not hurt enough for a shot". Dr. Chad Lee performed a right knee steroid injection on 11/10/21 and on 12/9/21 indicated "patient reports at least 80% reduction in pain from the procedure [right knee steroid injection]". There is no evidence within the available medical records regarding his right knee osteoarthritis that would support an inability of Mr. Harris from functioning within the restrictions and limitations as outlined in the previous report.

**(j)     The evidence, if any, of medication side-effects or limitations or restrictions due to Mr. Harris's medication or his other treatments.**

LIN SUPP000022

Please see previous discussion above regarding discrepancies in reported medication side effect.

> **(k)     Any other evidence contained in the newly-submitted documents that you believe to be particularly relevant to Mr. Harris's functional capacity as of April 22, 2019.**

N/A

3. **To the extent your opinion as to Mr. Harris's functional capacity has changed since your prior review and last addendum, please identify and describe the extent of any medically-supported restrictions and limitations that, in your professional medical opinion, existed as of April 22, 2019, which might affect his ability to perform the physical or non-physical duties of his occupation as an accountant.  Where possible, please express any restrictions or limitations found in terms of how frequently (*i.e.*, never, occasionally, frequently, or constantly) Mr. Harris could have been expected to perform various occupational tasks (*e.g.*, sitting, standing, walking, lifting up to *x* pounds, carrying, reaching, pushing, and pulling) in connection with full-time work.**

All available medical records (those prior to the last review as well as the newly provided medical records) have been reviewed for the purposes of this addendum. The clinical information within the available medical records and the significant discrepancies and inconsistencies contained within them precludes coming to any evidenced-based clinical conclusion other than the ones stated within the last review: no more than occasional standing or walking, ability to change positions as needed for comfort to accommodate neck and back pain, no more than occasional lifting up to 10lbs, no more than occasional reaching overhead and no lifting above shoulder level bilaterally. If stationed at a workstation, ergonomic set up will be required including screens at eye-level and avoidance of static positioning with head or neck in extremes of extension, flexion, or rotation. No climbing, crawling, crouching, kneeling. In the absence of surgery, these restrictions are reasonably supported permanently.

4. **To the extent your opinion as to Mr. Harris's functional capacity has changed and you now believe that his medically-supported restrictions and limitations as of April 22, 2019, exceed those that you identified in your prior report and addendum, please also identify all medically-supported restrictions and limitations from April 22, 2019, to the present. Please specifically identify the time periods for which such restrictions and limitations would, in your professional medical opinion, be supported.**

All available medical records (those prior to the last review as well as the newly provided medical records) have been reviewed for the purposes of this addendum. The clinical information within the available medical records and the significant discrepancies and inconsistencies contained within them precludes coming to any evidenced-based clinical conclusion other than the ones stated within the last review: no more than occasional standing or walking, ability to change positions as needed for comfort to accommodate neck and back

LIN SUPP000023

pain, no more than occasional lifting up to 10lbs, no more than occasional reaching overhead and no lifting above shoulder level bilaterally. If stationed at a workstation, ergonomic set up will be required including screens at eye-level and avoidance of static positioning with head or neck in extremes of extension, flexion, or rotation. No climbing, crawling, crouching, kneeling. In the absence of surgery, these restrictions are reasonably supported permanently.

*<<ELECTRONICALLY SIGNED>>*

Sheila Natarajan, MD, FAAPMR

Board Certified Physical Medicine and Rehabilitation

Consulting Physician

Lincoln Financial Group

LIN SUPP000024